FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION       2012 JAN 30 P 3: 49

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

-----------------------------------------------------x
DAVID HOPPAUGH, Individually and On   :
Behalf of All Others Similarly Situated,   :       Civil Action No:
                                          :                    1 : 12 c V 103
          Plaintiff,                      :                         CmH/IDD
                                          :       CLASS ACTION COMPLAINT
     vs.                                  :       FOR VIOLATION OF THE FEDERAL
                                          :       SECURITIES LAWS
K12 INC., RONALD J. PACKARD, and          :
HARRY T. HAWKS,                           :       JURY TRIAL DEMANDED
                                          :
          Defendants.                     :
                                          :
-----------------------------------------------------X

The allegations in this Complaint are based upon Plaintiff's personal knowledge as to Plaintiff's own acts, and are based upon information and belief as to all other matters alleged herein. Plaintiff's information and belief is based upon the investigation by Plaintiff's counsel into the facts and circumstances alleged herein, including, without limitation, a review and analysis of United States Securities and Exchange Commission ("SEC") filings by K12 Inc. ("K12" or the "Company"), as well as press releases, analyst reports, public statements, news articles and other publications disseminated by or concerning K12 and the other defendants named herein (together with K12, the "Defendants"). Many additional facts supporting the allegations herein are known only to the Defendants and/or are within their exclusive custody or control. Plaintiff believes that additional evidentiary support for the allegations herein will emerge after a reasonable opportunity to conduct discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of investors who purchased or otherwise acquired K12 common stock between September 9, 2009 and December 16, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder. These claims are asserted against K12 and certain of its officers who made materially false and misleading statements and omissions during the Class Period in press releases, analyst conference calls, and filings with the SEC.

2.      K12 is a technology-based education company. K12 offers proprietary curriculum, software systems and educational services designed to facilitate individualized learning for students primarily in kindergarten through 12th grade, or K-12. The Company purports to provide access to engaging and effective education, regardless of geographic location or socio-economic background. The Company delivers its educational content and learning

systems to students primarily through virtual (*i.e.*, online) public schools, virtual private schools, and through sales directly to school districts.

3.      During the Class Period, Defendants issued materially false and misleading statements regarding the Company's business and financial results. Specifically, Defendants misstated and/or failed to disclose that the Company had been engaging in abusive and deceptive student recruiting and flawed academic assessment practices, thereby increasing K12's student enrollment and revenues. As a result of Defendants' false statements and material omissions, K12 common stock traded at artificially inflated prices during the Class Period, reaching a high of $39.74 per share on April 29, 2011.

4.      Then on December 12, 2011, before the market opened, *The New York Times* released an article (the "NYT Article") titled "Profits and Questions at Online Charter Schools" chronicling a myriad of improper practices at K12's main virtual charter schools, including (i) high-pressure sales strategies aimed strictly at enrolling students, irrespective of the students' suitability for online education; (ii) administrative pressure to pass enrolled students, regardless of academic performance; and (iii) overall failure of K12 students to maintain grade-level performance in math and reading. Specifically, the NYT Article questioned Chief Executive Officer Ronald J. Packard's upbeat characterization of K12 students' performance on standardized tests. According to the NYT Article, Packard told investors that students at K12's Agora Cyber Charter School scored "significantly higher than a typical school on state administered tests for growth." The NYT Article indicated, however, that data had previously been released demonstrating that 42% of Agora students tested at grade level or better in math, compared with 75% of students statewide, and 52% of Agora students had hit the mark in reading, compared with 72% statewide. The NYT article also detailed issues such as high

withdrawal rates; aggressive sales practices that sought to place students in K12 schools, regardless of compatibility; pressure on teachers to pass students who underperformed, or who failed to attend class; and student-to-teacher ratios of up to 270-1, despite K12's promises to parents of much lower ratios.

5.     On this news, the price of K12 stock dropped 34.4%, or $9.89 per share, from a closing price of $28.79 on December 12, 2011, to a closing price of $18.90 per share on December 16, 2011, on unusually heavy trading volume.

6.     The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows:

(a) the Company misstated and failed to disclose that it had engaged in improper and deceptive recruiting and sales strategies, aimed strictly at enrolling students regardless of the students' ability to successfully complete the curriculum;

(b) the Company misstated and failed to disclose the administrative pressure from upper management levels to pass students despite poor (or nonexistent) academic performance, so as to maintain high enrollment levels and in turn continued government payments;

(c) the Company's failure to maintain overall math and reading performance levels of its students equal to statewide grade-level performance.

7.     As a result of the foregoing, Defendants' statements regarding the Company's empirical academic performance, financial performance, expected earnings and business prospects were false and misleading and lacked a reasonable basis when made.

8.    As a result of Defendants' false statements and omissions, K12's common stock traded at artificially inflated prices during the Class Period. Through this action, Plaintiff seeks to recover for himself and absent Class members (defined below) the devastating losses that were suffered as a result of the Defendants' fraud.

## JURISDICTION AND VENUE

9.    This action arises under Sections 10(b) and 20(a) of the Exchange Act, as amended, 15 U.S.C. §§ 78j(b) and 78(t), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

10.    This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

13.    Plaintiff, David Hoppaugh, as set forth in the accompanying certification and incorporated by reference herein, purchased K12 common stock at artificially inflated prices during the Class Period and has been damaged thereby.

14.    K12 is a technology-based education company with corporate headquarters located at 2300 Corporate Park Drive, Herndon, Virginia 20171. The Company offers proprietary curriculum, software systems and educational services marketed to students in

kindergarten through 12th grade. The Company combines curriculum with an individualized learning approach suited for virtual public schools, hybrid schools, school district online programs, public charter schools and private schools that utilize varying degrees of online and traditional classroom instruction, and other educational applications.

15.     Defendant Ronald J. Packard ("Packard") is and was, at all relevant times, the Company's Chief Executive Officer.

16.     Defendant Harry T. Hawks ("Hawks") has been the Company's Executive Vice President and Chief Financial Officer since May 2010.

17.     Packard and Hawks are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, had the authority to control and correct the contents of K12's public disclosures to the market. The Individual Defendants were provided with copies of the Company's reports, press releases and SEC filings alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and a class (the "Class") consisting of all persons who purchased or otherwise acquired K12 common stock during the Class Period at artificially

inflated prices and who suffered damages as a result. Excluded from the Class are the

Defendants named herein, members of their immediate families, any firm, trust, partnership,

corporation, officer, director or other individual or entity in which a Defendant has a controlling

interest or which is related to or affiliated with any of the Defendants, and the legal

representatives, heirs, successors-in-interest or assigns of such excluded persons.

19.    Members of the Class are so numerous and geographically dispersed that joinder

of all members is impracticable. While the exact number of Class members remains unknown at

this time, K12 currently has more than 36 million shares of stock outstanding, owned by

hundreds if not thousands of investors. Record owners and Class members can be identified

from records maintained by K12, or its transfer agent, and can be notified of the pendency of this

action by mail and publication, using forms of notice similar to those customarily used in

securities class actions.

20.    Plaintiff's claims are typical of the other members of the Class because Plaintiff

and all of the Class members sustained damages that arose out of the Defendants' unlawful

conduct complained of herein.

21.    Plaintiff will fairly and adequately protect the interests of the members of the

Class, and Plaintiff has no interests that are contrary to, or in conflict with, the interests of the

Class members that he seeks to represent. Plaintiff has retained competent counsel experienced

in class action litigation under the federal securities laws to ensure such protection and intends to

prosecute this action vigorously.

22.    A class action is superior to other methods for the fair and efficient adjudication

of this controversy since joinder of all members of the Class is impracticable. Furthermore, as

the damages suffered by individual members of the Class may be relatively small, the expense

and burden of individual litigation make it impossible for members of the Class to individually seek redress for wrongs done to them. There will be no difficulty in the management of this action as a class action.

23.     The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications, which could establish incompatible standards of conduct for Defendants. Questions of law and fact common to members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class. The questions of law and fact common to the Class include, but are not limited to, the following:

a.      whether Defendants' acts violated the federal securities laws as alleged herein;

b.      whether Defendants' publicly disseminated statements during the Class Period omitted and/or misrepresented material facts;

c.      whether Defendants acted with scienter in omitting and/or misrepresenting material facts;

d.      whether the price of K12 common stock was artificially inflated during the Class Period as a result of the material misrepresentations and omissions complained of herein;

e.      whether the Individual Defendants were controlling persons as alleged herein; and

f.      whether members of the Class have sustained damages and, if so, the proper measure of such damages.

## SUBSTANTIVE ALLEGATIONS

### K12's Business Model

24.     As stated above, K12 is a technology-based education company. K12's proprietary curriculum, online learning platform and varying levels of academic and management services, which can range from individual courses to complete turnkey online schools, are offered to charter schools, school districts and private school partners. Virtual public schools and hybrid schools under K12 turnkey management contracts ("Managed Schools") accounted for approximately 85% of K12's revenue in fiscal year 2011. For the 2011-12 school year, the Company will manage schools in 29 states and the District of Columbia.

25.     The Company derives most of its revenues from virtual public schools to which it provides access to course catalogues, student computers and a variety of management, technology and academic support services. In these schools, students attend class primarily over the Internet with offline learning materials instead of traveling to a physical classroom. Students receive assignments, complete lessons, and obtain instruction from certified teachers with whom they interact online, telephonically, in virtual classroom environments, and sometimes face-to-face.

26.     Specifically, revenues are principally earned from long-term contractual agreements to provide on-line curriculum, books, materials, computers and management services to public charter schools and school districts in the jurisdictions authorizing K12's services. In addition to providing the curriculum, books and materials, under most contracts the Company is responsible to the virtual public schools for all aspects of school management. This includes monitoring academic achievement, teacher hiring and training, compensation of school

personnel, financial management, enrollment processing and procurement of curriculum, equipment and required services.

27.     Put simply, the schools receive funding *on a per student basis from the state in which the public school or school district is located.* Packard stated in a February 15, 2011 conference call with Deutsche Bank analysts that, "the main [state funded dollar] stream we live off of is the average daily attendance and that's if kid's [sic] in a seat they get paid per day so much money. So, we hook into that stream." He later stated that "the way the core business works is *we're paid on an attendance basis*." (Emphasis added).

### Defendants' False and Misleading Statements Issued During the Class Period

28.     The Class Period begins on September 9, 2009, when the Company issued a press release reporting fourth quarter and full year 2009 earnings results for the fiscal year ended June 30, 2009.[1] The financial results discussed therein are also reiterated and expanded in the Company's Form 10-K filed with SEC on September 14, 2009, signed by defendant Packard. The Company reported revenues for fiscal year 2009 of $315.6 million, an increase of 39.5% over the prior year, primarily due to strong enrollment growth. Earnings before interest, taxes, depreciation, and amortization ("EBITDA") increased 68.8% to $43.2 million for the full year 2009 over the same period in the prior year, and operating income improved to $22.3 million, an increase of 71.7% as compared to the prior full year.

29.     On November 6, 2009, the Company issued a press release reporting first quarter 2010 earnings results. The Company reported revenues of $106.3 million, an increase of 20.0%

---

[1]     Defendants filed this press release, and each subsequent press release discussed herein, on a Form 8-K with the SEC. Each press release briefly reports financial performance for the preceding fiscal quarter and/or year. The full financial results are discussed and disclosed in the Company's Form 10-Q and Form 10-K filings with the SEC for each respective quarter and/or year. Plaintiff hereby incorporates by reference each quarterly and annual filing on Form 10-Q and Form 10-K which K12 administered during the Class Period.

over the first quarter in the prior year, primarily due to strong enrollment growth. EBITDA

increased 38.8% to $18.9 million for the first quarter over the same quarter in the prior year, and

operating income improved to $12.7 million, an increase of 38.1% compared with the first

quarter of fiscal year 2009.

30.     On February 5, 2010, the Company issued a press release reporting second quarter

2010 earnings results. The Company reported revenue growth for the second quarter up to $93.2

million, an increase of 20.1% over the second quarter in the prior year, primarily due to strong

enrollment growth. This $15.6 million increase was primarily attributable to an enrollment

increase for the second quarter, totaling 67,354 students, an increase of 22.3% over the second

quarter of fiscal year 2009. EBITDA increased 93.3% to $20.4 million for the second quarter

over the same quarter in the prior year, while operating income improved to $14.3 million, an

increase of 137.7% compared with the second quarter of fiscal year 2009.

31.     On May 10, 2010, the Company issued a press release reporting third quarter

2010 earnings results. The Company reported revenues for the third quarter of fiscal year 2010

grew to $96.6 million, an increase of 25.2% over the third quarter in the prior year, primarily due

to strong enrollment growth. EBITDA increased 23.0% to $16.4 million for the third quarter

over the same quarter in the prior year, while operating income improved to $10.4 million, an

increase of 40.0% compared with the third quarter of fiscal year 2009.

32.     On September 13, 2010, the Company issued press release reporting fourth

quarter and full year 2010 earnings results. The financial results discussed therein are also

reiterated and expanded in the Company's Form 10-K filed with SEC on September 13, 2010,

signed by defendants Packard and Hawks. The Company reported revenues of $384.5 million

for the fiscal year, an increase of 21.8% over the prior year, primarily due to strong enrollment

growth. EBITDA for fiscal year 2010 increased 41.8% over the same period in the prior year to $61.2 million, and operating income improved to $35.5 million, an increase of 58.8% as compared to fiscal year 2009.

33.     On this news, the price of K12 common stock rose 8.5%, or $2.03, on September 13, 2010, to close at $25.93 on heavy trading volume.

34.     Buoyed by continued fraudulent practices, K12's strong financial performance continued in the Company's fiscal year 2011. On November 9, 2010, the Company issued a press release reporting first quarter 2011 earnings results. The Company reported revenue growth for the first quarter of $134.9 million, an increase of 26.8% over the first quarter in the prior year, primarily due to strong enrollment growth. Defendant Packard stated, "[t]his was an exciting quarter for K12. Our core business remains strong and continues to grow at a healthy rate. We are pleased with enrollment growth in the virtual schools for this Fall."

35.     On February 9, 2011, the Company issued a press release reporting second quarter 2010 earnings results. The Company reported revenue growth for the second quarter to $129.0 million, an increase of 38.4% over the second quarter in the prior year, primarily due to strong enrollment growth and acquisitions. EBITDA for the second quarter of fiscal year 2011 was $24.3 million, an increase of 19.1% as compared to $20.4 million for the second quarter in the prior year. On this news, the price of K12 common stock rose 9.3%, or $2.65, on February 9, 2011, to close at $31.01 on heavy trading volume.

36.     On February 24, 2011, Packard and several other members of K12's management team held a conference call with Robert W. Baird & Co., Inc. banking analysts. Among other things, Packard touted K12's performance relative to traditional "brick and mortar" schools, asserting, "[w]e are able to provide an education that's *as good or better than the average*

*school academically in terms of the average state test score result* at a discount that across the board averages about 40% to taxpayers. So when you compare what we get funded in a state compared to what the U.S. DOE says the state averages are, on average we are 40% cheaper and we are *delivering as good a results or better as the average school*." (Emphasis added).

37.     Packard continued to falsely and misleadingly laud K12's educational effectiveness in a later conference call with Credit Suisse Global Services banking analysts on March 15, 2011, declaring:

> the schools are performing. And in fact when you look at the K through 4 results, where I'm not fixing somebody else's problem, *we see that the schools across every state, we have the data are 18 points better than state averages in math and 20 points better in reading.* And this is despite the fact that we have a higher poverty index. So this method of education is beyond the shadow of doubt, works and it works very, very well. (Emphasis added).

38.     On May 10, 2011, the Company issued a press release reporting third quarter 2011 earnings results. The Company reported revenues for the third quarter of fiscal year 2011 of $130.3 million, an increase of 34.8% over the third quarter in the prior year, primarily due to 22.7% organic revenue growth. EBITDA for the third quarter of fiscal year 2011 was $21.8 million, an increase of 32.5% as compared to $16.4 million for the third quarter in the prior year.

39.     On June 2, 2011, news began to leak into the market concerning the nature of K12's business practices from an article titled "Education According to Mike Milken," published in *Bloomberg BusinessWeek*.[2] The article highlights marketing tactics K12 employs to recruit potential students, stating in pertinent part:

---

[2]     While not a member of K12's executive team or Board of Directors, Michael Milken ("Milken"), the 1980s junk-bond king and convicted securities fraud felon, originally invested approximately $95 million in Packard's early K12 venture, prior to the December 2007 initial public offering. With his brother, Milken currently controls 19% of K12, a stake worth about $260 million.

One floor of K12's headquarters houses a call center, where 80 employees court students across the country—and the local, state, and federal money that comes with them. An online job posting for a K12 "enrollment sales consultant" says the applicant should "be able to close the sale with a customer" and "meet or exceed team and individual sales goals." Packard says K12's salespeople are paid primarily on salary, but part of their compensation is based on success in enrolling students. The U.S. Education Dept. has moved to ban the tying of recruiter pay to enrollment at for-profit colleges, saying the practice encourages employees to sign up students who might not benefit from the degrees (the ban doesn't apply to charter schools).

40.     However, Packard continued to mislead the market and dismissed the comparison to for-profit colleges, which had recently come under fire for their recruiting and admissions practices. Packard stated that the Company loses money if students drop out after several months. "We don't want to be recruiting kids who it's not right for, . . . [t]hat would be a disaster academically.  It would be a disaster for the company economically."

41.     On October 7, 2011, the Company issued a press release reporting fourth quarter and full year 2011 earnings results. The financial results discussed therein are also reiterated and expanded in the Company's Form 10-K filed with the SEC on October 7, 2011, signed by defendants Packard and Hawks. The Company reported revenues of $522.4 million, an increase of 35.9% over the prior year, primarily due to 23.7% organic revenue growth. EBITDA was $67.1 million, an increase of 9.6% as compared to the prior year, reflecting strong growth in the core business. According to the Company, total average enrollment increased by over 45% to 98,890.

42.     On October 10, 2011, Packard and several other members of K12's management team held a conference call with members of the investment community to discuss the fourth quarter and full year 2011 earnings results. Once again, Packard took the opportunity to tout K12's academic performance relative to brick and mortar schools. Packard stated:

Our norm-based tests show that on average our students are progressing more than one year for every year they're in the program. For example, the scores for the Aurora Virtual Charter School we manage in Pennsylvania *were significantly higher than the typical school on state administered tests for growth.* We anticipate that as states move to measure academic efficiency with the gains approach, the benefits to be achieved from the K12 learning system will become more visible. (Emphasis added).

43.     Based on the news from the quarterly and full year results, as well as the false and misleading statements during Packard's conference call with investment analysts, the price of K12 common stock rose 14.1%, or $3.84, on October 10, 2011, the next trading day, to close at $31.04 on heavy trading volume.

44.     On November 15, 2011, the Company issued a press release reporting first quarter 2012 earnings results. The Company reported revenue growth for the first quarter of $58.4 million, to reach $193.3 million for the quarter, an increase of 43.3% over the prior year, due to strong organic revenue growth of $33 million, or about 26%, in K12's core business of providing curriculum, technology and academic services to K-12 schools. EBITDA for the quarter was $21.3 million, an increase of $6.5 million or 43.9%, as compared to $14.8 million for the prior year, similarly reflecting growth in the core business, while net income was $4.6 million as compared to $2.2 million in the prior year, an increase of 109%, primarily attributable to increased revenues.

45.     On November 15, 2011, Packard and several other members of K12's management team held a conference call with members of the investment community to discuss the first quarter 2012 earnings results. Unsurprisingly, Packard boasted that K12's academic performance met, and exceeded, traditional schools. Packard stated:

It's probably worth reviewing what we do know about our student performance. There are *three critical facts* that suggest that these public virtual schools are having a significantly positive impact. First, the longer students are with K12 the better they do. Second, children that start with K12 in kindergarten do well. And

14

third, *a nationally normed exam given to students at the beginning of the year, our students generally outperform the norm groups.* (Emphasis added).

46. The statements referenced in ¶¶28 – 45 were materially false and misleading when made as they misrepresented and/or omitted adverse facts which then existed and the disclosure of which was necessary to make the statements not false and/or misleading. The true facts, which were known to or recklessly disregarded by each of the Defendants, were as follows:

      a. the Company misstated and failed to disclose that it had engaged in improper and deceptive recruiting and sales strategies, aimed strictly at enrolling students regardless of the students' ability to successfully complete the curriculum;

      b. the Company misstated and failed to disclose the administrative pressure from upper management levels to pass students despite poor (or nonexistent) academic performance, so as to maintain high enrollment levels and in turn continued government payments; and

      c. the Company failed to maintain overall math and reading performance levels of its students equal to statewide grade-level performance.

47. As a result of the foregoing, Defendants' statements regarding the Company's empirical academic performance, financial performance, expected earnings and business prospects were false and misleading and lacked a reasonable basis when made.

**THE TRUTH EMERGES**

48. On December 12, 2011, before the market opened, the NYT Article finally revealed to the investing public the dishonest and misleading practices at K12's main virtual charter schools, including: (i) high-pressure sales strategies aimed strictly at enrolling students;

15

(ii) administrative pressure to pass enrolled students regardless of academic performance; and (iii) the overall failure of K12 students to maintain grade-level performance in math and reading.

49.     The NYT Article recounted the constant cycle of enrollment and withdrawal at K12 schools, called the "churn rate." According to the NYT Article, school employees describe the call center at the Herndon, Virginia headquarters as "a high-pressured sales environment aimed at one thing: enrollment." Some workers, called "enrollment pals," are paid bonuses based on the number of students they sign up, according to former employees knowledgeable of the operations. Upon information and belief, the annual bonuses of both Packard and Hawks, as well as several other upper level management figures, are tied to student enrollment.

50.     Churn rate problems were illustrated by records Agora filed with Pennsylvania, which reveal that 2,688 students withdrew during the 2009-10 school year. At the same time, K12 continued to sign up new students. Enrollment at the end of the year — 4,890 — was 170 students *more than* at the beginning, obscuring the high number of withdrawals. The NYT Article revealed that some teachers said they were under pressure to pass students with marginal performance and attendance due to the emphasis on student retention above all else.

51.     Additionally, some teachers at K12 schools revealed in the NYT Article that they felt "pressured to pass students who did little work." Teachers also questioned why certain students who performed little class work (or no work at all) were allowed to remain on school rosters, potentially allowing the Company to continue receiving government payments for them.

52.     According to the NYT Article, Colorado state auditors found that the K12-run Colorado Virtual Academy counted about 120 students for state reimbursement whose enrollment could not be verified or who did not meet Colorado residency requirements. Indeed,

some had never logged in to their online classes. The state ordered the reimbursement of more than $800,000.

53.       Despite Packard's very recent proclamations to the contrary, the NYT Article indicates that only 42% of K12's Agora Cyber Charter School students tested at grade level or better in math, compared with 75% of students statewide, and only 52% of Agora students had hit the mark in reading, compared with 72% statewide. According to the NYT Article, an analysis by the Carroll County Public School District in Virginia shows that the 400 students in the virtual program there performed worse than the regular students in 19 of 26 categories on the state assessment test. The Carroll County superintendent, James Greg Smith, said he was particularly concerned about scores in middle school math, history and social sciences. In seventh-grade math, for example, only 35% of the online students passed a state assessment, compared to 68% of traditional students.

54.       On this news, the price of K12 stock dropped 34.4%, or $9.89 per share, from a closing price of $28.79 on December 12, 2011, to a closing price of $18.90 per share on December 16, 2011, on unusually heavy trading volume.

55.       The true facts, which were known by the Defendants but concealed from the investing public during the Class Period, were as follows:

> a.   the Company misstated and failed to disclose that it had engaged in improper and deceptive recruiting and sales strategies, aimed strictly at enrolling students regardless of the students' ability to successfully complete the curriculum;
>
> b.   the Company misstated and failed to disclose the administrative pressure from upper management levels to pass students despite poor (or nonexistent)

17

academic performance, so as to maintain high enrollment levels and in turn
continued government payments; and

c. the Company's failure to maintain overall math and reading performance
levels of its students equal to statewide grade-level performance.

56. As a result of the foregoing, Defendants' statements regarding the Company's
empirical academic performance, financial performance, expected earnings and business
prospects were false and misleading and lacked a reasonable basis when made.

57. As a result of Defendants' false statements and omissions, K12's common stock
traded at artificially inflated prices during the Class Period. However, after the above revelations
seeped into the market, the Company's shares were hammered by massive sales, sending them
down approximately 52.4% from their Class Period high of $39.74 per share.

## ADDITIONAL SCIENTER ALLEGATIONS

58. As alleged herein, Defendants acted with scienter in that Defendants knew that
the public documents and statements issued or disseminated in the name of the Company were
materially false and misleading; knew that such statements or documents would be issued or
disseminated to the investing public; and knowingly and substantially participated or acquiesced
in the issuance or dissemination of such statements or documents as primary violations of the
federal securities laws. As set forth elsewhere herein in detail, Defendants participated in the
fraudulent scheme alleged herein by virtue of (i) their receipt of information reflecting the true
facts regarding K12; (ii) their control over, receipt of, and/or modification of K12's allegedly
materially misleading misstatements and omissions; and/or (iii) their associations with the
Company, which made them privy to confidential proprietary information concerning K12.

## LOSS CAUSATION

59.     At all relevant times, K12's stock was traded on the New York Stock Exchange

("NYSE"). As described above, Defendants' material misrepresentations and omissions had the

effect of creating and maintaining an artificially inflated price for K12's stock.  Those

misrepresentations and omissions that were not immediately followed by an upward movement

in the Company's stock price served to maintain the share price at artificially inflated levels by

maintaining and supporting a false positive perception of K12's business, operations,

performance and prospects.

60.     Defendants had a duty to promptly disseminate accurate and truthful information

with respect to the Company's financial and operational condition or to cause and direct that

such information be disseminated, and to promptly correct any previously disseminated

information that was materially misleading to the market.  As a result of their failure to do so, the

price of K12 common stock was artificially inflated during the Class Period, directly causing

Plaintiff and the Class to suffer damages when the truth eventually emerged.

61.     Defendants' false and misleading statements and omissions in their SEC filings

and other public statements during the Class Period directly caused losses to Plaintiff and the

Class.  On the strength of these false statements, the Company's stock price was artificially

inflated to a Class Period high of $39.74 per share on April 29, 2011.

62.     As the truth began to emerge regarding K12's true empirical academic

performance, financial performance, expected earnings and business prospects, the price of K12

stock declined as the market processed each set of previously undisclosed facts.  Each such

disclosure removed a portion of the artificial inflation in the price of K12's common stock and

directly caused Plaintiff and other Class members to suffer damages.  On December 12, 2011,

the price of K12 stock dropped 34.4%, or $9.89 per share, from a closing price of $28.79, to a

closing price of $18.90 per share on December 16, 2010 -- a decline of approximately 52.4% per

share from its Class Period high.

63.    Until shortly before Plaintiff filed this Complaint, he was unaware of the facts

alleged herein and could not have reasonably discovered the Defendants' misrepresentations and

omissions by the exercise of reasonable diligence.

### APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE

64.    At all relevant times, the market for K12's common stock was an efficient market

for the following reasons, among others:

   a.    K12's common stock was listed and actively traded on the NYSE, a highly
          efficient national market;

   b.    As a registered and regulated issuer of securities, K12 filed periodic
          reports with the SEC, in addition to the frequent voluntary dissemination
          of information;

   c.    K12 regularly communicated with public investors through established
          market communication mechanisms, including through regular
          dissemination of press releases on the national circuits of major newswire
          services and through other wide-ranging public disclosures such as
          communications with the financial press and other similar reporting
          services;

   d.    K12 was followed by multiple analysts, which followed K12's business
          and wrote reports which were publicly available and affected the public
          marketplace;

e.     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of K12's stock; and

f.     Without knowledge of the misrepresented or omitted facts, Plaintiff and other members of the Class purchased or otherwise acquired K12 stock between the time the Defendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of K12 stock was artificially inflated by Defendants' misrepresentations and omissions.

65.     As a result of the above, the market for K12 common stock promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the security's price. Under these circumstances, all purchasers of K12 common stock during the Class Period suffered similar injuries through their purchases of shares at prices which were artificially inflated by the Defendants' misrepresentations and omissions. Thus, a presumption of reliance applies.

## NO SAFE HARBOR

66.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made and/or were statements of historical fact. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the

21

particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of K12 who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) and Rule 10b-5**

67.     Plaintiff realleges each allegation above as if fully set forth herein.

68.     This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against K12 and the Individual Defendants (the "Section 10(b) Defendants"). The Section 10(b) Defendants: (1) employed devices, schemes and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.     The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

70.     The Section 10(b) Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

22

71.     As a result of the Section 10(b) Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff was misled into believing that the Company's financial statements were true, accurate, and complete.

72.     Plaintiff purchased K12 common stock without knowing that the Section 10(b) Defendants had misstated or omitted material facts about the Company's financial performance or prospects. In purchasing the stock, Plaintiff relied directly or indirectly on false and misleading statements made by the Section 10(b) Defendants, and/or an absence of material adverse information that was known to Section 10(b) Defendants or recklessly disregarded by them, but not disclosed in the Section 10(b) Defendants' public statements. Plaintiff was damaged as a result of his reliance on the Section 10(b) Defendants' false statements and misrepresentations and omissions of material facts.

73.     At the time of the Section 10(b) Defendants' false statements, misrepresentations and omissions, Plaintiff was ignorant of their falsity and believed them to be true. Plaintiff would not otherwise have purchased or acquired K12 stock had Plaintiff known the truth about the matters discussed above.

74.     Plaintiff is filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Plaintiff's claim, and within five years after the violations with respect to Plaintiff's investments.

75.     By virtue of the foregoing, the Section 10(b) Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76.     As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiff has suffered damages in connection with the purchase of K12 stock.

## COUNT II

### Violation of Section 20(a) of the Exchange Act

77.     Plaintiff realleges each allegation above as if fully set forth herein.

78.     Each of the Individual Defendants, by reason of their status as senior executive officers and directors of K12, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff, within the meaning of § 20(a) of the Exchange Act (the "Section 20(a) Defendants"). The Section 20(a) Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiff's investments in K12 common stock within the meaning of § 20(a) of the Exchange Act. Therefore, the Section 20(a) Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

79.     The Section 20(a) Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Section 20(a) Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

80.     The Section 20(a) Defendants knew or recklessly disregarded the fact that K12's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Section 20(a) Defendants did not act in good faith.

81.     By virtue of their high-level positions and their participation in and awareness of K12's operations and public statements, the Section 20(a) Defendants were able to and did influence and control K12's decision-making, including controlling the content and

24

dissemination of the documents that Plaintiff contends contained materially false and misleading information, and on which Plaintiff relied.

82.     The Section 20(a) Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

83.     As set forth above, the Section 10(b) Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Section 20(a) Defendants are also liable pursuant to § 20(a) of the Exchange Act.

84.     As a direct and proximate result of the Section 20(a) Defendants' wrongful conduct, Plaintiff suffered damages in connection with his purchases of K12 stock.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff on behalf of himself and the Class, prays for relief and judgment including:

A.     Determining that Counts I and II of this action are elgible for class treatment under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law (including, but not limited to, rescission);

25

D.      Awarding Plaintiff and the Class their costs and expenses incurred in this action,

including reasonable counsel fees and expert fees; and

E.      Awarding such other and further relief as may be just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated:  Washington, D.C.
        January 30, 2012

Respectfully submitted,

**FINKELSTEIN THOMPSON LLP**

Robert O. Wilson (VSB# 77791)
Eugene J. Benick (VSB# 76495)
James Place
1077 30th Street NW, Suite 150
Washington, D.C. 20007
Tel:  (202) 337-8000
Fax:  (202) 337-8090
Email:  rwilson@finkelsteinthompson.com
        ebenick@finkelsteinthompson.com

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
Richard W. Gonnello
Francis P. McConville
369 Lexington Avenue, 10th Floor
New York, NY 10017
Tel: (212) 983-9330
Fax: (212) 983-9331
E-mail: nfaruqi@faruqilaw.com
        rgonnello@faruqilaw.com
        fmcconville@faruqilaw.com

26

**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis
560 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Tel: 201-567-7377
Fax: 201-567-7337
Email: mgardy@gardylaw.com
        jnotis@gardylaw.com

*Counsel for Plaintiff David Hoppaugh*

27

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, David R. Hoppaugh ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint filed against K-12 Inc. in this matter and has authorized its filing.

2. Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3. Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5. Plaintiff's transactions in K-12 Inc. securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6. In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 24th day of January 2012.

David R. Hoppaugh

| Transaction (Purchase or Sale) | Trade Date | Price Per Share | Quantity |
|---|---|---|---|
| Purchase | 12/7/2010 | $27.37 | 1.6807 |
| Purchase | 1/4/2011 | $29.35 | 1.5673 |
| Purchase | 1/18/2011 | $30.46 | 1.5102 |
| Purchase | 2/1/2011 | $27.59 | 1.6673 |
| Purchase | 3/1/2011 | $33.65 | 1.3670 |
| Purchase | 3/15/2011 | $32.01 | 1.4371 |
| Purchase | 4/5/2011 | $35.37 | 1.3005 |
| Purchase | 4/19/2011 | $36.36 | 1.2651 |
| Purchase | 5/3/2011 | $37.71 | 1.2198 |
| Purchase | 5/17/2011 | $34.58 | 1.3302 |
| Purchase | 6/7/2011 | $33.06 | 1.3914 |
| Purchase | 6/21/2011 | $33.28 | 1.3822 |
| Purchase | 7/5/2011 | $33.72 | 1.3642 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |