**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |
|---|---|
| DAVID HOPPAUGH, Individually and On Behalf of All Others Similarly Situated, | Civ. A. No. 1:12-cv-00103-CMH-IDD |
| Plaintiff, | |
| vs. | JURY TRIAL DEMANDED |
| K12 INC., RONALD J. PACKARD, and HARRY T. HAWKS, | CLASS ACTION |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT**

LABATON SUCHAROW LLP
Jonathan Gardner (admitted pro hac vice)
Michael W. Stocker (admitted pro hac vice)
Paul J. Scarlato (admitted pro hac vice)
Angelina Nguyen (admitted pro hac vice)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Lead Counsel for the Class*

WEBSTER BOOK LLP
Steven T. Webster (VSB# 31975)
Aaron S. Book (VSB# 43868)
Brian C. Athey (VSB# 66515)
300 N. Washington St., Suite 404
Alexandria, Virginia 22314
Telephone: (888) 987-9991
Facsimile: (888) 987-9991

*Local Counsel for the Class*

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION ................................................................................ 1

II.  JURISDICTION AND VENUE .......................................................................... 8

III.  PARTIES ............................................................................................................ 9

IV.  CONTROL PERSON ALLEGATIONS............................................................. 10

V.  SUBSTANTIVE ALLEGATIONS .................................................................... 12

    A.  The Company and its Business ................................................................. 12

    B.  K12's Dependence on Enrollments............................................................ 14

    C.  Defendants Use Ever-Increasing Enrollments to Conceal Churn,  and
        Increasingly Enroll "Last Resort" Students ................................................. 19

    D.  High Churn Negatively Impacts School  Performances and Education Quality ......... 23

        1.  Aggressive Enrollments Result in  Excessive Student-Teacher Ratios that
            K12 Concealed ................................................................................. 28

        2.  K12's "Highly Qualified" and "Certified" Teachers ........................... 29

        3.  K12's Special Education Programs  Fail to Meet Government
            Requirements...................................................................................... 31

    E.  K12 Used Improperly Lax Grading and Attendance  Practices To Maintain and
        Artificially Inflate Enrollment ..................................................................... 35

VI.  DEFENDANTS' MATERIALLY  FALSE AND MISLEADING STATEMENTS
     AND OMISSIONS ............................................................................................ 45

    A.  Class Period Enrollments and Revenues..................................................... 45

    B.  September 9, 2009 Earnings Call and September 18, 2009 8-K.................... 47

    C.  September 22, 2009 Bank of America Investor Conference ........................ 48

    D.  October 6, 2009 William Blair Investor Conference .................................. 49

    E.  November 6, 2009 Earnings Call and December 17, 2009 8-K ................... 50

    F.  February 5, 2010 Earnings Call and February 12, 2010 8-K ....................... 52

    G.  May 10, 2010 Earnings Call and May 18, 2010 8-K .................................. 55

H.  September 13, 2010 Earnings Call ......................................................................... 56

I.  November 9, 2010 Earnings Call .......................................................................... 60

J.  November 9, 2010 J.P. Morgan Investor Conference .......................................... 61

K.  November 10, 2010 Signal Hill Investor Conference .......................................... 62

L.  February 9, 2011 Earnings Call ........................................................................... 63

M.  February 15, 2011 Deutsche Bank Investor Conference ..................................... 64

N.  February 24, 2011 Robert W. Baird Investor Conference ................................... 66

O.  March 2, 2011 Morgan Stanley Investor Conference .......................................... 68

P.  March 15, 2011 Credit Suisse Global Services Investor Conference ................... 70

Q.  May 10, 2011 Earnings Call ................................................................................ 73

R.  September 15, 2011 BMO Investor Conference .................................................. 74

S.  2011 Form 10-K (filed October 7, 2011) ............................................................ 77

T.  October 10, 2011 Earnings Call .......................................................................... 79

U.  November 15, 2011 Earnings Call ....................................................................... 81

V.  Partial Disclosure of the Truth ............................................................................ 84

    1.  November 16, 2011 Citi U.S. Small and Mid Cap Investor Conference ............. 84

    2.  November 16, 2011 The Nation Article ................................................................ 85

W.  The Entire Truth is Finally Revealed ................................................................... 86

    1.  December 13, 2011 New York Times Article ....................................................... 86

    2.  December 16, 2011 Associated Press Article ....................................................... 91

VII.  ADDITIONAL SCIENTER ALLEGATIONS .................................................................. 92

VIII. CLASS ACTION ALLEGATIONS ................................................................................. 95

IX.  APPLICABILITY OF PRESUMPTION OF RELIANCE  UNDER THE
     AFFILIATED UTE DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE
     FRAUD ON THE MARKET DOCTRINE ...................................................................... 97

X.  NO SAFE HARBOR .......................................................................................................... 98

XI.   LOSS CAUSATION/ECONOMIC LOSS ............................................................................ 99

COUNT I  Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(b)
         Promulgated Thereunder Against All Defendants .............................................. 100

COUNT II  Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(a) and (c)
          Promulgated Thereunder Against All Defendants ............................................ 104

COUNT III  Violation Of Section 20(a) Of The Exchange Act Against the Individual
           Defendants ........................................................................................................ 105

JURY TRIAL DEMANDED ..................................................................................................... 107

Lead Plaintiff Arkansas Teacher Retirement System ("Plaintiff" or "Arkansas"), by its undersigned attorneys, hereby brings this Consolidated Amended Class Action Complaint ("Complaint") against K12 Inc. ("K12" or the "Company"), Ronald J. Packard ("Packard") and Harry T. Hawks ("Hawks"). The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of its counsel, which included interviews of former employees of K12 and other persons with knowledge of the matters alleged herein (some of whom have provided information in confidence, including internal K12 emails and other documents; these confidential witnesses ("CWs") will be identified herein by number (CW1, CW2, etc.),[1] and review and analysis of publicly available information, including United States Securities and Exchange Commission ("SEC") filings by K12, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and consultations with experts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Plaintiff alleges as follows:

I.  **NATURE OF THE ACTION**

1.      This action is brought on behalf of a class of purchasers of K12's publicly traded common stock between September 9, 2009 and December 16, 2011 inclusive (the purchasers being the "Class" and the time frame being the "Class Period"). Lead Plaintiff seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq. (the "Exchange Act").

---

[1]   All CWs will be described in the masculine gender in order to protect their identities.

2. K12 offers online educational services designed to facilitate individualized learning for students primarily in kindergarten through 12th grade, or K-12. The Company purports to provide engaging and effective education, regardless of geographic location or socio-economic background, delivering educational content and learning systems to students primarily through virtual public schools, virtual private school and through sales directly to school districts. Students in virtual public schools "attend" by logging in, from home, to online classes and lessons in a "virtual" classroom. This individualized learning method requires a high level of commitment from students and particularly from parents, who act as "learning coaches," and works best for gifted and motivated students.

3. K12's core operations – comprising almost 90% of its revenues – consist of managing virtual public schools. The bulk of K12's fees comes from "turnkey" management of virtual public schools, in which K12 contracts with the school district or non-profit board to provide across-the-board school services, including hiring and recruiting teachers, providing the curricula, laptops, software systems, and handling all administrative duties. K12 is one of the largest online educational companies. In fiscal year 2011 (which ended June 2011), K12 had full-time virtual schools in 27 states, with over 80,000 students enrolled.

4. K12's revenues depend primarily on student enrollment. Nationwide, the average student funding available for virtual schools is approximately $5,500 per student (more for special education students), with some northeastern states, like Pennsylvania, paying substantially more per student. Certain states cap enrollment in virtual schools, limiting the revenues K12 can earn, although the Company actively lobbies to reduce or remove such caps while concentrating its formidable marketing prowess in states that do not have enrollment caps.

5.     States determine school district funding levels based on enrollment counts at various points during the year.  Some states assess enrollment only at one point or "count date," usually in October or September; others assess enrollment at multiple count dates throughout the year, and some states use an "average daily attendance" measure each month.  Accordingly, depending on the state, K12 receives funding for an enrolled student only if it can demonstrate that student's attendance at a mandated point or points, or that the student's attendance reaches the threshold average daily attendance measure each month.  In those states with one or two count dates, K12 retains the entire funding amount for a student if the student drops out after the count date.  In those states where K12 bills part of a student's funding monthly, if a K12 student withdraws, K12 loses the ratable portion of the funds for the months left in the school year.

6.     Throughout the Class Period, K12 portrayed itself as a viable "choice" in public school education, offering a "world-class" education equivalent to, or better than, brick-and-mortar public schools while costing taxpayers less.  Packard, K12's founder and CEO, consistently stated the Company's "manifest destiny" was to make K12 available to every child across all 50 states, touting purported statistics showing parent satisfaction rates at 96% and academic results "as good as or better than state averages."

7.     As a result, K12's enrollments – and revenues – skyrocketed, increasing by as much as 40% year over year during the Class Period, and Packard reaped the benefits, selling *850,000* shares of K12 stock during the Class Period for proceeds of *$23.3 million*.  What Defendants concealed from the market, however, was a business model dependent on an ever-increasing rate of enrollments to sustain itself.  The core omission behind Defendants' fraudulent success story was that students at K12 virtual schools were dropping out at staggering rates – in some instances, *more than half* of students in a given school year would drop out – indicating

that "parent satisfaction" was nowhere near the levels Packard claimed.  These "churn" rates – closely tracked by Defendants but undisclosed to the market during the Class Period – were obscured by K12's aggressive tactics to enroll yet more students to replace those who had dropped out, allowing K12 to maintain the temporary illusion that overall enrollments were increasing.

8.     In reality, K12's ever-increasing appetite for enrollments to compensate for high churn rates – disguised as a "mission" to make K12 education available to every child in every state – resulted in students being enrolled who were unsuited to individualized online learning, which requires a high level of student and parent commitment.  Moreover, K12 enrolled more and more "last resort" students – students who had failed to succeed at brick-and-mortar schools and were several years behind grade level.  Not surprisingly, such students either dropped out before the end of the school year, or, if they stayed, negatively impacted the academic performance at K12 schools by testing below state averages.  These "last resort" students had an additional benefit – because they were more likely not to attend class, they did not utilize K12's teacher resources to the same degree as other students and thus cost K12 less to "educate" them, while their enrollment still permitted K12 to collect full funding from the states.

9.     Late in the Class Period, Packard responded to concerns about poor academic performance by stating that the "adequate yearly progress" or AYP grade-level benchmark figures used by the states to assess schools' academic performance was flawed, and that a better measure was "annual growth," or how much a student progressed in a year regardless of grade-level.  Packard asserted that when such a measure was used, K12 students made more gains in a year than other public school students.  Packard further asserted that a student would do better the longer that student remained with K12, and students who had remained at K12 schools for a

number of years outperformed state averages. Crucially, Packard omitted to disclose the high churn rates at K12's online public schools – if a student dropped out before the school year ended, an "annual growth" test would be meaningless. Thus, Packard's "annual growth" measures were misleading because they failed to account for the significant numbers of students who left K12 schools after less than a year.

10. Analyst reports reflected the market's understanding that K12's September enrollment figures were determinative of enrollments for the rest of the year. For example, a September 13, 2010 ThinkEquity report stated "[w]e think enrollment growth during Q1 is a very strong indicator of enrollment for the remainder of the fiscal year, *as students tend to remain in K12 programs for the duration of the school year*, and we will be looking for management's update after 1Q10"; similarly, a May 7, 2010 Wedbush report stated "[w]e remind investors that September/October enrollments largely dictate K12's full year financial results, and that investors are likely not to receive a surprise on the revenue side of the business." Packard reinforced this understanding by stating during the Class Period that "[f]ew measures are better than student retention for validating the quality of our curriculum, systems and instruction."

11. Churn affected K12 schools in other negative ways. Teachers, already overwhelmed by high teacher-student ratios from K12's rapid growth, found their time being increasingly consumed by administrative duties related to constant withdrawals and new enrollments throughout the year. Moreover, pressured to keep enrollments up, teachers were instructed to pass failing students and request that parents retroactively mark their children "present" even if those children had failed to log in to class. These improper grading and attendance policies served to artificially inflate enrollments.

12.     For example, at Agora Cyber Charter School in Pennsylvania, one of K12's largest revenue-generating public schools, students that failed to log in for ten consecutive days were marked "inactive" but not withdrawn, permitting K12 to continue billing the school for those students.

13.     Other K12 "world-class" services also suffered, belying Packard's claim of high parental satisfaction.  Although K12 consistently represented that its special education programs complied with all federal and state requirements, in at least one instance, the Ohio Department of Education found, after a formal complaint by a parent, that the K12-managed Ohio Virtual Academy had violated several provisions with respect to its program for a special needs student. In another case, a former special education teacher at Agora Cyber Charter School, one of K12's two largest schools in terms of revenue, described a misuse of special education funds to purchase gift cards from Barnes and Noble bookstores.

14.     K12 also represented in its SEC filings that all its teachers were "highly qualified" as defined under the No Child Left Behind Act (NCLB).  Yet a 2009-10 performance audit of K12's Hawaii Virtual Academy revealed that only 89% of classes were taught by highly qualified teachers in 2010, and a former teacher at the California Virtual Academy reported that he was offered a job after only one telephone interview, in which he was never asked whether he was highly qualified.

15.     K12's "enroll, enroll, enroll" philosophy and extremely high churn rates were combined with an extremely lax attendance reporting policy.  According to former K12 teachers, parents could certify their children's attendance by clicking a button – no subsequent online activity was necessary.  Teachers used a system that allowed them to monitor online activity once a student had logged on, and several observed that frequently, there was no further online

activity once the parents had certified their child was "present." One Agora Cyber Charter School student who had been absent for 141 straight days, but who had not formally withdrawn, was still considered "enrolled," and K12 continued to receive funding.

16. In Michigan, pupil count auditors described difficulties auditing Michigan Virtual Academy's enrollment in 2010. "While teachers sign a print-out of log-ins, there is no verifiable evidence of student attendance, absences are not recorded, and many parents do not complete or submit their attendance paperwork on count day. For an auditor, this lack of systemic record-keeping poses a distinct problem." Similarly, a 2009-2010 Nevada audit found that "Nevada Virtual Academy was unable to produce and maintain complete enrollment records in a timely manner. While we were eventually able to reconcile enrollment and attendance reports, it was noted that the completed Master Register contained multiple inaccuracies regarding the dates and codes for pupil enrollment or withdrawal [and] [t]hese Master Register violations are repeat findings from the previous Pupil Enrollment and Attendance Audit."

17. In Colorado, a pupil count audit for the 2009-2010 school year found that Colorado Virtual Academy counted about 120 students for state reimbursement whose enrollment could not be verified or who did not meet Colorado residency requirements. Some had never logged in. Colorado demanded that K12 refund the state $800,000 in school funding. K12 never disclosed that its enrollments and revenues were inflated in this manner.

18. As concerns over poorly performing virtual schools grew towards the end of the Class Period, Packard was forced to partially reveal the truth on November 16, 2011, admitting that only "about 60% of the kids who start with us in September are with us a year later." Packard further admitted that "[w]e track churn immensely," but that "we haven't chosen to disclose churn rates to investors. K12's Class Period SEC filings confirm that Defendants had

7

access to enrollment data, including undisclosed withdrawals, stating that K12 "continually evaluate[s] our enrollment levels by state, by school and by grade. We track new student enrollments and withdrawals throughout the year." Former employees during the Class Period also confirmed that all K12 corporate employees and virtual school administrators had access to the Company's Student Administration Management System ("SAMS") database, which tracked enrollment data.

19.     Finally, the entire truth was revealed when a December 13, 2011 New York Times article and subsequent December 16, 2012 Associated Press article exposed K12's immense churn rates, the poor academic performance of its schools compared with brick and mortar public schools, excessive student-teacher ratios, improper practices at several of its schools nation-wide including improperly lax grading and attendance policies that contributed to enrollment inflation, and the actual enrollment inflation discovered in Colorado. On December 13, 2011, K12's stock price plummeted 23.6% on the news, with 4,812,000 shares traded compared with an average daily trading volume over the Class Period of 221,082 shares. As the market continued to digest the disclosure, K12's stock price sank another 4.14% on December 14, 2011 and a further 1.71% on December 15, 2011. On December 16, 2011, following the Associated Press article, K12's stock price sank another 8.8%, with 1,641,300 shares traded.

## II.     **JURISDICTION AND VENUE**

20.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

22.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).

23.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    **PARTIES**

24.     On May 18, 2012, the Court appointed Arkansas to serve as Lead Plaintiff in this consolidated securities class action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 77z-1.

25.     Lead Plaintiff Arkansas is an institutional investor that provides retirement, disability, and survivor benefits to the thousands of current and former employees of the Arkansas education community.  Arkansas manages more than $11 billion in assets held in trust. As set forth in the certification annexed to Arkansas's Motion for Appointment as Lead Plaintiff, incorporated by reference herein, it purchased the common stock of K12 on the open market during the Class Period and suffered damages as a result of the misconduct alleged herein.

26.     Defendant K12 is a technology-based education company incorporated in Delaware, with corporate headquarters located at 2300 Corporate Park Drive, Herndon, Virginia 20171.  The Company offers proprietary curriculum, software systems and educational services marketed to students in kindergarten through 12th grade.  The Company combines curriculum with an individualized learning approach suited for virtual public schools, hybrid schools, school district online programs, public charter schools and private schools that utilize varying degrees of online and traditional classroom instruction, and other educational applications.  K12's common stock, at all times relevant here, traded on the NYSE under the ticker symbol "LRN."

27.     Defendant Packard is and was at all relevant times the Company's Chief Executive Officer and a Director on the Company's board.  Packard was a direct and substantial participant in the fraud.

28.     Defendant Hawks has been the Company's Executive Vice President and Chief Financial Officer since May 2010.[2]  Hawks was a direct and substantial participant in the fraud.

29.     Defendants Packard and Hawks are collectively referred to as the "Individual Defendants."  The Individual Defendants, together with K12, are collectively referred to as the "Defendants."

IV.     **CONTROL PERSON ALLEGATIONS**

30.     The Individual Defendants, because of their positions of control and authority as senior executive officers and Directors, had access to the adverse, undisclosed information about K12's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

31.     Each of the above officers of K12, by virtue of his high-level position with the Company, directly participated in the management of the Company, and was directly involved in the day-to-day operations of the Company at the highest levels.  The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Enrollment and revenue figures, including churn rates, for the Company's

_____

[2] Hawks is only being charged with those false and misleading statements made after May 2010.

core business of managing virtual public schools were fundamental aspects of K12's business and subjects that the Individual Defendants followed, tracked, and were aware of at all times.

32.     The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance or had the ability and opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

33.     As senior officers and controlling persons of a publicly-held company whose securities were, during the relevant time, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

34.     Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of K12's securities during the Class Period, which included the dissemination of materially false and misleading statements regarding enrollment and revenue figures, including churn rates, at K12's virtual public schools, the academic performance of those schools compared with other state

public schools, and concealment or omission of material adverse facts. The scheme: (i) deceived the investing public regarding K12's operations and business, and the true value of K12's common stock; and (ii) caused Plaintiff and other members of the Class to purchase K12's common stock at artificially inflated prices, which fell as the truth concerning K12 ultimately became known.

35.    In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of K12, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    The Company and its Business

36.    K12 specializes in selling proprietary curriculum and educational services for online delivery to students in grades K-12. K12 operates in 29 states, including Arizona, Arkansas, California, Colorado, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, Nevada, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Washington, Wisconsin, and Wyoming, as well as the District of Columbia. More than 90% of K12's revenue is generated by sales of its learning system to students attending full-time virtual public charter schools, which are tuition-free online schools generally offered on a state-wide basis. K12 also offers a private online school, the K12 International Academy, and sells its online courses directly to families as well as to schools and districts to augment curriculum at individual public schools and districts. However, as Packard stated in February 2011, "[p]ublic virtual schools will be our core business for the foreseeable future."

37.     Virtual public schools under turnkey management contracts accounted for approximately 85% of K12's revenue in fiscal year 2011; similarly, the percentage of enrollments associated with turnkey management service schools, or managed schools, was 85% for the year ended June 30, 2009.  In turnkey-managed schools, K12 takes responsibility for all aspects of the management of the schools, including monitoring academic achievement, teacher hiring and training, compensation of school personnel, financial management, enrollment processing and provision of curriculum, equipment and required services.  In fiscal year 2011, K12 derived approximately 13% of its revenues from each of two turnkey schools – the Ohio Virtual Academy and the Agora Cyber Charter School in Pennsylvania.  In aggregate, these schools accounted for approximately 26% of K12's total revenues (28% in fiscal year 2010).

38.     K12 has the largest digital curriculum portfolio for the K-12 online market.  The K12 curriculum consists of online lessons, learning kits and lesson guides.  K12 curriculum customers use a learning management system called the Online School (OLS) platform – a web-based software platform that provides access to online lessons, lesson planning and scheduling tools, as well as a progress tracking tool to aid parents and teachers in managing each student's progress.

39.     Once a schedule is established, the OLS delivers lessons based upon the specified parameters of the school and the teacher.  Information collected by the progress tracking tool regarding student performance, attendance and other data is transferred to K12's proprietary management system for use in providing administrative support services.

40.     The Student Administration Management System (SAMS) is K12's proprietary Student Information System (SIS).  SAMS is integrated with the OLS and K12's Online Enrollment System, which allows parents to complete school enrollment forms online.

41.     K12, in its Class Period SEC filings, states that it uses "a rigorous evaluation program for making hiring recommendations to the schools we serve.  We generally recruit teachers who, at a minimum, are state certified and meet each state's requirements for designation as a 'Highly Qualified Teacher,' and generally have at least three years of teaching experience."  As of June 30, 2011, K12 had approximately 2,500 employees including 1,150 teachers, in addition to approximately 2,400 teachers employed by turnkey-managed virtual public schools.

**B.     K12's Dependence on Enrollments**

42.     K12's revenues are based primarily on student enrollment.  Nationwide, the average student funding available for virtual schools is approximately $5,500 per student (more for special education students), with some states, like Pennsylvania (which pays over $12,000 per student) paying substantially more.  Certain states cap enrollment in virtual schools, limiting the revenues K12 can earn in those states, although the Company actively lobbies to reduce or remove such caps while concentrating its formidable marketing prowess in states that do not have enrollment caps.

43.     States determine school district funding levels based on enrollment counts at various points during the year.  Some states assess enrollment only at one point or "count date," usually in October or September; others assess enrollment at multiple count dates throughout the year, and some states use an "average daily attendance" measure for each month of the school year.  Accordingly, depending on the state, K12 receives funding for an enrolled student if it can demonstrate that student's attendance at a mandated point or points, or that the student's attendance reaches the threshold average daily attendance measure each month.  In those states with one or two count dates, K12 retains the entire funding amount for a student if the student drops out after the count date.  In those states where K12 bills part of a student's funding

monthly, if a K12 student withdraws after a count date, K12 loses the ratable portion of the funds for the months left in the school year.

44.     School sessions generally begin in August or September and end in May or June. K12 considers the duration of a school year to be 10 months, using the number of students on the last day of September to be its opening aggregate enrollment level, and the number of students enrolled on the last day of May to be its ending enrollment level. For each quarterly period, average enrollments represent the average of the month-end enrollment levels for each month that has transpired between September and the end of the period, up to and including the month of May. Thus, average enrollment numbers do not expose churn rate – the number of students withdrawing over the course of the school year. According to its Class Period SEC filings, K12 "continually evaluate[s] our enrollment levels by state, by school and by grade. We track new student enrollments and withdrawals throughout the year."

45.     Enrollment and revenue figures were the key metrics in K12's financial reports. For example, K12's 2009 10-K stated "[f]rom fiscal year 2006 to fiscal year 2009, we increased average enrollments in the virtual public schools we serve from approximately 20,000 students to 55,000 students, representing a compound annual growth rate of approximately 40%. Over the same period, we increased revenues from $116.9 million to $315.6 million, representing a compound annual growth rate of approximately 39%, and increased EBITDA from $6.8 million to $43.2 million, a compound annual growth rate of approximately 85.2%. Also, over that period, we increased net income from $1.4 million to $12.3 million and operating income from $1.8 million to $22.3 million." Similarly, on quarterly analyst calls, K12 would routinely tie revenues to enrollment. For example, on the February 5, 2010 call, Keith Hass ("Hass"), SVP of Finance and Investor Relations, reported that "our revenues for the second quarter were $93.2

million, an increase of 20% over the second quarter of last year. This was primarily driven by a 22.3% increase in enrollments."

46.     Packard portrayed the Company's every-increasing drive for enrollments as K12's "manifest destiny" and mission to bring its educational services to "every child" in "all 50 states." For example, on the November 6, 2009 conference call to discuss K12's financial results, Packard declared "K12 managed schools now serve public school students in 25 states bringing us halfway to our manifest destiny of serving students in every state"; on the September 13, 2010 earnings call Packard stated "[w]e are now in a total of 27 states plus the District of Columbia, which brings us closer to our manifest destiny of having K12 managed virtual schools in all 50 states"; on the October 10, 2011 earnings call Packard began with "[f]irst and foremost, we marched toward our manifest destiny of making a K-12 education available to every child."

47.     K12 had a dedicated sales and marketing team whose sole aim was to drive enrollments, especially in those states that had no enrollment caps. In fiscal year 2009, K12's sales team conducted *over 4200* "information sessions and workshops" promoting K12's services to teachers and parents. Former sales employees at K12's call centers, located in Virginia and Kentucky, described high pressure to make huge enrollment quotas in order to get a commission. Sales employees were provided with a "script" of what to say to prospective students and parents, including purported "statistics" showing that K12 students were years more advanced than brick-and-mortar school students.

48.     CW1 was an enrollment consultant who worked at K12 from April 2010 through September 2011, reporting to K12's Vice President of Enrollment. CW1 stated that salespeople were paid a commission based on the number of students that they enrolled, but explained that the commission structure was not typical – rather than payment based on each student enrolled,

K12's salespeople had to hit a target total dollar figure every quarter in order to make *any* commission. CW1's target was around $400,000 per quarter. If he didn't meet this target, he received no commission. CW1 said the sales pitch was very vague and included statistical claims that K12 students performed 30% better on standardized tests than students in brick and mortar schools across the country, were 1-2 years more advanced, and that that K12 students had a better chance of going to college. CW1 noted that sales staff had no contact with teachers or schools. CW1 observed that "the goals kept going up and [commission] payments kept getting lower." In 18 months, CW1 sold approximately $1.5 million worth of contracts but was only paid $80,000. CW1 repeatedly asked his supervisors for the underlying data for these performance statistics, as he felt it would help him close sales if he were able to better explain the statistics to parents, but was never given anything in response.

49.     CW2 worked at K12 from 2003 to 2011. CW2, who worked in customer service and Sales/Enrollment, described a toxic work environment where sales staff were pressured to meet unrealistic quotas, frequently being forced to make as many as 200 outgoing calls daily to keep up. CW2 confirmed that sales staff were never given any actual data of student performance, but were instead fed statistics from K12's website, and were told to tell parents that students who did the K12 program for 1-2 years performed better than their peers at brick and mortar schools.

50.     CW3 worked as an administrator at K12's California Virtual Academy ("CAVA") during the Class Period until June 2011. CW3 reported to the Laura Terrazas, Dean of Student Services, and Katrina Abston, the Head of School. CW3 confirmed that enrollment consultants were paid on commission, with their primary goal to enroll as many students as possible. CW3 stated that he attended weekly enrollment meetings with Laura Terrazas, Katrina Abston, Jack

Pierce (the registrar), and several K12 corporate employees. According to CW3, the weekly enrollment meetings were "all about numbers," and focused on enrollment projections. CW3 stated that a draft enrollment "script," which originated from K12's corporate office, was distributed and discussed at several of the enrollment meetings. CW3 described the script as a "flow chart," which contained responses to potential questions that parents might ask during a sales call.

51.     According to CW3, "enrollment process requirements would change after the school year started." Whereas the "required documents [to] process enrollment" were supposed to include the student's most recent report card, transcripts from prior schools, and a "release of records" enabling K12 to request the student's records from prior schools, the requirements "would change at some point in the year to only require the birth certificate and proof of residence. *It seemed to depend on where we were in relationship to [enrollment] projections.*"

52.     CW4 worked for K12 from May 2011 through August 2011 as an Enrollment Consultant for K12's Colorado and Arizona schools, reporting to Bobby Merchant, a Team Leader. CW4's primary responsibility was to contact potential students' parents from a list of "leads" Merchant provided to each sales associate daily. CW4 stated that there was constant pressure to generate sales, describing the Company's sales philosophy as "enroll, enroll, enroll." As added incentive, K12 offered gifts, lunches, and cash bonuses on a weekly basis to the top performing enrollment consultants. CW4 confirmed that a script was given to salespeople for use on their calls. According to CW4, Erica Scott, an Enrollment Manager, provided consultants with a script containing key "verbiage" to use, and various approaches to take with potential customers. Although the script also contained statistics comparing K12 schools to "brick and mortar" schools, such as graduation rates, CW4 was never provided with underlying data

supporting the statistics. CW4 stated that enrollment consultants were instructed to refer to the performance of K12 students as "comparable [to] or even better" than the performance of students at traditional schools, and to state that students at K12 schools were "on a better tier" than those at traditional schools.

53. Packard delivered the same message at multiple investor conferences. For example, at the September 22, 2009 Bank of America conference, Packard stated that "we give results that are as good or better than state averages and that is all we promise. But that is a pretty powerful promise when you can deliver at a lower price equal or better results…. we have to deliver. At the end of the day, that delivering allows you to stay in states and thrive continuing to get kids placed in top colleges. So the academics actually matter a lot here." Similarly, at the February 15, 2011 Deutsche Bank conference, Packard stated that "unlike we might have seen [with] colleges, these children have to take standardized tests. So we can compare how we do to children in brick and mortar schools. *And we do absolutely as well as the average brick and mortar school in the state, and in a lot of cases, significantly better.*"

C.  **Defendants Use Ever-Increasing Enrollments to Conceal Churn, and Increasingly Enroll "Last Resort" Students**

54. As K12's enrollments – and revenues – skyrocketed during the Class Period, Defendants were concealing a key material fact: the churn rates at K12's virtual public schools were excessively high. A school's churn rate is the number of students who drop out/withdraw over a school year expressed as a percentage of the total number of students enrolled during the year. For example, the churn rate at one of K12's largest virtual academies, Ohio Virtual

Academy, was over 50% during the 2010/2011 school year, *i.e.*, *more than half* the students enrolled that year dropped out.[3]

55.     Similarly, at Agora Cyber Charter School – comprising more than 10% of K12's fiscal 2010 revenue on its own – a total of 7,578 students were signed up through the course of the 2009-2010 school year, of whom 4,718 were in place in September.  Throughout the year, a total of 2,688 dropped out for a churn rate, of 35.5%.  California Virtual Academy schools signed up a total of 16,934 students in the 2010-2011 school year (11,682 were enrolled in September) and 23.8% pulled out that year.  Colorado Virtual Academy schools had 6,449 students registered through the 2010-2011 school year, 4,163 of whom were enrolled that August.  A total of 2,330 dropped out for a churn rate of almost 36.1%.  These figures would be even higher if K12 had not replaced students who dropped out with students enrolled during the year.[4]

56.     These high churn rates reflect instability in enrollments because K12 was unable to retain students through the school year – accordingly, K12's revenues were correspondingly unstable because they depended heavily on enrollments.  Analyst reports during the Class Period reflect that the market erroneously assumed K12's enrollments were stable.  For example, a February 2, 2010 ThinkEquity analyst report stated that "*[e]nrollment gains made during Q1 tend to persist for the rest of the school year*, so we are confident in our estimate of 26% growth….We expect Q2 enrollment to remain roughly stable throughout FY10 *since relatively few students enter or exit during the school year*"; similarly, a May 7, 2010 Wedbush analyst report assured investors that "*September/October enrollments largely dictate K12's full year*

---

[3] *See* The Financial Investigator, "K12: A Corporate Destiny Manifested," February 27, 2012, available at http://www.thefinancialinvestigator.com/?p=649

[4] These figures were cited in The Financial Investigator, "K12: A Corporate Destiny Manifested," February 27, 2012, available at http://www.thefinancialinvestigator.com/?p=649.  The churn rates for other K12 schools are obtainable only through discovery.

*financial results*, and that investors are likely not to receive a surprise on the revenue side of the business."

57.     CW3, a former administrator at California Virtual Academy who attended weekly enrollment meetings, confirmed that the turnover rate was high, stating that as soon as students withdrew, more would be brought in to replace them.  CW3 referred to California Virtual Academy as a "revolving door."

58.     CW5, a former K12 Market Research Manager from July 2008 to April 2011, confirmed that management internally tracked churn.  CW5 was a statistician with a doctorate who was charged, among other things, with studying churn at K12's schools.  According to CW5, another factor contributing to churn was the mistaken impression (fed by the Company's marketing team) that K12's program was flexible and not state-regulated – when it became clear that the program was required to meet certain state requirements, the parents withdrew their children.  CW5, describing how K12's aggressive marketing kept recruiting children unsuited to K12's program, stated "it was as if you were trying to stop the bleeding but were still inflicting wounds at the same time."

59.     According to CW5, by 2009 "everybody knew there was an issue with retention," and the Company accordingly created an internal "Retention Task Force," comprised of V.P.-and-above level employees, to focus on retention problems.  Defendants, however, did not *publicly* disclose the retention and churn problems until the end of the Class Period.

60.     CW6 was the Senior Director for School Development from September 2008 through September 2009, reporting to Peter Stewart, the Vice President for Business Development.  According to CW6, when discussing the Company's sales strategy with Peter Stewart ("Stewart"), Stewart informed him that the K12 curriculum wasn't built for "inner-city

kids," but instead was geared towards "gifted and talented" students. This struck CW6 as odd because the majority of K12 students were inner-city students. CW6 asked his superiors on more than one occasion to see data that supported the Company's claims concerning the above-average performance of K12 students, but was told that there was no such data.

61.     According to CW6, K12 targeted inner-city and at-risk populations due to their higher potential profit in those areas. CW6 stated that Stewart didn't necessarily agree with this practice, but told CW6 "that's what they had to do." According to CW6, Stewart – who routinely received orders directly from Packard – was acting on Packard's instructions.

62.     CW7, a former operations manager at one of K12's virtual schools from October 2008 to June 2010 whose responsibilities included supervising all enrollment activities, confirmed that "habitually truant students drive revenue…and that K12 needs these students or they would have to spend a lot more on instruction." In other words, K12 corporate officials knowingly enrolled students that would be a bad fit for K12 schools and were likely to drop out, resulting in more churn and more instability in enrollments (and, accordingly, revenues), and K12's recruitment of inner-city and at-risk "last resort" students had another benefit – these students used up less of K12's educational and teaching resources while permitting K12 to collect full funding from the states.

63.     CW8 worked as a journalism teacher from August 2011 through March 2012 at K12's Texas Virtual Academy. CW8 initially reported to Savannah Pettit, the school principal, and David Fuller, Head of School, subsequently reporting to Laurie Elliott, who was school principal following Pettit's departure, and Megan Henry, who acted as the Interim Head of School following Fuller's departure. CW8 confirmed that Texas Virtual Academy had the "wrong kind of students" in the program, explaining that the majority of his students saw the

virtual school as a way to "hide out" and not attend class. Therefore, many of his students were failing students.

64.     CW9 was the Senior V.P. of Operations at K12 from March 2004 through September 2011. CW9 corroborated that K12 management tracked student enrollment through the SAMS database. According to CW9, all virtual school administrators and K12 corporate employees had access to SAMS.

65.     CW10, the Company's Controller from September 2005 through January 2011, reported directly to Hawks throughout his tenure. CW10 focused most of his time on the Company's corporate operations including SEC reporting. One of the departments that reported to CW10 was "Shared Services," which handled the revenue generated by each virtual school. CW10 confirmed that all of the schools entered enrollment, attendance and other information into a "central…proprietary" system that was managed at the corporate level.

### D.     High Churn Negatively Impacts School Performances and Education Quality

66.     K12's ever-increasing need for enrollments to mitigate high churn rates and sustain the growth rates investors expected led the Company to accept any student its salespeople could convince to enroll, regardless of whether the Company's individualized learning system, which required a high level of parent and student commitment, was suitable for that student.

67.     As a result, students at K12 schools performed more poorly than their peers at brick and mortar public schools, as measured by Adequate Yearly Progress (AYP), a state-wide grade-level benchmark,[5] and by individual state-assessed proficiency tests in reading and math.

___

[5]     AYP is the measure by which schools, districts, and states are held accountable for student performance under Title I of the No Child Left Behind Act of 2001 (NCLB), the current version of the Elementary and Secondary Education. State tests must be the primary factor in the state's measure of AYP, but the use of at least one other academic indicator of school performance is required; for secondary schools, the other academic indicator must be the high school graduation rate. *See* http://www.edweek.org/ew/issues/adequate-yearly-progress/.

For the 2009-2010 school year, *75%* of the K12 virtual public schools in operation that year failed to meet AYP, including Agora Cyber Charter School and Ohio Virtual Academy, schools that each generated more than 10% of K12's revenues that year; in 2010-2011, 66% of the 49 K12 virtual public schools in operation failed to meet AYP, again including Agora Cyber Charter School and Ohio Virtual Academy, which each generated more than 10% of K12's revenues in 2010-2011.[6]

68.    Similarly, the chart below shows that a representative sample[7] group of K12's virtual public schools had graduation rates markedly lower than state averages:

| Graduation Rates (%) | | | | | |
|---|---|---|---|---|---|
| | | **2009-2010** | | **2010-2011** [a] | |
| **State** | **K12 Schools** | **K12 School** | **State** | **K12 School** | **State** |
| **AZ** | Arizona Virtual Academy [b] | 23 | 76.1 | 35.2 | 75.4 |
| **CA** | California Virtual Academy @ Los Angeles [c] | 29.2 | 78.6 | 34.8 | 80.5 |
| **CO** | Colorado Virtual Academy | 12 | 72.4 | 21.6 | 73.9 |
| **NV** | Nevada Virtual Academy [d] | 83.3 | 71.3 | 58.3 | 72.3 |
| **OH** | Ohio Virtual Academy (OVA) [e] | 54.1 | 83 | 58.8 | 84.3 |
| **PA** | Agora Cyber Charter School [f] | 68.5 | 90 | 66 | 91 |
| **SC** | South Carolina Virtual Charter School [g] | 23.2 | 72.1 | 7.4 | 73.7 |
| **WA** | Washington Virtual Academies [h] | N/A | 76.5 | 22.2 | 75 |

[a] Arizona, California, Nevada, Ohio, South Carolina and all report previous year graduation data on school and state report cards and more current data are not published. Therefore, for these states, data are reported for the previous year.
[b] http://www.azed.gov/research-evaluation/graduation-rates/
[c] http://dq.cde.ca.gov/dataquest/CompletionRate/comprate1.asp?cChoice=StGradRate&cYear=2008-09&level=State; http://dq.cde.ca.gov/dataquest/Acnt2011/2010BaseSchDC.aspx?allcds=19-65094-0112706&c=R
[d] 83.3% based on 12 students; http://www.nevadareportcard.com/profile/pdf/10-11/18404.E.pdf; http://www.nevadareportcard.com/
[e] http://www.ode.state.oh.us/reportcardfiles/2010-2011/BUILD/142950.pdf;
http://ilrc.ode.state.oh.us/PublicDW/asp/Main.aspx?server=mstris2&project=ILRC&evt=3002&uid=guest&pwd=&persist-mode="8"
[f] http://paayp.emetric.net/Content/reportcards/RC11S126510020000007858.PDF; http://paayp.emetric.net/;
http://www.education.state.pa.us/portal/server.pt/community/state_report_cards/7438
[g] http://ed.sc.gov/data/ayp/2011/; http://ed.sc.gov/data/report-cards/2011/high/c/h4701004.pdf
[h] http://www.k12.wa.us/DataAdmin/pubdocs/GradDropout/10-11/GradDropoutStats_2010-11.pdf;
http://www.k12.wa.us/DataAdmin/default.aspx

---

[6]    *See* National Education Policy Center "Profiles of For-Profit Education Management Organizations" Reports for 2009-2010 and 2010-2011.

[7]    The sample of K12 schools used in the charts include those that were in operation during the Class Period and for which sufficient data could be gathered in the time allotted and without formal discovery. Much of the school and state-specific data is only available via requests for information from various state departments and/or school districts, and for some schools it is entirely unavailable without compelled discovery from K12 and third parties. The sample includes K12's largest schools and several medium-sized schools.

69.    The chart below shows that K12 schools also scored lower on standardized math and reading tests compared to all state public schools:

| K12 vs State Public Schools - Proficiency on Math and Reading Standardized Tests | | | | | |
|---|---|---|---|---|---|
| | | 2009-2010 | | 2010-2011 | |
| | | M | R | M | R |
| AZ | K12 Arizona Virtual Academy [a] | 42 | 74 | 43 | 75 |
| | Arizona State public schools [b] | 61.5 | 76.9 | 63.6 | 79.0 |
| CA | K12 California Virtual Academy @ Los Angeles [c] | 24.1 | 56.3 | N/A | N/A |
| | California State public schools [d] | 35.9 | 52.3 | N/A | N/A |
| CO | K12 Colorado Virtual Academy [e] | 27.9 | 55.5 | 38.7 | 64 |
| | Colorado State public schools [f] | 52.4 | 68 | 53.2 | 67.9 |
| GA | K12 Georgia Cyber Academy (Odyssey School) [g] | 72.3 | 93.7 | 66.4 | 91.4 |
| | Georgia State public schools [h] | 85 | 91.4 | 85.1 | 92.3 |
| NV | K12 Nevada Virtual Academy [i] (K-8) | 46.7 | 71 | 46 | 59 |
| | Nevada State public schools [j] (K-8) | 66.7 | 74 | 69.7 | 69.3 |
| OH | K12 Ohio Virtual Academy [k] | 66.7 | 83.1 | 67.7 | 83.4 |
| | Ohio State public Schools [l] | 70.3 | 76.1 | 78.9 | 83.9 |
| PA | K12 Agora Cyber Charter School [m] | 40.5 | 51.7 | 38.5 | 49 |
| | Pennsylvania State public schools [n] | 72.2 | 70.5 | 72.9 | 72.3 |
| SC | K12 South Carolina Virtual Charter School [o] | 71.7 | 83.6 | 55.4 | 65.5 |
| | South Carolina State public schools [p] | 80.4 | 83.5 | 62.3 | 68.0 |
| TX | K12 Texas Virtual Academy [q] | 60.3 | 87.5 | 62.8 | 85.5 |
| | Texas State public schools [r] | 80.9 | 89 | 80.8 | 88.1 |
| WA | K12 Washington Virtual Academies [s] | 11.5 | 35.7 | 38.7 | 56.3 |
| | Washington State public schools [t] | 50.3 | 71.4 | 60.1 | 72.4 |

[a] http://www10.ade.az.gov/ReportCard/SchoolReportCard.aspx?id=79705&Year=2011&ReportLevel=1
[b] http://www.azed.gov/research-evaluation/files/2012/04/2011statereportcard.pdf
[c] http://star.cde.ca.gov/star2010/ViewReport.asp?ps=true&lstCounty=19&lstDistrict=65094-0838&lstSchool=0112706
[d] http://star.cde.ca.gov/star2010/ViewReport.asp?ps=true&lstTestYear=2010&lstTestType=C&lstCounty=&lstDistrict=&lstSchool=&lstGroup=
1&lstSubGroup=1

e  https://cedar2.cde.state.co.us/documents/UIP2011/0020-1752.pdf
f  http://www.cde.state.co.us/FedPrograms/dl/danda_nclbstrptcrd_0910.pdf
g  http://archives.gadoe.org/ReportingFW.aspx?PageReq=102&SchoolId=36407&T=1&FY=2011
h  http://archives.gadoe.org/ReportingFW.aspx?PageReq=102&StateId=ALL&T=1&FY=2011
i  http://www.nevadareportcard.com/profile/pdf/10-11/18404.E.pdf
j  http://www.nevadareportcard.com/profile/pdf/10-11/18404.E.pdf  [K-8]
k  http://www.ode.state.oh.us/reportcardfiles/2010-2011/BUILD/142950.pdf
l  http://www.ode.state.oh.us/reportcardfiles/2010-2011/BUILD/142950.pdf
m  http://paayp.emetric.net/School/Overview/c15/4/7858
n  http://paayp.emetric.net/School/Overview/c15/4/7858
o  http://ed.sc.gov/data/report-cards/2011/high/c/h4701004.pdf; http://ed.sc.gov/data/report-cards/2010/elem/c/e4701004.pdf
p  http://ed.sc.gov/data/report-cards/2011/high/c/h4701004.pdf; http://ed.sc.gov/data/report-cards/2010/elem/c/e4701004.pdf
q  http://ritter.tea.state.tx.us./cgi/sas/broker
r  http://ritter.tea.state.tx.us./cgi/sas/broker
s  http://reportcard.ospi.k12.wa.us/summary.aspx?groupLevel=District&schoolId=7655&rep&year=2010-11
t  http://reportcard.ospi.k12.wa.us/summary.aspx?year=2010-11

70.    In other words, K12's virtual academies were not, contrary to Packard's Class Period assertions, delivering "quality education" that was as good as, or better, than brick and mortar public schools.

71.    An April 2011 report titled "Charter School Performance in Pennsylvania" by Stanford University's Center for Research on Education Outcomes similarly concluded that students in Pennsylvania's virtual public schools performed "significantly worse" in math and reading than their public school peers.  Yet, later in the Class Period, Packard continued to assert that K12 delivered outstanding academic performance based on "annual growth" measures.

72.    In a March 8, 2012 Burnett County News Sentinel article titled "Is online education giant K12 floundering?" the superintendent for the Insight School of Wisconsin, which K12 has managed since June 2011, confirmed that the school had, under K12's management, "experience[d] some problems with performance," and that the school had also had the "same enrollment problems" with churn that other K12 schools had experienced.[8]

73.    During the Class Period, Packard acknowledged the importance of student retention, stating on the October 10, 2011 earnings call that "*[f]ew measures are better than student retention for validating the quality of our curriculum, systems and instruction*."  In a

---

[8] http://www.presspubs.com/burnett/news/article_1d10247e-6867-11e1-8ba3-0019bb2963f4.html

partial disclosure of the truth on November 16, 2011, Packard also acknowledged that "*[w]e track churn immensely* and we manage – and we view the retention of the kids as one of the best metrics of what we actually are able to do [but] [w]e don't disclose it." Accordingly, Defendants admittedly knew, or were extremely reckless in not knowing, about the excessive rates of churn during the Class Period – and the corresponding effects of that churn on "the quality of [K12's] curriculum, systems and instruction."

74.     Analyst reports during the Class Period also reflect the market's understanding that stable enrollment and retention were crucial for stable revenues. For example, a September 13, 2010 ThinkEquity report stated "[w]e think enrollment growth during Q1 is a very strong indicator of enrollment for the remainder of the fiscal year, *as students tend to remain in K12 programs for the duration of the school year*, and we will be looking for management's update after 1Q10"; similarly, a May 7, 2010 Wedbush report stated "[w]e remind investors that *September/October enrollments largely dictate K12's full year financial results*, and that investors are likely not to receive a surprise on the revenue side of the business."

75.     A former special education instructor at Agora Cyber Charter School, Heidi Gardner, corroborated the negative effects of churn on her teaching:

> "If you weren't trying to make initial [E-mail or phone] contact with new students then you were trying to keep on top of the 'inactive' [students who had not logged on to Agora's web portal in a few days] or confirm if students who [had] not been in contact with [teachers] for weeks or months were still enrolled," Gardner said. "You could add four hours to your work day doing this."

> "When it came to the actual instruction, you'd be a secretary, scheduling in 10 minutes here and there for students who often had complex learning challenges."

The Financial Investigator, "K12: A Corporate Destiny Manifested", February 27, 2012, available at http://www.thefinancialinvestigator.com/?p=649

### 1. Aggressive Enrollments Result in Excessive Student-Teacher Ratios that K12 Concealed

76.    K12's rapidly increasing enrollments also resulted in overwhelmingly high student-teacher ratios, compounded by NCLB's requirement that all teachers be "highly qualified" as defined under the Act, which made it more difficult to rapidly recruit appropriate teachers.

77.    CW8 described the student-teacher ratio as "unmanageable," eventually leading to his departure from the Company. CW8 stated that at the beginning of the 2011-2012 school year, he was responsible for approximately *150-180 students*, although some of these students ended up withdrawing. Moreover, that ratio was actually the lowest in the Texas Virtual Academy – most teachers were responsible for *200-300 students*, and one teacher, Joe Sullivan, was responsible for *over 400 students*.

78.    CW8 suffered "insane" hours and reached out to Mary Gifford, Regional Vice President, Central Region at K12. CW8 informed Gifford that the "school is unworkable," and that "something needs to be done." Gifford requested that CW8 ask other teachers to participate in a conference call regarding the problems. According to CW8, approximately 20 teachers participated in the call with CW8 and Gifford. When the teachers raised the issue of teacher-student ratios, however, Gifford refused to acknowledge that the numbers being provided by the teachers were accurate, and quickly "shut down" the discussion.

79.    Other former teachers described how K12 manipulated its reported student-teacher ratios to conceal how high they were. According to CW11, a former special education teacher at Agora Cyber Charter School during the Class Period, Agora used lead teachers in its reported student-teacher ratios even though lead teachers do not teach, have no student workload and simply oversee other teachers.

80.     CW12, a teacher at Colorado Virtual Academy from fall 2001 until approximately August 2010, confirmed that Colorado Virtual Academy also included lead teachers (who had no students) as well as special education teachers (who by law could only have a limited number of students) in its reported student-teacher ratios, to deliberately lower the figures.

81.     K12 further manipulated student-teacher ratios by having one teacher simultaneously teach in several K12 schools in different states.  An anonymous email forwarded on June 14, 2012 described at least one instance of manipulation involving a K12 teacher who taught classes for three different schools in at least two different states – Georgia and Florida. The Florida student-teacher ratio audit would only register the teacher's Florida student numbers; similarly, the Georgia audit would only register the teacher's Georgia student numbers. Although the ratio was acceptable in either state, the true ratio, which would have to include all the teacher's students in both states, would have been too high.

### 2.     K12's "Highly Qualified" and "Certified" Teachers

82.     Moreover, in contrast to K12's statement in its Class Period SEC filings that "[w]e use a rigorous evaluation program for making hiring recommendations to the virtual public schools we serve.  We hire teachers who, at a minimum, are state certified and meet the federal requirements for designation as a "Highly Qualified Teacher," and generally have at least three years of teaching experience," CW8 stated that his interview consisted of Savannah Pettit, the principal at that time, telling him about the position and then asking, "Do you want it?"  and that Pettit asked no questions about his qualifications.  The only question that Pettit asked was, "Do you have any questions for me?"  CW8 added that the interview took place at the end of July for a position that began approximately two weeks later, and that the training he received after he started his position was "non-existent."

83. Similarly, CW13, a teacher at K12 from 2007 through 2010 at California Virtual Academy, stated that he was hired mid-year to replace a teacher who had recently left the school. CW13 received his job offer after only one telephone interview. The issue of whether he was "highly qualified" was never raised during that interview.

84. K12 seemed more concerned about hiring teachers who could recruit students, rather than teach. A post-Class Period, March 2, 2012 blog article by David Safier on Blog for Arizona, titled "Craig Barrett's K12 Inc. has high student 'churn' rate" reported that "eight [out] of ten interview questions" for an applicant for a K12 teaching position "were about what she would do to recruit new students."[9]

85. At least two K12 schools also had a lower percentage of classes taught by highly qualified teachers than the state average. In 2010-2011, Hawaii Virtual Academy had only 71% of classes taught by highly qualified teachers, compared with 86% state-wide. Similarly, at South Carolina Virtual Charter School, only 82.7% of classes were taught by highly qualified teachers, compared with 93.9% state-wide, for the 2010-2011 year.[10]

86. There is also evidence that K12 teachers who were *not* certified to teach certain subjects did, in fact, teach those subjects, and that school records were subsequently altered to retroactively "assign" students who had been taught by an uncertified teacher to a certified teacher, even though the certified teacher never actually taught that student. A February 15, 2011 email from the projects manager at Florida Virtual Academy to the schools' teachers asked them to sign their class rolls and explained that "some teachers may notice a few extra students in their class roll. That is due to certification issues. *In the virtual setting, any teacher can teach the students the subjects but the districts like to have certified teachers in each subject*. So *if you*

---

[9] http://www.blogforarizona.com/blog/2012/03/craig-barretts-k12-inc-has-high-student-churn-rate.html
[10] Statistics obtained from the respective state Departments of Education.

*see your name next to a student that might not be yours* its [*sic*] because you were qualified to teach that subject and we needed to put your name there."

### 3. K12's Special Education Programs Fail to Meet Government Requirements

87.     Other "quality" educational services also suffered.  Although K12 represented in its Class Period SEC filings that its special education programs complied with all federal and state requirements, in at least one reported instance, the Ohio Department of Education found, after a formal complaint by a parent, that the K12-managed Ohio Virtual Academy had violated several provisions with respect to its program for a special needs student.

88.     In a February 3, 2012 letter, the Ohio Department of Education, Office for Exceptional Children, informed Kristin Stewart, Superintendent of Ohio Virtual Academy:

> The community school provided copies of three Individualized Educational Program(s) (IEP) that were utilized from the time of the student's enrollment at the Ohio Virtual Academy until the current complaint was filed.  The community school "adopted" a previous school's IEP on February 4,2011, completed an "amended" IEP (Facilitated IEP) on June 23, 2011 and additional "amended" IEP (second Facilitated IEP) with a listed start date of October 12, 2011, but an apparent meeting date of November 10, 2011.  *There are numerous procedural errors, confusing dates, lack of staff and parent signatures and a lack of clear intent associated with these IEPs, which makes an accurate determination of the adequacy of the plan to serve this student confusing at best.  The community school failed to provide an Individualized Educational Program (IEP) that was adequate in its services*, description of specialized services, scope and detail. These IEP deficiencies are a violation of 34 CFR §300.320 [Definition of individualized educational program], 34 CFR §300.324 [Development, review and revision of IEP].  The community school failed to provide services specified or which should have been specified in the student's IEP.  This is a violation of 34 CFR §300.320(a) [Definition of individualized education program] and 34 CFR §300.324 [Development, review, and revision of IEP].

During the period of February 4, 2011 (adopted IEP) through June 23, 2011 ("amended" IEP) the community school failed to provide the following services:

-- 70 minutes per day of specially designed instruction in a resource room

-- Special transportation (as would be needed for attendance at off-site related services)

-- Adapted physical education for 120 minutes per month (omission continuing to the present)

-- Sessions of occupational therapy were to have been provided 90 minutes per month from the time of IEP adoption. OT sessions were omitted during the time periods of 2/4/1 to 3/17/11 and 9/1/11 to 10/12/11.

89.     A followup letter on May 7, 2012 from the Ohio Department of Education to Stewart stated:

The student's Facilitated IEP (November 10, 2011) indicated the student required specially designed physical education. However, as of the date of the current complaint (March 6, 2012) the community school had not updated the student's IEP to clarify Adapted Physical Education goals, objectives or specialized instruction details and student had not received Adapted Physical Education. This is a violation of 34 CFR §300.320 [Definition of individualized education program] and 34 CFR §300.503 [Prior notice by the public agency; content of notice].

Additional Finding: The community school's continued failure to provide in a timely manner Adapted Physical Education as indicated by the IEP's in effect for the student constituted a violation of FAPE per 34 CFR§300.17 [Free appropriate public education]….*The community school failed to provide properly planned and accountable speech and language services to the student*. This is a violation of 34 C.FR §300.34 [Related services].

90.     A former high school advisor who worked at Agora Cyber Charter School from June 2008 through June 2010 sent an email to Aaron Hall, V.P. of Program Management at K12, questioning whether it was "ethical" to continue enrolling special education students (and

collecting the increased special education funding for them) when his school could not provide adequate services for those students:

> At the start of the [2009-2010] school year, we received an email from the head of Special Education stating that corrective action required us to have services available for all SPED students beginning the first day of school. At the end of November, and again in December, I have copies of a chat session with a Master Teacher where I expressed concern that some of my advisees still did not have a SPED teacher assigned. *In that chat, he acknowledged that many did not have SPED teachers assigned as we did not have enough hired to service all students.* This was November 19th.
>
> I followed that up with emails to my department chair and the director of the high school telling them that some of my students were beyond frustrated. The end of the semester was near and they were failing but had never received SPED services.
>
> ***
>
> Question: *Is it ethical, responsible, or in the best interests of students to accept them on your roll if we are not equipped to serve them?* I would like for the senior administration to listen to a student on the phone crying and tell them that it is okay. *Is it even legal*? I know that in Adams County, *the fees that the district pays are higher for special education students than it is for regular education. Is it ethical to accept that fee if students are not assigned to special educators.* If you, Mr. Hall, had a child who was entitled to Special Education services, would it be okay with you for that child to go from September to December with no Special Educator assigned to them?

Emphasis added.

91.    In another case, a former special education teacher at Agora Cyber Charter School, one of K12's two largest schools in terms of revenue, described a misuse of special education funds to purchase gift cards from Barnes and Noble bookstores:

> Gardner says that the special education department received a $200,000 federal grant under the American Recovery and Reinvestment Act for the 2010/2011 school year. As a function of trying to manage the ever-fluctuating class lists, the grant appears to have been completely forgotten about. Under the terms of the

grant, however, funds had to be spent by September 1, and according to Gardner, the funds were "rediscovered in May."

"I had direct orders to make sure it got spent. We were made to run around for weeks buying I-Pads and gift certificates to Barnes & Noble and ITunes, getting dozens of copies of voice translation software we just kept at the office, throwing parties for graduating seniors across the state and we still couldn't finish the grant money," recalled Gardner. "So dozens of extra $50.00 gift cards were given to teachers who had nothing to do with Special Ed, all of whom thought [Agora's Head of School] Sharon [Williams] was simply being very thoughtful."

"They had no idea it came from the federal government," said Gardner, who described herself as "Still angry that I was made to do that," suggesting the story is "Basically the reason everyone who pays taxes should worry about something like ARRA."

The Financial Investigator, "K12: A Corporate Destiny Manifested", February 27, 2012, available at http://www.thefinancialinvestigator.com/?p=649

92.    Even when special education funds are properly used, however, it is not clear if K12 provides services worth the funding costs. For example, Agora Cyber Charter School charges $22,000 per year for each child who needs one hour a week for speech therapy, which the child receives via a headset and a microphone connected to a computer. In contrast, one hour of speech therapy a week in a traditional public school costs about $1,500 a year – a markup by K12 of 1500%.[11]

93.    The cumulative effect of these impaired and sub-par services was to increase withdrawal rates, which in turn resulted in ever-increasing desperation tactics by Defendants to mask churn with yet more students who were unsuited to K12's individualized learning program – a vicious cycle that could not be sustained indefinitely.

---

[11] *See* January 25, 2012 testimony of Karen McPhee, superintendent of the Ottawa Area Intermediate School District at a House Education Committee hearing on Senate Bill 619 in Michigan.

## E. K12 Used Improperly Lax Grading and Attendance Practices To Maintain and Artificially Inflate Enrollment

94.     To satisfy its need to both keep enrollments high and continually generate more enrollments, K12 employed the improperly lax attendance and grading policies and procedures described below.

95.     CW14 was a teacher at California Virtual Academy from October 2007 through September 2011.  CW14 stated that teachers were pressured to ensure attendance remained high.  According to CW14, teachers were instructed to contact parents prior to each attendance count day by the state, and instruct the parents to *retroactively* log students' attendance for any missed days.  CW14 stated that teachers had the ability to view and alter students' attendance records through SAMS, and that although supervisors did not specifically tell teachers to doctor attendance records, they continually reminded teachers that the SAMS software permitted them to do so.  CW14 further noted that teachers were penalized if students withdrew from the school, as the teachers' annual reviews took into account the turnover rate of their students.  CW14 observed that it was next to impossible for a teacher to have a student withdrawn for noncompliance.  CW14 explained that when a student was repeatedly absent or not completing assignments, he was instructed to call the student's parents and send a certified letter to them informing them that their child would be withdrawn from the program if his or her attendance was not logged and assignments made up.  If parents did not respond to the initial letter or phone calls, CW14 was instructed to send follow up letters containing similar threats.  CW14 stated that once a parent finally did respond and correct their child's noncompliance, the student's attendance record would start from a clean slate, *i.e.*, the letter-writing campaign would start over again in the event that the student became noncompliant in the future.

96. CW8 also recalled being instructed to tell parents to log attendance every day even if their child didn't attend class. CW8 confirmed that parents could log attendance retroactively. According to CW8, students with unexcused absences would receive Family Accountability Points, or FAPS. Once a student accumulated 20 FAPS, they were supposed to be withdrawn from the school, but administration rarely enforced this policy. CW8 explained that he had many students that should have been withdrawn, as they would simply log in to the software but never complete their assignments. CW8 reported this issue to a student advisor, who explained that nothing could be done without administration signing off on the withdrawal, which administration refused to do.

97. CW15 enrolled his son in Utah Virtual Academy in August 2011. CW15's son successfully completed his 2011-2012 curriculum at the end of April 2012, approximately one month ahead of schedule. Because his son had completed his curriculum and was no longer attending classes, CW15 stopped marking attendance for his son. CW15 then received emails from his son's teacher, instructing him to go back and log attendance for the missed dates. The emails stated that "you may log hours *for free reading time, educational outings, sports they're involved in*, etc." CW15 continued to refuse to log attendance for days that his son did not attend class. CW15 then received a phone call from an administrator at the Utah Virtual Academy concerning his son's attendance. CW15 explained to the administrator that his son was no longer attending classes because he had finished his curriculum for the year, but the administrator stated that CW15 nonetheless was required to go back and log attendance for the missed dates. The administrator further stated that the school would take "legal action" against CW15 if he did not log the missed attendance.

98.     CW3 stated that parents were expected to log attendance for every day.  CW3 confirmed that on a certain date each month, teachers were instructed to contact parents and remind them to retroactively log attendance.  CW3 was aware of occasions when teachers logged students' attendance when parents did not respond to the teachers' requests to do so.

99.     CW16 was a teacher for California Virtual Academy from April 2007 through June 2010, reporting to Karen Moe, his regional supervisor.  CW16 explained that after initially logging in to the Virtual Academy software, parents would need to click a button certifying their child's attendance for the day.  According to CW16, teachers could track the date and time that a student logged in, as well as what the student did after logging in and how long they remained logged in.  CW16 stated that teachers were instructed to tell parents to mark their children present at all times – even if absolutely no work was done on a given date – because almost any everyday activity, television show, or "field trip" could be considered educational in nature.

100.    An October 19, 2009 weekly newsletter sent to parents of K12 students at California Virtual Academy confirms CW16's account, stating: "Usually there isn't any reason to have an absence in our virtual setting.  Even if you aren't feeling well or if you take a day to do a field trip or activity you can log any academic activities you do that day.  So usually you can log some reading time in your Literature class or some time in your science class if you watched a science related program, etc.  There are so many learning experiences in every day activities as well!"

101.    CW16 further stated that the software permitted parents to log their child's attendance retroactively.  CW16 confirmed that parents were given a warning a few days prior to the running of each monthly "attendance report" so that they could retroactively log their child's attendance.   The October 26, 2009 weekly letter corroborates CW16's account, informing

parents that "CAVA will be running our monthly attendance report on Friday, October 30th at close of business (5:00 pm). The report will include attendance for October 5th through October 30th. After the attendance report is run, those days' attendance will be 'locked.'" Thus, parents could retroactively mark attendance as far back as October 5, at any time before the days were "locked" on October 30th at 5pm.

102. CW16 explained that the Virtual Academy software also provided teachers with the ability to certify students' attendance, which they were instructed to do prior to the running of the attendance report if the parents had not done so. According to CW16, after a parent/student logged in to the software and clicked the attendance certification button, there would frequently be no further activity on the account. CW16 stated that he raised several of his concerns with his superiors. CW16 recalled a specific conversation with his regional supervisor, Karen Moe, in which he informed Moe that there was an "integrity problem" at the school, and that he was confident that a number of his students were cheating. No action was ever taken in response.

103. CW16 also sent an email to Moe in March 2010 regarding a student whose parents had certified attendance but who had done no work for "weeks":

> I am dealing with this [family] with the learning coach [] and it is not getting anywhere. *They have cleared their attendance but not provided any progress for weeks*. Mom keeps giving the excuse that her daughter or her [*sic*] are ill or that their computer is in the "shop." *Besides logging in a large amount of lessons in one day, they are not doing daily progress*. I have kept a log of our communication on cavatest. *I really suggest that this student get an administrative withdrawal*. Maybe that is stepping over my authority but I think it's something that would only benefit the student because she would get into a school where she is at least being exposed to schoolwork on a daily basis and not sitting at home losing precious time.

Emphasis added.

104.    In response, Moe told CW16 that he needed "to follow policy," which consisted merely of sending the student yet another form letter regarding the student's lack of work, and the student remained enrolled.

105.    CW16 further stated that *he routinely passed students who should not have passed* because he believed they cheated on their exams, *but passed them at the instruction of his superiors*.  CW16 explained that it was very easy for students to cheat on exams as there was no way for the teacher to tell who was actually taking the exam (*i.e.*, student or parent).  CW16 suspected that a number of students would have their parents or another individual take exams in their place.  CW16 stated that teachers would occasionally travel to students' houses to meet with the student in person.  CW16's suspicion that certain students were cheating were bolstered by these in-person visits, because he would often observe that students' textbooks had never been opened, yet the same students performed well on their exams.

106.    The 2009-2010 California Virtual Academy school calendar, sent to parents, confirms that "grading" was based on "progress" in online lessons, *i.e.*, a parent could easily complete an online lesson in place of a child:

> Your child will be graded in our school according to how much "progress" they make in their classes each week.  *The target amount of progress is 2% each week, which you keep track of on the Progress screen on the OLS.*  If your child doesn't do any school work or only does it a couple times a week, they'll earn a grade of "Needs Improvement."  If they do work almost everyday, they'll earn the grade of "Mastery" or "Sufficient Progress."  These grades go on their permanent school record.

Emphasis added.

107.    The grading policy adopted by Agora Cyber Charter School, effective November 11, 2011, also corroborates CW16's account.  The policy required all teachers to raise students' first quarter grades to at least a "50" regardless of the actual grade earned by the student in the

quarter. This would include students who had earned a zero in the first quarter or who had never logged on or submitted any work. The policy states that for the first quarter, "the lowest final grade that can be given is a '50'"; for the second through fourth quarters "all students should be encouraged and provided opportunities to retake and redo assignments to demonstrate mastery and improve grades" and for grades 9-12 "50 will be given for incomplete assignments."

108.    On November 17, 2011 the Agora Cyber Charter School middle school director sent an e-mail to select teachers attaching a spreadsheet that showed which students' grades needed to be adjusted up to a "50% per the new grading procedures." The spreadsheet included *237* Agora Cyber Charter School students whose grades were artificially increased.

109.    Teachers who attempted to accurately assess their students were discouraged from doing so. CW17, a special education teacher at Agora Cyber Charter School from February 2009 through June 2010, was informed in March 2010 that using actual measurement tools (such as "scantrons") to assess student progress was inappropriate.

110.    CW18 was a teacher at Ohio Virtual Academy from September 2009 through July 2011, and stated that he was pressured by administration to pass students. When too many of his students received failing grades during a semester, CW18 would be contacted by the school principal and told that if he did not get his pass rate up to 80%, his contract would not be renewed. CW18 was instructed to contact failing/non-attending students and their parents and attempt to negotiate a "make-up plan," which consisted of a student merely sitting through the end-of-unit tests. If the student complied, all of the student's missed/failed assignments and quizzes would be exempted.

111.    CW19 was a teacher at Georgia Cyber Academy from August 2007 through July 2010, reporting to Kelly Morando. According to CW19, the school received state funding based

on the number of students that were enrolled as of a specific date in October, and that teachers were pressured to keep students enrolled until this date. CW19 explained that teachers were penalized if students withdrew before the cut-off date, because one of the criteria used to evaluate teachers in their annual reviews was the percentage of enrolled students retained. In contrast to the brick and mortar schools where CW19 previously worked, where his opinion as to whether a student should pass or fail a course would be respected by administration, at Georgia Cyber Academy the parents' opinions routinely outweighed his professional judgment. *CW19 stated that if he failed a student, but the student's parent complained to administration that he or she wanted the student to progress to the next grade level, administration would routinely defer to the parent.* Finally, CW19 noted that his class size of 60 to 70 students resulted in a work load he could not reasonably complete in his assigned 8 A.M. – 4 P.M. shift.

112.     CW20 was an academic advisor at Colorado Virtual Academy from 2008 through 2009. One of CW20's responsibilities was to track students' attendance. CW20 stated that there was a push by administration to keep students enrolled until the "October count." As long as a student was present for the October count, the academy would receive its annual state funding for that student. CW20 tracked attendance through the SIS system. The SIS system allowed users to see the date that a student logged in to the virtual academy software, how long they remained logged in, and what—if anything—they did after logging in. However, CW20 stated that *the only factor that was taken into account for attendance purposes was whether the student logged in.* CW20 observed that after the October count had passed and the academy had received its funding, the administration would begin withdrawing poorly performing students as a way of artificially inflating the school's test scores.

113.    CW21 was a teacher at Agora Cyber Charter School from October 2010 through June 2011.  CW21 reported to lead teacher Holly Allen, and school principal Amy Rutt.  CW21 confirmed that parents were solely responsible for certifying attendance.  CW21 explained that parents certified attendance by logging in to their account and clicking a button.  According to CW21, the administration instructed him to convey to parents that they were to mark their children as "present" regardless of how long a student actually spent logged in to the software on a given day.  CW21 frequently encountered situations where a student would not log in to their account, or would log in but fail to complete the assigned lesson plans.  CW21 stated that if a student had two weeks of consecutive unexcused absences, he was to notify administration so that they could begin the withdrawal process, but that the withdrawal process did not always function as it was supposed to.  For example, CW21 remembered a specific instance in which one of his students failed to attend class for 30-45 days in a row, with no excuse.  The student then resurfaced, and explained that he had been away on a trip to Canada with his parents.  Administration allowed the student to continue attending the school with no repercussions.  CW21 constantly heard Sharon Williams, Head of School at Agora Cyber Charter School, make statements – both publicly to parents and privately to teachers – concerning the superior performance of K12 students as compared to traditional "brick and mortar" students.  From CW21's personal observations, these statements were "garbage," and that in his experience, K12 students did not perform anywhere near as well as students at traditional schools.

114.    In a particularly egregious example, CW17, a special education teacher at Agora Cyber Charter School from February 2009 through June 2010, reported that Agora Cyber Charter School continued to bill for one of his students even though the student was absent for 140 consecutive days.  CW17 explained that "they bill for kids who are still 'enrolled' but

inactive/truant for long periods of time. The kid who misses more than 10 days is supposed to be bounced back to the home school so the home school can pursue truancy. (In PA charter schools aren't legally responsible for pursuing truancy – the home school is). So what Agora does (or at least did) is keep the kid in inactive limbo and keep billing – hence my former student who was absent for 140 consecutive days – but still billable time."

115. CW18, who taught at Ohio Virtual Academy from September 2009 through July 2011, was responsible for approximately 280 students. Of these 280 students, CW18 stated that *over half carried a 0.0 GPA* because they never logged in to the system and never took their assigned quizzes or tests. CW18 was instructed to contact these students and their parents, but a majority of the students and parents never returned his calls. CW18 kept notes of student absences and his contact attempts in the Learning Management System (LMS) software, which other teachers and administration were able to access. According to CW18, between the first and second semester of each year, administration would begin withdrawing students who were not attending class and enroll new students to replace them.

116. CW22 was a teacher at California Virtual Academy from 2005 through 2010. CW22 confirmed that teachers were instructed to tell parents that so long as a student engaged in any type of activity that could be considered educational in nature (such as watching a science-related television show), the student should be marked present. CW22 stated that teachers were pressured to ensure that student attendance remained high, and confirmed that parents could log students' attendance retroactively. CW22 also confirmed that the school's attendance software not only allowed teachers to view students' attendance and completed lessons, but enabled teachers to change this data. CW22 was aware of teachers who altered students' attendance records due to pressure to keep attendance high.

117.     CW11 described how Agora Cyber Charter School also manipulated enrollments. According to CW11, no Agora Cyber Charter School student could be withdrawn without the approval of Head of School Sharon Williams, a K12 employee, and Williams used her discretion to manipulate both Agora Cyber Charter School's enrollment figures and AYP scores. CW11 stated that during the school year, Williams kept students enrolled who were not attending classes, but that immediately before year-end state testing Williams withdrew students that would have negatively impacted the school's academic performance.

118.     Thus, lax attendance and grading policies at K12 schools served to artificially inflate enrollment figures, and the revenues that derived directly from those figures. Moreover, K12 schools manipulated students' withdrawals such that the withdrawal dates occurred only after the state's count date, or before state assessment tests, thus misleadingly boosting the school's academic performance.

119.     In addition to lax attendance policies, K12 schools also had poorly-kept enrollment and attendance records. In Michigan, pupil count auditors described difficulties auditing Michigan Virtual Academy's enrollment in 2010. "While teachers sign a print-out of log-ins, there is no verifiable evidence of student attendance, absences are not recorded, and many parents do not complete or submit their attendance paperwork on count day. For an auditor, this lack of systemic record-keeping poses a distinct problem." Similarly, a 2009-2010 Nevada audit found that "Nevada Virtual Academy was unable to produce and maintain complete enrollment records in a timely manner. While we were eventually able to reconcile enrollment and attendance reports, it was noted that the completed Master Register contained multiple inaccuracies regarding the dates and codes for pupil enrollment or withdrawal [and]

[t]hese Master Register violations are repeat findings from the previous Pupil Enrollment and Attendance Audit."

120. In Colorado, a pupil count audit for the 2009-2010 school year found that Colorado Virtual Academy counted about 120 students for state reimbursement whose enrollment could not be verified or who did not meet Colorado residency requirements. Some had never logged in. Colorado demanded that K12 refund the state $800,000 in school funding. CW23, former director of Internal Audit Department from October 2006 to April 2011, confirmed that Colorado sought a refund of $800,000, but that the internal audit department was not asked to look into the issue, which was excused internally as being part of the vagaries of having to deal with different state-by-state requirements. CW23 described a lack of internal controls and said, for example, that K12 could not close each month's books and struggled to close by the end of the quarter. CW23 also reported that K12's entire internal audit department was laid off in April 2011 without a reason being provided.

121. K12 never disclosed the enrollment errors, the Colorado refund, or that its enrollments and revenues were falsely inflated.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. Class Period Enrollments and Revenues

122. K12's failure to reveal its excessively high churn rates, poor academic performance, improper practices at its schools (including failures to adequately service special needs children, misusing special education funds, pressuring teachers to pass failing students, and lax attendance policies), knowingly enrolling students not suited to K12's individualized learning program, and demonstrated enrollment inflation in at least two states, as detailed in ¶¶42-121, resulted in a material inflation of its enrollment figures and a misleading portrayal that

those enrollment figures were stable.[12]  Had parents and school districts known of K12's material

omissions, its enrollment and funding would have been negatively impacted.  Because K12's

revenues depend primarily on enrollment, its Class Period revenue figures were also materially

misleading.  K12's misleading enrollment and revenue figures during the Class Period are set

forth in the table below:

| Quarter | Revenue (thousands) | Average enrollment | Source |
|---|---|---|---|
| 6/30/2009 | $72,166 | 52,563 | 9/14/09 10K 9/9/09 8K |
| 9/30/2009 | $106,325 | 69,542 | 11/6/09 10Q 11/6/09 8K |
| 12/31/2009 | $93,197 | 67,354 | 2/5/10 10Q 2/5/10 8K |
| 3/31/2010 | $96,627 | 67,560 | 5/10/10 10Q 5/10/10 8K |
| 6/30/2010 | $88,321 | 63,508 | 9/13/10 10K[13] 9/13/10 8K |
| 9/30/2010 | $134,871 | 99,611 | 11/9/10 10Q 11/9/10 8K |
| 12/31/2010 | $129,002 | 98,296 | 2/9/11 10Q 2/9/11 8K |
| 3/31/2011 | $130,293 | 101,030 | 5/10/11 10Q 5/10/11 8K |
| 6/30/2011 | $128,268 | 96,213 | 10/7/11 10K 10/11/11 8K |
| 9/30/2011 | $193,330 | 141,525 | 11/14/11 10Q 11/15/11 10QA 11/15/11 8K |

---

[12]  For example, a September 13, 2010 ThinkEquity report stated "[w]e think enrollment growth during Q1 is a very strong indicator of enrollment for the remainder of the fiscal year, *as students tend to remain in K12 programs for the duration of the school year*" (emphasis added).

[13]  Hawks is charged only with those misleading statements made in the Company's SEC filings from September 13, 2010 to the end of the Class Period.  The prior misleading statements in the Company's SEC filings during the Class Period are attributed to K12 and Packard.

123.    The September 9, 2009 earnings call and the September 18, 2009 8-K that attached the transcript of the call contained the following false and misleading statements regarding student retention:

> **Sara Gubins - Bank of America/Merrill Lynch - Analyst**
>
> Hi, thank you.  *Could you talk about student retention?*  And I am wondering why they was there a slightly greater sequential drop from the third quarter to the fourth quarter this year than we have seen in past years?
>
> **Ron Packard - K12 Inc. - CEO**
>
> *Retention, remarkably over the years, retention has been relatively consistent,* fluctuating up and down by a couple of points, so there is -- we do not believe there is any long term thing going on that is different.  I would have to get into details to figure out why the last quarter enrollment might have dropped more.
>
> But remember, in the previous years, we had added some states midyear.  It depends on states being capped, what percentage mixes.  It is a very complex number because the portfolio in states makes a huge difference.  In some states you can add kids in the year.  Other states you cannot.  So it is a very complex thing to answer.  *We have not seen any significant changes in retention.*

Emphasis added.

124.    These statements were false and misleading because of Packard's failure to reveal that churn rate at K12's schools was excessively high.  *See* ¶¶54-59, 72, 75.  By failing to disclose high churn rates while stating that there were no "significant changes in retention," Packard misleadingly portrayed retention as being relatively stable, when in reality K12 was forced to frantically enroll students to replace those who had dropped out, including "last resort" students K12 knew were ill-suited to its individualized learning program.

125.    Analyst reports reflected the market's understanding that stable retention reflected students remaining with K12 throughout the year.   For example, a September 10, 2009

ThinkEquity report stated that "*[w]e think enrollment growth during Q1 is a very strong indicator of enrollment for the remainder of the fiscal year, as students tend to remain in K12 programs for the duration of the school year*, and we will be looking for management's update after 1Q10." (emphasis added).

### C. September 22, 2009 Bank of America Investor Conference

126. The September 22, 2009 Bank of America Investor Conference contained the following false and misleading statements regarding academic performance and parent satisfaction:

> **Ron Packard - K12 Inc. - CEO and Founder**
>
> We generally get about two-thirds of the money on a per child basis that a typical brick-and-mortar school gets. *And for that, we give results that are as good or better than state averages* and that is all we promise. But that is a pretty powerful promise when you can deliver at a lower price *equal or better results*.
>
> \*\*\*
>
> *Probably the most important thing I will tell you about K12 and what we do is the parent satisfaction level is extremely high.* We are looking at 96% parent satisfaction with the curriculum and 89% very satisfied.
>
> \*\*\*
>
> I would also say that there is a big difference between this and the college space in the sense *that you actually have to produce academic results*. When you move into colleges, we have no idea how well colleges do with regard to educating children. *They don't have to sit into a room with a proctored test and compare against every other student in that grade in the state*. So this is a much more difficult academic process than you would see in colleges. We don't know how Harvard does for that matter. We only know what goes in there. What they actually do and learn, we have no idea in terms of benchmarking them versus other schools. *So we have to deliver.* At the end of the day, that delivering allows you to stay in states and thrive continuing to get kids placed in top colleges. So the academics actually matter a lot here.

Emphasis added.

127.     These statements were false and misleading because Packard failed to disclose that K12 schools performed poorly compared with brick and mortar public schools on state-administered tests.  K12 virtual public schools performed more poorly than other public schools on standardized AYP testing (¶67), had markedly lower graduation rates (¶68), and K12 students performed more poorly on state proficiency tests in math and reading than their peers in other public schools (¶¶69-72).  As detailed in ¶¶42-52, 54-63, 66, 72, and 75-81 high churn rates and K12's enrollment efforts to mask churn and continue enrollment growth overwhelmed teachers and resulted in students being enrolled who were not suitable for K12's individualized learning program.  Moreover, since K12 did not include parents in its survey whose children withdrew, the undisclosed high churn rates as well as the poor test scores establish that Packard's claim that "parent satisfaction level is very high" was – at a minimum – materially misleading.

    **D.**    **October 6, 2009 William Blair Investor Conference**

128.     The October 6, 2009 William Blair Investor Conference contained the following false and misleading statements about academic performance and parent satisfaction:

> **Ron Packard - K12 Inc. - CEO and Founder**
>
> Probably the best thing I will tell you today is our customer satisfaction.  *We are seeing 96% of the customers, parents, satisfied with the offering*.  What is great about this is it drives referrals.  So even despite all the money we now spend recruiting students, our single biggest source of new students is still referrals from existing families.  So we would grow without spending money on marketing or recruiting because the product is so good.  And this has been true since the beginning.  We have seen these high satisfaction ratings, and we keep getting better every year.
>
> ***
>
> Interesting enough, when we look at where we are not having to solve somebody else's problem, the kids do extraordinarily well. *So we are seeing kids who are with us kindergarten through fourth*

*grade are doing 20 points better in reading than the state averages
and 18 points better in math.* This is a sample across all six states
that we have data for kids K through 4. Because we have been
adding states each year, and we only have six states. So this is
several hundred children across six states.

\*\*\*

So we see a lot of families now saying, I am going to do this K-3,
K-4, and get my kids up to this level. *And we are achieving these
numbers despite having a higher index of poverty than the state
averages.* So there is no doubt this method works; it is a very
powerful option for families that can take advantage of it.

Emphasis added.

129.    These statements were false and misleading because Packard failed to disclose

that high churn rates at K12 schools were overwhelming teachers and resulting in the enrollment

of "last resort" students that negatively affected academic performance. As detailed in ¶¶66-72,

a sample of K12 schools, including some of the biggest in terms of revenue, were

underperforming compared to state averages and K12 students were dropping out at excessive

rates, making a 96% parent satisfaction rate materially misleading. Moreover, by using statistics

for K12 students who had been with K12 for four years, Packard misleadingly portrayed that

students at K12 remained with the program, when in reality churn rates of over 50% meant that

half the students dropped out within a year, making such statistics meaningless.

130.    In response to Packard's omissions and misleading statements, K12's share price

rose 3.67%, from $16.60 at the close of October 5, 2009 to $17.24 at the close of October 6,

2009.

### E.    November 6, 2009 Earnings Call and December 17, 2009 8-K

131.    The November 6, 2009 earnings call and the December 17, 2009 8-K that

attached the transcript of the call contained the following false and misleading statements

regarding enrollments and student retention:

**Keith Haas - K12 Inc. - SVP - Finance and IR**

Overall we are pleased with our first quarter results as revenues increased 20% to $106.3 million from $88.6 million in the same period last year. *Revenue growth was driven by a 23.7% increase in enrollments to 69,542 students.* Managed school enrollment as a percentage of total enrollment was relatively flat at 85.6% as compared to 85.4% last year.

**Packard**

I mean I look at how much better we are *in terms of the ability to deliver student results* than we were just five years ago. And I think that that wasn't obvious to people, but now it just states how it -- I think it's a great testimony to how hard this business is and to the core competencies that K12 has built over eight years serving now 69,000 kids. We know how to train online teachers. We know how to get academic results. We know how to recruit *and retain students*. And these are hard. And so I think it says this is a hard business, but it's a fantastic business. You have the core competencies to do it.

Emphasis added.

132. These statements were false and misleading because, as detailed in ¶¶42-52, 54-63, 72, and 75-81 K12 failed to disclose that excessive churn rates and overzealous enrolling led to overwhelmed teachers and the recruitment of students ill-suited to K12's learning program, which was originally targeted at gifted children, not "last resort" students who were already behind their peers academically. Moreover, churn rates as high as 50% meant that K12 did not "retain" a significant amount of students for even as long as one school year. Of the students K12 was able to retain, it was only able to do so through the improper practices detailed in ¶¶94-121, including lax attendance and grading policies such as passing students who should have failed, and instructing parents to retroactively log attendance for days that students did not attend.

133. A January 14, 2010 Battleroad Research analyst report reflected the market's adoption of Packard's misstatements about the academic performance of K12's schools, and his

failure to disclose that a significant number of K12 students could not be evaluated over the course of "years" because they were dropping out after less than one year:

> The virtual public schools they work with are usually, according to the company, *on par with and in some cases, above their classroom based peers, in terms of performance on standardized exams*. K12 also claims that *students who use their system for at least three years typically do better on standardized tests than students who have been using it for one year or less*.

Emphasis added.

### F.    February 5, 2010 Earnings Call and February 12, 2010 8-K

134.    The February 5, 2010 earnings call and the February 12, 2010 8-K that attached the transcript of the call contained the following false and misleading statements regarding enrollments, special education funds and student retention:

> **Keith Haas - K12 Inc., Incorporated - SVP - Finance & Investor Relations**
>
> Our revenues for the second quarter were $93.2 million, an increase of 20% over the second quarter of last year. This was primarily driven by a 22.3% increase in enrollments.
>
> ***
>
> So, basically schools receive different sorts of funding, different sorts of funding streams. And typically the base funding for these schools are general education funds, and those can be used for any school purpose. *Restricted funds are those that are tied to specific initiatives, and basically cannot be used for general purposes*. So, for example, *one example of a restricted fund would be special education dollars. And so those are going to go to specific services to access those funds…. Well, certainly the restricted funds is basically almost zero margin revenue*.
>
> ***
>
> **Sara Gubins - Bank of America/Merrill Lynch - Analyst**
>
> Okay. Also, *could you talk about student retention trends*? I know it's a little bit tough to know how that will look throughout the year. But it looks like it was down a bit versus last year just when I look at the sequential pattern of enrollment. And so I'm

wondering how that's trending, and what you might expect for the rest of the year.

**Ron Packard - K12 Inc., Incorporated - CEO**

I think generally year-over-year we see retention within 100 basis points of what it was the previous year. *So, we're not seeing huge changes in it.* It tends to be a little more in high school than it is in K through 8. But some of that just has to do with the nature of the enrollment. So, I don't think there's a huge difference. A lot of that depends on when states come on more than it is on changes in retention.

Emphasis added.

135. These statements were false and misleading because, as detailed in ¶¶42-52, 54-63, 72, and 87-93 (1) enrollment and revenue figures misleadingly portrayed retention and financial stability in the absence of any disclosure of the enormous churn rates at K12 schools (*i.e.*, the significant numbers of students who dropped out in less than a school year); (2) special education funds were misused at Agora Cyber Charter School, one of K12's largest schools, as described by a former special education teacher, who recounted how the funds were spent on Barnes and Noble gift cards; (3) Agora Cyber Charter School charges $22,000 per year for each child who needs one hour a week for speech therapy, which the child receives via a headset and a microphone connected to a computer. In contrast, one hour of speech therapy a week in a traditional public school costs about $1,500 a year – a markup by K12 of 1500%. Accordingly, the revenue K12 makes from special education is not "almost zero margin revenue"; and (4) Packard failed to disclose that excessive churn rates meant that K12 was unable to retain significant numbers of students for even one school year, and that K12 was masking churn with over-zealous enrollments that recruited "last resort" students.

136. A February 2, 2010 ThinkEquity analyst report reiterated the market's understanding that "*[e]nrollment gains made during Q1 tend to persist for the rest of the school*

*year*, so we are confident in our estimate of 26% growth….We expect Q2 enrollment to remain roughly stable throughout FY10 *since relatively few students enter or exit during the school year*. These new schools increase our confidence that K12's enrollment growth can continue to exceed 20% for several years." On the earnings call three days after this analyst report was published, Packard continued to mislead the market by failing to disclose that large percentages of the student body were "entering and exiting during the school year."

137.     An April 8, 2010 Wedbush analyst report also reiterated K12's misleading message regarding the quality of its students and its ability to retain students:

> *Unlike other postsecondary institutions, K12 has a demonstrated track record of producing outcomes for K-12 students*. The notion of outcomes is not ingrained in postsecondary, and on this point we feel that K12 has a competitive advantage relative to slothful traditional postsecondary institutions targeting the 18-24 segment. *We think that the company's demonstrated execution could result in higher persistence rates and lower default rates [i.e., regarding students.]*.

Emphasis added.

138.     Similarly, an April 14, 2010 ThinkEquity analyst report stated:

> We expect growth in enrollment at K12 virtual academies to remain the dominant driver of financial results….*Considering that the high school dropout rate at approximately 50% in many urban school districts, according to the NCES (National Center for Education Statistics), we think K12 has an opportunity to work with public school systems to use its curriculum to help students finish high school* and move on to college.

Emphasis added.

As detailed in ¶68, however, K12 schools had graduation rates much lower than state averages during the Class Period.

139.     An April 14, 2010 Wedbush analyst report reflected K12's misleading statements regarding academic performance:

> Along with over 50 investors, we attended K12's investor day in
> Chicago yesterday. *Our biggest takeaway was that unlike most
> postsecondary institutions, K12 has a commitment to measurable
> outcomes. Management offered case studies of demonstrated
> results in improving student performance.*

Emphasis added.

140. A May 7, 2010 Wedbush analyst report again confirmed the market's erroneous

impression that K12 benefited from stable enrollments (and revenues), and that the market

remained unaware of the excessive churn at K12 schools:

> *We remind investors that September/October enrollments largely
> dictate K12's full year financial results, and that investors are
> likely not to receive a surprise on the revenue side* of the business.

Emphasis added.

### G. <u>May 10, 2010 Earnings Call and May 18, 2010 8-K</u>

141. The May 10, 2010 earnings call and the May 18, 2010 8-K that attached the

transcript of the call contained the following false and misleading statements regarding the

quality of education at K12 schools and enrollments:

**Ron Packard - K12 Inc. - CEO and Founder**

In these recessionary times, K12 remains a tremendous value for
taxpayers *because we deliver a high-quality public education at a
lower cost* to taxpayers than traditional classroom-based schools.

\*\*\*

**Keith Haas - K12 Inc. - SVP, Finance & IR**

Our revenues for the third quarter were $96.6 million, an increase
of 25.2% over the third quarter of last year. *This was primarily
driven by a 20.6% increase in enrollments*.

Emphasis added.

142. These statements were false and misleading because as detailed in ¶¶42-52, 54-

63, 66-72, 75-81, and 94-121 (1) K12 schools were underperforming brick and mortar schools on

standardized state tests and had extremely high student-teacher ratios, which overwhelmed teachers that reported they did not have enough time in a work day to adequately teach their students; (2) K12 and Packard failed to disclose the excessive churn at K12 schools, which was masked by aggressive enrolling tactics that recruited "last resort" students and negatively impacted the schools' academic performance; and (3) K12 and Packard failed to disclose their improperly lax attendance and grading polices, which served to artificially inflate enrollment by keeping students enrolled that should have been withdrawn.

143.    In response to K12's and Packard's misleading statements, the market sent K12's share price up over 7% over the two trading day period of May 10-11, 2010, from a closing price of $22.36 on May 7, 2010 to a closing price of $23.95 on May 11, 2010.

144.    A May 11, 2010 Wedbush analyst report reiterated that K12 had stable enrollment and revenues and that students who enrolled in the fall would be with K12 through the school year, when in reality K12 students were dropping out at rates of up to 50% in a given school year:

> *We remind investors that Fall enrollments remain the only metric that matters for this company's financial health*, and in our opinion, concern regarding Q3 enrollments could prove a bit misplaced.

Emphasis added.

145.    A June 3, 2010 RedChip analyst report reflected Packard's repeated message that K12 schools did not "sacrifice quality":

> [K12] is actually providing a service to the government by offering a cheaper alternative to K-12 education without sacrificing quality.

**H.    September 13, 2010 Earnings Call**

146.    The September 13, 2010 earnings call contained the following false and misleading statements regarding academic performance and enrollments:

**Hawks (CFO)**

As Ron mentioned, our revenues for fiscal year 2010 were $384.5 million, an increase of 21.8% over last year. *The primary driver was a 21.6% increase in enrollments in our virtual public schools* and hybrid schools.

\*\*\*

**Amy Junker - Robert W. Baird & Co. - Analyst**

Okay, great. And then, if we can just touch on, given it is mid-September, is it safe to assume that we probably won't get any new state announcements in addition to the Michigan and Massachusetts? And as a follow-up to that, can you just comment, two states is obviously very strong, you continue to win new states, but were you at all disappointed that you didn't get more, that both of those were capped?

**Ron Packard - K12 INC - Founder, CEO**

I think the answer is, it's unlikely we would get new states but not impossible, to answer your first question. Michigan and Massachusetts have been states we'd like to have been in for a long time, so we're pretty excited about those. Obviously we're always disappointed when we have to limit the number of students who could access these schools because the demand is far stronger than the number of slots we have, but we're optimistic. We've been in this situation before, and that we can continually expand that cap going forward, and hopefully remove it. *Given how proven the academic performance of our schools are, there's really not a great reason to have these [enrollment caps]*, but still people in the first years, some states want to do them. So we're just excited to be in those two states, and I'm hoping as we demonstrate results in those states that those will be removed.

Emphasis added.

147. These statements were false and misleading because as detailed in ¶¶42-52, 54-63, 66-72, 75-81, and 94-121 (1) Defendants failed to disclose K12's improperly lax attendance and grading polices, which served to artificially inflate enrollment by keeping students enrolled that should have been withdrawn; (2) K12 schools were underperforming brick and mortar schools on standardized state tests and AYP, and had extremely high student-teacher ratios,

57

which overwhelmed teachers that reported they did not have enough time in a work day to adequately teach their students; and (3) Defendants failed to disclose the excessive churn at K12 schools, which was masked by aggressive enrolling tactics that recruited "last resort" students and negatively impacted the schools' academic performance, contrary to the assertion that K12 had "proven academic performance."

148.    The market again reacted positively to Defendants' misleading statements and K12's share price rose 8.49% on September 13, 2010.

149.    A September 13, 2010 ThinkEquity report again confirmed the market's understanding that K12 had stable enrollment and revenues, when in reality excessive churn meant that a significant number of students enrolling in the fall would drop out before the end of the year:

> *We think enrollment growth during Q1 is a very strong indicator of enrollment for the remainder of the fiscal year, as students tend to remain in K12 programs for the duration of the school year*, and we will be looking for management's update after 1Q10.

Emphasis added.

150.    A September 29, 2010 RedChip analyst report reflected the market's erroneous impression that K12 did not suffer excessive dropout rates and that it had a "proven" academic record by comparing it to the for-profit college education industry:

> It is important to recognize that there is sizeable distinction between what is going on with for-profit colleges vs. the rest of the companies in this industry [such as K12].  The government is beginning to crack down on practices by postsecondary providers whereas government programs like Race to the Top are actually encouraging states to use for-profit online education for primary and secondary education.  *The reason there is such negativity regarding these post-secondary providers is due to their lack of tangible results and subsequent use of government funds*….Many including those in the DOE argue that these students do not receive the benefits that a college education should provide.  *Moreover, the*

> *[college] dropout rate, which is voluntarily given by the industry,*
> *is greater than 50%.*

Emphasis added.

151.    Similarly, a September 21, 2010 Craig Hallum analyst report confirmed the market remained unaware that (1) K12's enrollment figures masked high churn and instability in enrollments; and (2) K12 schools were performing poorly compared to brick and mortar schools, and that parent satisfaction given high dropout rates and poor performance could not be "96%":

> Virtual School Enrollment Growth Still Has Legs.  *Historically the*
> *primary growth driver for K12 has been full-time student*
> *enrollment at its statewide virtual (i.e., online) public charter*
> *schools.  K12's enrollment since FY 2006 has grown three-fold*
> *from 20,220 students to 66,811,* a four-year CAGR of nearly 35%
> that matches the Company's revenue growth rate over this period.
>
> ***
>
> Full-time online business model - K12's virtual schools are public,
> meaning the state (and possibly small amounts of local or federal
> funds) pays the average bill of about $6,000 per student for a fully
> managed enrollment.  K12 does not charge the state or school
> district, but rather takes the funding that the state provides (which
> varies by state and by type of student demographics – *e.g.* gifted
> program or special education students) and then manages the
> virtual academy to provide education below this cost level.  Given
> that a virtual academy has no school building and related costs,
> start-up costs are low.  *Compared to the national average funding*
> *of more than $10,000 annually per K-12 student, K12 provides an*
> *equal (and often better) education at far lower cost.*
>
> ***
>
> Quality Education - K12's goal is to provide an education as good
> as or better than the average brick and mortar school at a
> significantly lower cost to tax payers.  *Despite receiving only*
> *about 70% of the funding of a traditional school, standardized test*
> *results indicate that K12's students do perform as well or better*
> *(especially in reading) than traditional schools.  More importantly*
> *in our view, K12 students' academic performance improves the*
> *longer students have been using K12.  In light of these results, it is*
> *not surprising that 96% of parents are satisfied* with the K12
> curriculum according to a 2008 study by TRC Market Research.

Emphasis added.

**I.**     **November 9, 2010 Earnings Call**

152.    The November 9, 2010 earnings call contained the following false and misleading statements regarding academic performance and enrollments:

> **Ron Packard - K12 INC - Founder, CEO**
>
> Our core virtual school business remains strong. *Enrollments on November 1st were up approximately 19% over November 1st the prior year. Existing state enrollments grew at 17.5%.* Additionally, the cost structure and margins from this business continue to remain healthy and to improve versus last year.
>
> \*\*\*
>
> This year we opened virtual academies in two new states, Michigan and Massachusetts. These schools' enrollment are strong and will continue to grow over the coming years. We believe these place a great foundation for future growth of our virtual academy business. Demand for virtual academy education persists because of the great options it offers students, *as well as its proven academic gains*.

Emphasis added.

153.    These statements were false and misleading because as detailed in ¶¶42-52, 54-63, 66-72, 75-81, and 94-121 (1) Packard failed to disclose K12's improperly lax attendance and grading polices, which served to artificially inflate enrollment by keeping students enrolled that should have been withdrawn; (2) K12 schools were underperforming brick and mortar schools on standardized state tests and AYP, and had extremely high student-teacher ratios which overwhelmed teachers that reported they did not have enough time in a work day to adequately teach their students; and (3) Packard failed to disclose the excessive churn at K12 schools, which was masked by aggressive enrolling tactics that recruited "last resort" students and negatively impacted the schools' academic performance, contrary to the assertion that K12 had "proven academic gains."

### J. November 9, 2010 J.P. Morgan Investor Conference

154. The November 9, 2010 J.P. Morgan investor conference contained the following false and misleading statements regarding academic performance:

**Ron Packard - K12 INC - Founder, CEO**

The question I always get is, why do states authorize them? And there's two reasons why we've been successful against the large forces that want to preserve the status quo in education. I think one reason is the dollar value. *Our kids will do as well or better than the average school in the state and we get about 60% of the dollars per child that they get typical brick and mortar school.*

\*\*\*

Also unlike the postsecondary institutions, *we actually have to deliver results where children sit in a proctored setting and take the same standardized tests as kids in the brick and mortar setting. And because our kids do well on these tests, it provides us the ability to show the tax – show the government that we're delivering value for the taxpayers.* So it's also barrier to entry because it's not easy to do that.

\*\*\*

*At the end of a day, a school needs to deliver results and we're fortunate that we're able to have these kids take the standardized tests, so we can show how well we do.* One of the great things is the longer you're will K12, the better you do. So if you look at that graph, you see increasing bar charts. *Every year the kids are with us they do better and better.*

*Additionally, when we start with just a K, and we don't have to fix somebody else's problem, we're seeing 18 and 20 points above state averages. This is despite the fact that we have a higher percentage of kids in poverty than the average in the states.* So this would equate to 90% plus for efficiency including all special needs children. So when you don't – when we're not fixing somebody else's problem, it's obvious how incredibly well this does.

Emphasis added.

155. These statements were false and misleading because as detailed in ¶¶42-52, 54-63, 66-72, 75-81, and 94-121 (1) K12 schools were underperforming brick and mortar schools on

standardized state tests and AYP, and had extremely high student-teacher ratios, which overwhelmed teachers that reported they did not have enough time in a work day to adequately teach their students; (2) Packard failed to disclose the excessive churn at K12 schools, which was masked by aggressive enrolling tactics that recruited "last resort" students and negatively impacted the schools' academic performance compared with brick and mortar schools; and (3) Packard misleadingly touted the performance of K12 students who had been with K12 over several years, but failed to disclose that at some of K12's largest schools, more than half of the students dropped out within a year, making such statistics meaningless.

### K. November 10, 2010 Signal Hill Investor Conference

156.    The November 10, 2010 Signal Hill investor conference contained the following false and misleading statements regarding academic performance:

**Ron Packard - K12 INC - Founder, CEO**

People say why do states do this?  And there's two reasons why states do this.  The first and foremost is, it is a great value proposition for the state.  We save taxpayers a fortune.  If every child in United States were in a K12 public virtual school, the country would save over $200 billion.  *So, we get on average about 40% less funding per child than what taxpayers spend on the traditional brick and mortar school.  And we deliver results that are as good or better than the average school in the state*, and when you look at the demographics and we learn they may be significantly better and we'll talk about that.

*The most important thing about a school is the academic performance.*  K12 is in the business of helping kids, it's why we're here, it's why we get up every morning and *we're happy to say that we have a lot of evidence now that these schools actually outperform, on average, their brick and mortar counterparts.*  If you look at the first side of the graph, *every year you're with K12, you do better and better relative to your peers.  So, the longer you're with us, the better you do.*  An average school would see a flattening here.  *We see – and the kids who can start with us, in K through 4, these kids are doing 20 points above state averages.  This is – these 90% of kids who start from kindergarten are at grade level proficiency after fourth grade.  This includes all the*

> *special needs kids, kids severely at risk.*  So, when we're not fixing
> somebody else's problem, which is what we do most of the time,
> it's a phenomenal education.

Emphasis added.

157.    These statements were false and misleading because as detailed in ¶¶42-52, 54-

63, 66-72, and 75-81 (1) K12 schools were underperforming brick and mortar schools on

standardized state tests and AYP, and had extremely high student-teacher ratios, which

overwhelmed teachers that reported they did not have enough time in a work day to adequately

teach their students; (2) Packard failed to disclose the excessive churn at K12 schools, which was

masked by aggressive enrolling tactics that recruited "last resort" students and negatively

impacted the schools' academic performance compared with brick and mortar schools; and (3)

Packard misleadingly touted the performance of K12 students who had been with K12 over

several years, but failed to disclose that at some of K12's largest schools, more than half of the

students dropped out within a year, making such statistics meaningless.

### L.    February 9, 2011 Earnings Call

158.    The February 9, 2011 earnings call contained the following false and misleading

statements regarding enrollments and student retention:

> **Ron Packard - K12 INC - Founder, CEO**
>
> Turning to our second quarter results, which now include a full
> quarter of KCDL revenue, our financial performance was strong.
> Quarterly revenue was $129 million, up 38% from the second
> quarter of last year.  Excluding the KCDL and AEC acquisitions,
> our organic revenue growth rate was 26% for the quarter.  *Revenue
> was higher in part because we have experienced robust end year
> enrollment.  Enrollment in the second quarter this year was
> 81,083, compared to enrollment of 67,354 in the second quarter of
> last year.*
>
> ***

> Public virtual schools will be our core business for the foreseeable future. This business still accounts for approximately 83% of our revenue, and we expect both revenue and income to grow rapidly as the business scales. *Our enrollment in end year retention numbers are also improving.*

Emphasis added.

159. These statements were false and misleading because as detailed in ¶¶42-52, 54-63, and 94-121 (1) Packard failed to disclose K12's improperly lax attendance and grading polices, which served to artificially inflate enrollment by keeping students enrolled that should have been withdrawn; and (2) Packard failed to disclose the excessive churn at K12 schools, which was masked by aggressive enrolling tactics that recruited "last resort" students, making enrollments (and revenues) unstable and dependent on ever-more aggressive enrollment practices.

160. Again, the market responded positively to Packard's and K12's misleading statements, sending K12's share price up 9.34%, from a closing price of $28.36 on February 8, 2011 to a closing price of $31.01 on February 9, 2011.

**M.  February 15, 2011 Deutsche Bank Investor Conference**

161. The February 15, 2011 Deutsche Bank investor conference contained the following false and misleading statements regarding the quality of K12's education and academic performance:

**Ron Packard - K12 INC - Founder, CEO**

> And why do states do this? And the reason is twofold. We are more efficient, *we basically deliver an education that is as good or better at about 60% of the cost per child to the taxpayer.* So the way to think about this is every child in the United States were in a K12 public virtual school, tax payers would save over $200 billion a year. So we're more efficient, but we also have -- unlike we might have seen colleges, *these children have to take standardized tests. So we can compare how we do to children in brick and mortar schools. And we do absolutely as well as the average brick*

*and mortar school in the state, and in a lot of cases, significantly better.*

\*\*\*

*Probably the most important thing I've been telling you is how well our kids do.* And we -- if you look at this, you can see that as a child, *the longer and longer a child is with our school, the better and better they do.*

*A normal school would be flat lining; we actually see increasing performance with tenure.* We use normalized before-and-after tests every year to measure the growth. And we're seeing -- *our children are gaining more than a year per every year in this school.* So we're teaching significantly more than what a year's worth of learning is, and that's fantastic.

We also -- *when you look at kids who start with us and go through fourth grade where we have the data -- this is across every state we had data on at the time. We're seeing 18 points better than state averages in math and 20 points better in reading.* So when we're not fixing another school's problem, these kids do extraordinary. *In some of these states, we're seeing 100% proficiency including all the special needs kids.*

*And this also despite the fact that we have a higher level of kids in poverty than in traditional schools. So these schools are academically delivering.* And we have an adverse selection bias, just to be clear. If a child is in a normal school who's doing well probably doesn't come to us. But because we're getting kids who, for some reason that local brick and mortar school isn't working for them.

\*\*\*

We now have several thousand teachers that work for us. We manage 27 schools, actually 40 schools if you include all the different schools in California. We have the ability to actually go in and help pass legislation to allow online education. We know how to work in a regulated environment. *We actually deliver educational results that stand the scrutiny of standardized testing.* We now learned how to market to the consumer. We have relationships with several hundred school districts, soon to be several thousand. We're continuing innovating both new products and offerings in education, and we have an incredible array of teachers.

\*\*\*

> The teachers -- we get teachers from -- we get, the one problem
> I've never had in 10 years is recruiting teachers. We get teachers
> who want to teach kids, and they want to work in the most
> innovative type solutions; they want the highest quality content.
> *Most -- and interestingly enough a lot of our teachers who
> generally tend to be younger, because they adapt to technology,
> they've have told me that they know their students far better in a
> virtual school than they ever did in a classroom.*

Emphasis added.

162. These statements were false and misleading because as detailed in ¶¶42-52, 54-63, 66-72, and 75-81 (1) K12 schools were underperforming brick and mortar schools on standardized state tests and AYP, and had extremely high student-teacher ratios, which overwhelmed teachers that reported they did not have enough time in a work day to adequately teach their students; (2) Packard failed to disclose the excessive churn at K12 schools, which was masked by aggressive enrolling tactics that recruited "last resort" students and negatively impacted the schools' academic performance compared with brick and mortar schools; (3) Packard misleadingly touted the performance of K12 students who had been with K12 over several years, but failed to disclose that at some of K12's largest schools, more than half of the students dropped out within a year, making such "annual growth" statistics meaningless; and (4) former K12 teachers reported overwhelming student-teacher ratios and churn-related administrative duties made it impossible to adequately teach their students, let alone "knowing virtual students" better than in a real classroom.

### N. February 24, 2011 Robert W. Baird Investor Conference

163. The February 24, 2011 Robert W. Baird investor conference contained the following false and misleading statements regarding the quality of K12's education and academic performance:

**Ron Packard - K12 INC - Founder, CEO**

So why would states do this? Again, we are a tremendous value proposition for states. First and foremost, we are significant savings for taxpayers. *We are able to provide an education that's as good or better than the average school academically in terms of the average state test score result at a discount that across the board averages about 40% to taxpayers.* So when you compare what we get funded in a state compared to what the U.S. DOE says the state averages are, on average we are 40% cheaper *and we are delivering as good a results or better as the average school.* I mean, that is a staggering value for us.

***

*So, our kids have to go into a proctored setting every year and take the exact same tests that the children in the brick and mortar schools do.* And if you look at the left of that chart, what we are showing is the longer you are with us, the better you do. So, which normal school would flatline. They gain year for year. *We are seeing the longer you are with us, you do better every year.*

*That means we're delivering more than a year of gains for every year they're with us* and, by the way, we see that when – we actually test a lot of internal testing now on, every mom on how kids are progressing and we've seen our own internal nationally norm benchmarks that kids are gaining more than a year every year they are with us.

And it turns out when you don't, *when you start with us extraordinarily well so we are seeing 18 to 20 points above state averages for the kids who were with the state before.* That means I am not fixing somebody else's problem and taking them into the beginning. It speaks how powerful educational modality, individualized learning is. And in some of these kids we are seeing 100% improvement. This includes all the special needs kids and the fact is that we have a higher level of kids in the under poverty than just state averages.

*So, with a less prosperous mix, we're able to achieve these kind of results. It speaks to the power of the educational model and by the way this is very important because it allows us to justify ourselves.* We're able to show states that our kids are learning and I think that's one of the issues that are facing the secondary, it that can't do that. *There is no nationally accepted norms or metrics for college education, but the fact that we have that in every state*

> *allows us to demonstrate academic effectiveness.* If you combine
> that with economic efficiency it gives us a very powerful offering.

Emphasis added.

164.    These statements were false and misleading because as detailed in ¶¶42-52, 54-63, 66-72, and 75-81 (1) K12 schools were underperforming brick and mortar schools on standardized state tests and AYP, and had extremely high student-teacher ratios, which overwhelmed teachers that reported they did not have enough time in a work day to adequately teach their students; (2) Packard failed to disclose the excessive churn at K12 schools, which was masked by aggressive enrolling tactics that recruited "last resort" students and negatively impacted the schools' academic performance compared with brick and mortar schools; and (3) Packard misleadingly touted the performance of K12 students who had been with K12 over several years, but failed to disclose that at some of K12's largest schools, more than half of the students dropped out within a year, making such "annual growth" statistics meaningless.

### O.    March 2, 2011 Morgan Stanley Investor Conference

165.    The March 2, 2011 Morgan Stanley investor conference contained the following false and misleading statements regarding the quality of K12's education, parent satisfaction rates, and academic performance:

> **Ron Packard - K12 INC - Founder, CEO**
>
> The way the core business works is we are paid on an attendance basis. So states basically pay for the education. So it is primarily state revenue with some federal and local revenue. It is done on an attendance basis.
>
> So we enroll kids in a school, and they're actually enrolled in a not-for-profit charter school, of which K12 then bills for curriculum, other services, technology. And the states pay an average of about $5,500 per kid across the states.
>
> We tend to be about 40% cheaper on a per child basis to taxpayers than what they would pay for a traditional child in a public brick-

and-mortar school. So we are a great value economically, but also we have, unlike what you would see in the college space, *our kids have to take standardized tests in a proctored setting*.

*So we are able to show that our kids are doing as well or better than the average child in a brick-and-mortar school at a significant savings to taxpayers*.

So we charge every state the same in terms of billing for curriculum, services, management [would be a] percentage of revenue. And we are generally price takers, meaning whatever the state pays they pay. We don't negotiate it. We hook into the public funding formula. And we don't get every stream, but the ones we get, we usually get most of it.

\*\*\*

**Suzi Stein - Morgan Stanley - Analyst**

Can you talk a little about your marketing strategy, how you attract new students, how that has changed?

**Ron Packard - K12 Inc. - Founder, CEO**

Well, over the course of 10 years it has changed dramatically, because the Web-based methods have become very large, not only just Google, but the social networking, all those sites. So we also do radio, some selective television.

*But despite all we do the largest source of new students is still referrals from existing students, which is because we have such high satisfaction rates*. And we would grow, I believe, if we didn't market at all because the word-of-mouth is strong.

It is one thing to get a marketing message, it is another thing when your neighbor tells you, I'm doing this. My kid loves it and look how much he knows.

*So I think that is the best thing I can say about our business is the fact that we have such a high referral rate from existing customers*.

\*\*\*

**Suzi Stein - Morgan Stanley - Analyst**

How about the competitive environment, how has that changed? How have you been able to maintain such a lead over other virtual school operators?

**Ron Packard - K12 Inc. - Founder, CEO**

I think -- the business is a hard business. We have seen the University of Phoenix come in and out of it, because it is hard. *We have to deliver for a price that is dramatically less than what you get from the college space, and education that meets the scrutiny of standardized tests.*

Emphasis added.

166. These statements were false and misleading because as detailed in ¶¶42-52, 54-63, 66-72, and 75-81 (1) K12 schools were underperforming brick and mortar schools on standardized state tests and had extremely high student-teacher ratios, which overwhelmed teachers that reported they did not have enough time in a work day to adequately teach their students; (2) Packard failed to disclose the excessive churn at K12 schools, which was masked by aggressive enrolling tactics that recruited "last resort" students and negatively impacted the schools' academic performance compared with brick and mortar schools; (3) Packard misleadingly touted the performance of K12 students who had been with K12 over several years, but failed to disclose that at some of K12's largest schools, more than half of the students dropped out within a year, making such "annual growth" statistics meaningless; and (4) excessive churn and poorly performing students made Packard's statement that K12 had such "high satisfaction rates" materially misleading.

**P.**   **March 15, 2011 Credit Suisse Global Services Investor Conference**

167. The March 15, 2011 Credit Suisse Global Services investor conference contained the following false and misleading statements regarding the quality of K12's education, teacher credentials and academic performance:

**Ron Packard - K12 INC - Founder, CEO**

We're going to talk about each of our lines of business, but the core business, I want to emphasize, is approximately 85% of our revenue, and we believe because, not only that this is large, but it's

also growing very rapidly, that it will continue to be the majority of our revenue for the foreseeable future.

So what is the core business?  Our core business is public virtual schools.  We provide the curriculum, technology, and management services for public virtual schools.

***

*[K12 virtual public school students] have state-certified teachers who were certified and reside in the state in which they're enrolled.*

***

But first of all, first thing is we're able to deliver at a cost that somewhere around 60% of what states pay the average school or what taxpayers pay, *an education that delivers great results*.  So we – *our students have to take the same standardized test in a proctored setting as the children in the brick and- mortar public schools do.*

And this is very important and it's one of the reasons *why I think we've been so successful because we can show that the kids in these schools are learning more than one year gains for every year in a standardized way*.  And it's one of the big differences between the K through 12 space and college, is that we have a standardized metric that we can demonstrate to the taxpayers that we are delivering a better value for the dollar.

***

*It's probably the most important thing I'll tell you today, is that, if you look at the asset and the gains, the longer student is with us, the better they do.  So students who've been with us 7 years, they're almost all proficient.*  This includes a mix that we believe is higher percentage of poverty than the state average is, in almost every state, if not every state.

And it also includes all the special needs populations.  *So the schools are performing.*  And in fact when you look at the K through 4 results, where I'm not fixing somebody else's problem, we see that the schools across every state, we have the data are 18 points better than state averages in math and 20 points better in reading.  And this is despite the fact that we have a higher poverty index.  *So this method of education is beyond the shadow of doubt, works and it works very, very well.*

> And working in this regulated environment, and probably most importantly, *we deliver educational results*. *We can prove with standardized tests that what we do works*, and that creates a huge differentiation with what's happening in the post-secondary, where they're struggling on what are the right outcome metrics. *We have the outcome metrics; people in K through 12 have lived with them, with standardized tests, for a while*, and the fact that we have that, I consider a fantastic thing. It's not a burden, *it's a fantastic thing for K12 to be able to show that we're delivering an education*. It protects us from a lot of people that might not necessarily want online education. It's hard to argue with something that works and is cheaper.

Emphasis added.

168.    These statements were false and misleading because as detailed in ¶¶42-52, 54-63, 66-72, 75-78, and 81-86 (1) K12 schools were underperforming brick and mortar schools on standardized state tests and AYP, and had extremely high student-teacher ratios, which overwhelmed teachers that reported they did not have enough time in a work day to adequately teach their students; (2) there is evidence that the same K12 teachers taught classes for different schools in different states, thus making it impossible for teachers to "reside in" the same state as all their enrolled students; (3) according to a Class Period email sent by an administrator to teachers at Florida Virtual Academy, K12 teachers who were not certified to teach certain subjects did, in fact, teach those subjects, and that school records were subsequently altered to retroactively "assign" students who had been taught by an uncertified teacher to a certified teacher, even though the certified teacher never actually taught that student; (4) Packard failed to disclose the excessive churn at K12 schools, which was masked by aggressive enrolling tactics that recruited "last resort" students and negatively impacted the schools' academic performance compared with brick and mortar schools; (5) Packard misleadingly touted the performance of K12 students who had been with K12 over several years, but failed to disclose that at some of

K12's largest schools, more than half of the students dropped out within a year, making such "annual growth" statistics meaningless; and (6) excessive churn and poorly performing students showed that K12's method of education was *not* working "very, very well."

### Q. **May 10, 2011 Earnings Call**

169. The May 10, 2011 earnings call contained the following false and misleading statements regarding enrollments and student retention:

> **Ron Packard - K12 INC - Founder, CEO**
>
> The schools we served had healthy enrollment growth, as well, with 81,666 students, compared to enrollment of 67,560 last year, a 20.9% improvement. *Total average enrollments for the quarter, which include private schools and district enrollments on a full-time equivalent basis, passed the 100,000 student mark*, a new milestone in the pursuit of our manifest destiny of making a K12 education available to every child.
>
> \*\*\*
>
> Our core Virtual Academy business continues to produce excellent results. In-year enrollments increased versus last year *and retention has improved*.

Emphasis added.

170. These statements were false and misleading because as detailed in ¶¶42-52, 54-63, and 94-121 (1) Packard failed to disclose K12's improperly lax attendance and grading polices, which served to artificially inflate enrollment by keeping students enrolled that should have been withdrawn; (2) Packard failed to disclose the excessive churn at K12 schools, which was masked by aggressive enrolling tactics that recruited "last resort" students, making enrollments (and revenues) unstable and dependent on ever-more aggressive enrollment practices; and (3) excessive churn, lax attendance and grading policies, and poor record-keeping at schools were affecting enrollment counts, and at least two states, after conducting audits, found that K12 schools had inflated enrollment, with one state demanding an $800,000 refund.

171. A September 1, 2011 Wunderlich analyst report confirmed that the market was unaware that K12 schools were performing poorly:

> We find the core K12 value proposition to be quite strong. The company offers a flexible alternative to students that do not easily fit into traditional ground-based public schools. The K12 academy provides students with an individualized learning experience utilizing a highquality, academically rigorous Web- and print-based curriculum, with demonstrably positive outcomes at a lower cost to taxpayers than ground-based public schools. In addition, public virtual schools can accommodate student population growth without the cost of new school construction. *Students at K12 virtual schools generally perform as well as or better than the state averages*.

Emphasis added.

### R. September 15, 2011 BMO Investor Conference

172. The September 15, 2011 BMO investor conference contained the following false and misleading statements regarding the quality of K12's education, parent satisfaction, and K12's academic performance:

> **Ron Packard - K12 INC - Founder, CEO**
>
> Like any business we've succeeded because we've had a compelling value proposition. For K12 that means two things. First and foremost before we could ever enroll a student in a state we have to have the state approve public virtual schools, which means that taxpayer money will go to a school that is accredited. And from a legal point of view, accreditation point of view, going to one of our schools is no different than going to the brick-and-mortar elementary school down the street.
>
> So why do states do this, why have 27, now 30 states gone forward and done this? I think there's two reasons. One is a value effect. We're able for about 60% of the published, what they pay per child, delivering an education that delivers more than a year of gains per year. *So you're getting very good academic results and you're doing it at 60% of the dollar for the taxpayer. That's pretty compelling particularly when you have state budgets*.
>
> \*\*\*

*On the right side we can see that kids who have been with us K-4. So this is a pure set where I didn't have to fix anybody else's issues. We're seeing kids are 18 points in math and 20 points in language arts better than their respective state averages. This goes up close to between 90% and 100% and this includes all special needs kids, everybody. And when you factor in that we have a much higher index of kids in poverty than the average school in every state, this is extraordinarily impressive academic results.*

\*\*\*

And the word of mouth is very powerful. The greatest thing about our business is despite all we spend on student recruiting, the largest group of students that come to us come from referrals from existing students. *And that's because our customer satisfaction is so high*, there's nothing more powerful than word-of-mouth. So as we begin -- that word-of-mouth and begin to have this type of success with universities it actually may accelerate our growth.

\*\*\*

### Unidentified Audience Member

Ron, there was an article recently that talked about some of your outcomes and your test scores being a little lower as your growth increased. And your presentation was very bullish and it showed that the test scores are actually better. So I was wondering if you could reconcile the two data sets.

### Ron Packard - K12, Inc. - Founder & CEO

I'm happy to reconcile that. What's happened is -- the way to measure a school is by the growth of the students in it. What's happened, particularly as we've gotten larger and we've pushed into the upper grades, we've seen a significant degradation in the incoming students. Because of attrition in our high rate of growth it's not uncommon for 50% of the students in a school to be in their first year with us.

*And so when you test somebody in March that's been with you only for four months you're certainly not reflecting where they are but where they came from. So we actually see schools where the scores have gone down even though we know the educational gains because of our improvements and what we do have gone up.* And we have measures internally and externally on all of these things.

So what we do know is *when we measure growth students that are with us are getting more than a year of growth for the year they're with us*.  But if all of a sudden for example -- I can tell you a school in California that I just took the data on -- we've gone from 6% special ed to 18% special ed, we've gone from 20% poverty to 70% poverty all in a three or four year period.

Because what happens is as a school gets more and more known more and more people come to what I call the school of last resort. These are kids where the school system has absolutely failed them and they are one step to dropping out.  And they hear of a virtual education and it solves and it's something that's attractive to them.

So we redid our entire K-5 math curriculum at a cost of almost $20 million simply to solve the problem where the majority of kids coming to me in middle school and above were two to three years at a minimum behind grade level.  So we test scored -- *the measure of static point of score for a school that's growing is not only ridiculous, it's useless.  So we look at the growth rates*.  And what I showed you today was the growth rates of how students progress.

If you looked at most of our test scores three or four years ago, most of our schools would be slightly above average.  As we push into high school the student mix and the word has gotten out has become more they might be below average, *even though the gains we're seeing in those schools are higher than they were three or four years ago in our metrics*.

So that's the -- and that's why, by the way, the whole country is going to move to growth models.  Because even for a normal school that doesn't have that kind of growth it's -- the static point is a bad metric.  When you're in a school that's growing at 30% plus a year it's a useless metric.

Emphasis added.

173.    These statements were false and misleading because as detailed in ¶¶42-52, 54-63, 66-72, and 75-81 (1) K12 schools were underperforming brick and mortar schools on standardized state tests and had extremely high student-teacher ratios, which overwhelmed teachers that reported they did not have enough time in a work day to adequately teach their students; (2) Packard failed to disclose the excessive churn at K12 schools, which was masked by aggressive enrolling tactics that recruited "last resort" students and negatively impacted the

schools' academic performance compared with brick and mortar schools; (3) Packard failed to disclose that so many K12 students dropped out *within* a year (as much as 50% at Ohio Virtual Academy, one of K12's largest schools by revenue) that "annual growth" statistics were meaningless; and (4) excessive churn and poorly performing students establish that K12's statements that it had such "high satisfaction rates" were materially misleading.

174. An October 10, 2011 Morgan Stanley analyst report confirmed the market was unaware of K12's unstable enrollments and high churn rates:

> With retention rates improving and enrollments increasing across [K12]'s network (not just in states where caps were lifted), there is evidence that virtual schooling is gaining wider acceptance.

175. An October 11, 2011 Wunderlich analyst report relayed that K12's retention rate was improving, when in reality K12 was experiencing churn rates as high as 50% during the Class Period:

> Based on preliminary enrollment numbers as of October 1, management believes that organic growth will be significantly higher than the 19.7% achieved during FY11. *In addition, improvements in both retention and re-enrollment were cited.*

Emphasis added.

**S.** **2011 Form 10-K (filed October 7, 2011)**

176. The 2011 10-K (signed by both Packard and Hawks) touted K12's rigorous evaluation and training programs for teachers:

> *We use a rigorous evaluation program for making hiring recommendations* to the virtual public schools we serve. *We hire teachers who, at a minimum, are state certified and meet the federal requirements for designation as a "Highly Qualified Teacher,"* and generally have at least three years of teaching experience. We also seek to recruit teachers who have the skill set necessary to be successful in a virtual public school environment. Teaching in a virtual public school is characterized by heightened one-on-one student-teacher and parent-teacher interaction, so

> virtual public school teachers must have strong interpersonal communications skills….
>
> New teachers participate in our comprehensive training program during which, among other things, they are introduced to our educational philosophy, our curriculum and our OLS and other technology applications, and are provided strategies for communicating and connecting with students and their families in a virtual public school environment.

Emphasis added.

177.    This statement was false and misleading because as detailed in ¶¶82-86 above, K12 principals hired teachers after only perfunctory interviews, did not inquire if they were "highly qualified," and provided "training" that was "non-existent."  Moreover, in at least two states, the percentage of classes taught by highly qualified teachers in 2010-2011 was below the state average, as detailed in ¶85.

178.    The 2011 10-K also represented that K12's special education programs met all federal and state requirements:

> We direct and facilitate the development and implementation of "individualized education plans" for students with special needs. *Our special education program is compliant with the federal Individuals with Disabilities Education Act and all state special education requirements.  Each special needs student is assigned a certified special education teacher who arranges for any required ancillary services, including speech and occupational therapy*, and any required assistive technologies, such as special computer displays or speech recognition software.

Emphasis added.

179.    This statement was false and misleading because as detailed in ¶¶87-90 (1) at least one state department of education has issued formal findings that a K12 special education program did not comply with federal and state regulations, and that the school "failed to provide an Individualized Educational Program (IEP) that was adequate in its services"; and (2) there is

evidence Agora Cyber Charter School did not have enough special education teachers for the special needs students they enrolled.

T.   **October 10, 2011 Earnings Call**

180.   The October 10, 2011 earnings call contained the following false and misleading statements regarding enrollments, academic performance and student retention:

**Ron Packard - K12 INC - Founder, CEO**

Our core business has never been better. In fiscal year 2011 we experienced an organic growth rate in our managed virtual public schools of 19.7%.This growth rate will be significantly higher for the 2012 fiscal year based on our preliminary enrollment numbers as of October 1.

*Over the past year we saw major improvements in retention and re-enrollment, both in K-8 and high school, and that is a direct tribute to our dedicated employees. Few measures are better than student retention for validating the quality of our curriculum, systems and instruction.*

Our norm-based tests show that on average our students are progressing more than one year for every year they're in the program. For example, the scores for the (inaudible) virtual charter school we manage in Pennsylvania were significantly higher than a typical school on state administered tests for growth. We anticipate that as states move to measure academic proficiency with the gains approach the benefits to be achieved from the K12 learning system will become more visible.

\*\*\*

We are experiencing a significant acceleration in the growth rate of our core public-school business and this includes acceleration in the same state enrollment growth rates. It is quite rewarding to see the acceleration in organic growth occurring when the law of large numbers would suggest the opposite. This could potentially signal the mainstreaming of online education.

These enrollment gains are occurring while the cost of student acquisition has declined.

\*\*\*

**Gary Bisbee - Barclays Capital - Analyst**

Good morning.  I guess I saw an article that you probably saw as well in the New York Times yesterday looking at technology sold into public elementary schools and questioning some of the value of that.  I guess it jogged a memory to maybe ask an update.  *Is there any more concrete data you can give us on test scores?*

*And I know at one point I had talked to you and you had mentioned that the better metric was students who had been in your schools for a couple of years.*  And is there a form in which you'd likely provide some of that or any just update on how we should think about the value that you're adding?

**Ron Packard - K12, Inc. - CEO & Founder**

It's a good question and I think you'll see over the next year us providing more data with regard to that.  What I will say about that is -- reiterating a little of what I said in the call is we do norm reference testing at the beginning and end of the year of our own tests using a national test and *we see more than a year learning for every year the kids are in the school.*

*We also know that when you start with us in kindergarten and you go through fourth grade across our entire portfolio you see incredible rates of proficiency, in some cases almost perfect.*  And so the nation is moving to a gains measure which we believe is the right one and what you'll see is hopefully we're outperforming on those measures.

In Pennsylvania would actually have a gains measure, I think the state was we're in the top 20% or 25% of schools in the state with regard to academic gains.  So we're going to start breaking that and providing more data on that.  We're pretty excited about how well our kids do.

What is happening nationwide, and particularly as we move more and more high school and middle school students, is as virtual schools become more well known we're seeing a large influx of kids who would probably likely be dropouts from the system.  So we're taking kids sometimes three or four years behind grade level and trying to uplift them.

Given our high growth rates of enrollment, and in many cases the majority of kids are taking the test with us for the first time.  So because of that mix shift you may actually see average scores of states go down, in fact you have in several states.  *But in terms of what the gains measures are, they're actually quite good in most cases.*

*So I think we're trying to figure out how to put that in a comprehensive report, but the main message is we think we're delivering more than a year's gain*; there's lots of evidence that shows that in most of the states certainly. And we'll provide you more detail as we know more.

But there's no question, I think it's important to understand that what virtual schools do -- public virtual schools is for most of the children in this country that is the only choice they have. So there's a large influx of kids who their only choice is they're unhappy with their brick-and-mortar high schools. They either drop out -- previously they would be dropouts, now they have an option that allows them flexibility, more individualized learning, and we're hopefully taking these kids in and able to graduate them.

So that's what's going on and we're pretty excited about what we're seeing in terms of results and we'll give you much more detail on that probably over the next 12 to 18 months as we figure out how to present that.

Emphasis added.

181.    These statements were false and misleading because as detailed in ¶¶42-52, 54-63, and 72 (1) Packard failed to disclose the excessive churn at K12 schools, which was masked by aggressive enrolling tactics that recruited "last resort" students ill-suited to K12's individualized learning program and more likely to drop out, contributing to a vicious cycle of churn; and (2) Packard failed to disclose that so many K12 students dropped out within a year (as much as 50% at Ohio Virtual Academy, one of K12's largest schools by revenue) that "annual growth" statistics were meaningless.

182.    The market reacted favorably to K12's and Packard's misleading presentation, sending K12's share price up 14.12% on October 10, 2011.

   U.    **November 15, 2011 Earnings Call**

183.    The November 15, 2011 earnings call contained the following false and misleading statements regarding enrollments and academic performance:

**Ron Packard – K12 Inc – CEO, Founder**

*Our enrollment grew over 30% this past year*, as we experienced acceleration in key metrics, including growth from cap expansion, growth from new states, and most impressively, *the enrollment growth in non-cap states was almost 10% higher this year than last year, in both K-8 and high school*. We believe this trend reflects both improvement in K12 operations, as well as the mainstreaming of online education.

\*\*\*

Now I would like to take some time to address academic performance, as there have been some articles about this in recent weeks. Unfortunately, most of these articles exhibit little understanding of how to measure academic quality in schools with a fast-growing and dynamic student population, which is the characteristic of almost all of the schools we serve. 10 years ago I was stunned by the variety of children we were able to attract to virtual schools. The fact that we can serve both highly gifted children, as well as children significantly below grade level demonstrates the power of online education and its appeal -- continued appeal -- to more and more families.

\*\*\*

Because of the growth and our increased enrollments, approximately half of the students in several schools we serve are in their first year. This can result in test scores below state averages as no educational organization can remediate these students fast enough to perform well on the state tests in their first year with the school. To measure a school with such a high growth rate using static state test scores is not only wrong, it's absurd. We pride ourselves on being able to help these children realize academic success. Without this option, they would likely join the 30% of students who do not graduate from high school in this country.

It's probably worth reviewing what we do know about our student performance. There are three critical facts that suggest that these public virtual schools are having a significantly positive impact. *First, the longer students are with K12, the better they do. Second, children who start with K12 in kindergarten do well. And third, on nationally normed exams given to students at the beginning and the end of the year, our students generally out-perform the norm groups. There are many ways of evaluating student achievement,*

*but at K12 we measure our success to whether students are learning at a faster rate than they did before they enrolled.*

*There's a growing consensus to move away from outdated student achievement metrics such as AYP and to adopt growth models that measure a student's gains in one year and year-over-year.* We believe we're on the right track, because our internally administered Scantron tests have demonstrated *many of these students are now making gains of one year or more per year in schools*, which confirms the benefits of individualized education. For example, if a student who comes to us in the sixth grade three years behind grade level, and then has gains of one year per year, that is a great improvement.

\*\*\*

Yes. I'll try to kind of reiterate a little bit what I said, and put a little more context around it. One of the things that I think was very exciting about this year is that in states where there are no caps, right, so there was no artificial restriction on growth, when we look at the growth rates year over year, in those states, versus the previous year-over-year growth rates, *we were seeing both at K through 8 and high school, organic same-state un-capped growth go up by almost 10%.* So you had a significant acceleration in growth in states that a lot of them have been with us for a long time. States that had been with us for 9, 10 years, saw a significantly higher growth rate this year than they did the previous year, and it wasn't the result of any cap expansion.

What that tells me is one, we must be getting better at what we do, but also I think online schools are becoming more mainstream. It's very difficult and you could never -- we could never have predicted all of a sudden acceleration in growth rates in states that have been with us 9, 10 years. So we're extraordinarily excited about that, and the growth -- that acceleration of growth happened both in high school and K-8 on year-over-year measures. *And then, we also had a significant part of our growth came from cap expansion, but to actually see states accelerate on a same-state basis in non-cap states is amazing.*

Emphasis added.

184. These statements were false and misleading because as detailed in ¶¶42-52, 54-63, and 94-121 (1) Packard failed to disclose K12's improperly lax attendance and grading polices, which served to artificially inflate enrollment by keeping students enrolled that should

have been withdrawn; (2) Packard failed to disclose the excessive churn at K12 schools, which was masked by aggressive enrolling tactics that recruited "last resort" students, making enrollments (and revenues) unstable and dependent on ever-more aggressive enrollment practices; (3) Packard failed to disclose that so many K12 students dropped out within a year (as much as 50% at Ohio Virtual Academy, one of K12's largest schools by revenue) that "annual growth" statistics were meaningless; and (4) excessive churn, lax attendance and grading policies, and poor record-keeping at schools were affecting enrollment counts, and at least two states, after conducting audits, found that K12 schools had inflated enrollment, with one state demanding an $800,000 refund.

**V.    Partial Disclosure of the Truth**

**1.    November 16, 2011 Citi U.S. Small and Mid Cap Investor Conference**

185.    At the November 16, 2011 Citi U.S. Small and Mid Cap investor conference, Packard was forced to admit that K12 closely tracked churn and that only "about 60%" of K12 students remained with K12 after one year, but continued to fail to disclose the improper practices that contributed to enrollment inflation, including lax attendance and grading policies, and that at least two states found enrollments inflated at K12 schools:

> **Unidentified Audience Member**
>
> Do you guys track churn in your students at all?
>
> **Ron Packard - K12 Inc. - CEO & Founder**
>
> *We track churn immensely* and we manage -- and *we view the retention of the kids as one of the best metrics of what we actually are able to do. We don't disclose it, but we basically -- what we basically tell people more or less is about 60% of the kids who start with us in September are with us a year later.* So we lose some of those kids during the school year and we lose some of those kids over the summer.

And by the way, we don't think this is for everybody. We think if we were perfect and did everything perfectly we might be three or four points better than that, and that's what our goal is. But there's a lot of kids who this isn't right for and they come in and they find out it isn't right for them (inaudible) other option. And that's what the educational system should be. It should be fluid. You should have lots of choices and find the one that's right for you. So if you take that general number of 60% that are with you a year later and you add that to the growth you see why the majority of the kids are brand-new.

Unidentified Audience Member

(Inaudible - microphone inaccessible)?

**Ron Packard - K12 Inc. - CEO & Founder**

For lots of reasons. *We obviously disclosed it with policymakers, but we haven't chosen to do so.* We know relative to most virtual schools we do very well because we've looked at acquiring some. And we actually -- and by the way, I could actually raise that number more if I made the schools easier.

The number one reason people leave, and it's been true for 11 straight years now, is because the school is too hard and takes too much time. The rigor level that we set is the main reason -- is the number one reason why kids leave and we're not going to back that down, right. We've taken a stand on what a good education is and we're not backing down off of it. Yes.

Emphasis added.

186. On this news, K12's stock price sank 2.15% on unusually heavy trading volume, with 481,900 shares traded compared with an average daily Class Period volume of 221,082 shares.

### 2. November 16, 2011 The Nation Article

187. A November 16, 2011 The Nation article titled "How Online Learning Companies Bought America's Schools" also reported on K12's academic performance, stating:

A recent study of virtual schools in Pennsylvania conducted by the Center for Research on Education Outcomes at Stanford University revealed that students in online schools performed significantly worse than their traditional counterparts. Another study, from the

University of Colorado in December 2010, found that *only 30 percent of virtual schools run by for-profit organizations met the minimum progress standards outlined by No Child Left Behind*, compared with 54.9 percent of brick-and-mortar schools. For White Hat Management, the politically connected Ohio for-profit operating both traditional and virtual charter schools, the success rate under NCLB was a mere 2 percent, while *for schools run by K12 Inc., it was 25 percent*. A major review by the Education Department found that policy reforms embracing online courses "lack scientific evidence" of their effectiveness.

"Why are our legislators rushing to jump off the cliff of cyber charter schools when the best available evidence produced by independent analysts show that *such schools will be unsuccessful*?" asked Ed Fuller, an education researcher at Pennsylvania State University, on his blog.

Emphasis added.

188. As the market continued to absorb the partial disclosure, K12's stock price declined another 5.88% on November 17, 2011, and a further 7.75% November 18, 2011.

W. **The Entire Truth is Finally Revealed**

1. **December 13, 2011 New York Times Article**

189. On December 13, 2011 a New York Times article entitled "Profits and Questions at Online Charter Schools" revealed the scope of Defendants' fraud, including that (1) K12's schools had excessive rates of churn; (2) aggressive enrollment tactics, (3) improper grading and attendance policies had artificially inflated enrollment; and (4) after a state pupil count audit, Colorado had determined that approximately 120 students at Colorado Virtual Academy had been improperly enrolled, even though they did not meet residency requirements:

The New York Times has spent several months examining this idea, focusing on K12 Inc. A look at the company's operations, based on interviews and a review of school finances and performance records, raises serious questions about whether K12 schools — and full-time online schools in general — benefit children or taxpayers, particularly as state education budgets are being slashed.

Instead, *a portrait emerges of a company that tries to squeeze profits from public school dollars by raising enrollment, increasing teacher workload and lowering standards.*

*Current and former staff members of K12 Inc. schools say problems begin with intense recruitment efforts that fail to filter out students who are not suited for the program, which requires strong parental commitment and self-motivated students.* Online schools typically are characterized by high rates of withdrawal.

Teachers have had to take on more and more students, relaxing rigor and achievement along the way, according to interviews. While teachers do not have the burden of a full day of classes, they field questions from families, monitor students' progress and review and grade schoolwork. Complaints about low pay and high class loads — *with some high school teachers managing more than 250 students* — have prompted a unionization battle at Agora, which has offices in Wayne, Pa.

A look at a forthcoming study by researchers at Western Michigan University and the National Education Policy Center shows that *only a third of K12's schools achieved adequate yearly progress, the measurement mandated by federal No Child Left Behind legislation.*

*Some teachers at K12 schools said they felt pressured to pass students who did little work.* Teachers have also questioned why some students who did no class work were allowed to remain on school rosters, potentially allowing the company to continue receiving public money for them. *State auditors found that the K12-run Colorado Virtual Academy counted about 120 students for state reimbursement whose enrollment could not be verified or who did not meet Colorado residency requirements. Some had never logged in.*

\*\*\*

In an interview at K12's headquarters in Herndon, Va., Mr. Packard said, "We're here to help children, and that is our overriding purpose and we want to do it as well and efficiently as possible."

He acknowledged what he called a "degradation" in K12's test scores, but he argued that they are an inaccurate measure because many students are already behind when they arrive. "The type of child now coming to an online school, 75 percent of those kids

coming in are behind more than one grade level," Mr. Packard said.

***

Mr. Packard reports to investors every year with higher enrollment numbers and sales. On Nov. 15, he announced that the company's online schools had enrolled more than 94,000 students. "I think online schools are becoming more mainstream," said Mr. Packard, who was paid $5 million this year.

A sizable portion of the public money collected by K12 is rolled back into generating more business, a common practice for for-profit companies that nevertheless raises questions when the money is intended to educate schoolchildren. K12 spent $26.5 million on advertising in 2010, according to an analysis prepared for The New York Times by Kantar Media. "Some of the cyber charter schools have fairly aggressive recruitment campaigns," said Jim Buckheit, executive director of the Pennsylvania Association of School Administrators. "They have vans, billboards, and TV and radio ads. They set up recruitment meetings in area hotels and invite parents to come."

K12 has run thousands of the sessions, where part of the pitch is supplying computers and subsidized Internet connections for qualifying families. Dr. Seidenberger said he was surprised to see ads for online schools in the outfield at Coca-Cola Park, the stadium of the Lehigh Valley IronPigs minor league baseball team.

***

*The Churn*

Parents who become interested in K12's schools can follow up by calling 866 numbers, which connect them to a call center in Herndon.

*School employees who have visited the center have described a high-pressured sales environment aimed at one thing: enrollment.*

Some workers, called "enrollment pals," are paid bonuses based on the number of students they sign up, according to former employees knowledgeable of the operations. *Mr. Packard's annual bonus is also partly tied to enrollment.*

Because the online schools are public, students cannot legally be denied enrollment. *But former K12 employees said the aggressive and impersonal enrollment process lures students who are not a*

*good fit….The constant cycle of enrollment and withdrawal, called the churn rate, appears to be a problem at many schools.* Records Agora filed with Pennsylvania reveal that 2,688 students withdrew during the 2009-10 school year. At the same time, K12 continued to sign up new students. Enrollment at the end of the year — 4,890 — was 170 students more than at the beginning, obscuring the high number of withdrawals.

\*\*\*

*The state audit of the Colorado Virtual Academy, which found that the state paid for students who were not attending the school, ordered the reimbursement of more than $800,000.*

*With retention a problem, some teachers said they were under pressure to pass students with marginal performance and attendance.*

*Students need simply to log in to be marked present for the day*, according to Agora teachers and administrators.

For most students, attendance is recommended but not mandatory at what are called synchronous sessions — when they can interact online with the teacher. *A new grading policy states that students who do not turn in work will be given a "50" rather than a zero.* Several teachers said *assignments were frequently open for unlimited retakes.*

Agora records from last year show that failing students were told they could make up their work. "All students with a course average of 40 to 59 percent were called and told all assignments past due could be made up without penalty," according to minutes from a school board meeting. Similar calls were going out to students with averages of 0 to 39 percent.

\*\*\*

Poor attendance and disengaged students have been such a problem that *Agora dismissed 600 students last year* for nonattendance, 149 of them just before state tests were administered, according to school board minutes.

\*\*\*

But many teachers said the job had become less desirable as the company increased enrollment, particularly because pay at many K12 schools starts in the low 30s — low even for online schools.

*Some class sizes have become unwieldy, they said, requiring 60-hourweeks and compromising instruction.*

At Agora, enrollment has reached 8,836, up from 6,323 in May, according to figures released by the school. As of late November, the total number of staff members — 408 — was lower than last year. *Some high school teachers said they were managing as many as 270 student*s, even though they had been told they would have 150.

\*\*\*

In interviews, former teachers at Ohio Virtual Academy and Colorado Virtual Academy also complained of bigger class loads, with elementary teachers who once handled 40 to 50 pupils now supervising 75. *A teacher with an elementary class that size and a 40-hour workweek could devote little more than 30 minutes a week to each student.*

Mary Ravanelli, a former teacher at Ohio Virtual Academy, said she oversaw more than 70 students at a time, answering calls from 8 a.m. to 5 p.m., updating parents on students' progress and attending various school outings. "We'd actually meet our students several times a year," she said.

With teacher salaries and benefits the biggest cost to K12, increasing student-to-teacher ratios is an easy way for the company to increase profits. Ms. Henderson, the former Agora teacher and mother of four students, said the ultimate losers are the children.

"What has happened now in honors literature courses, the teachers are not able to keep up with 300 students, so they'll just cut curriculum. The kids are losing out," she said. "This past week my son was exempted from 'The Great Gatsby' because of the workload of the teacher."

Emphasis added.

190.     K12's stock price plummeted 23.6% on unusually heavy trading volume on the news, with 4,812,000 shares traded compared with an average daily Class Period volume of 221,082 shares. As the market continued to digest the disclosure, K12's stock price sank another 4.14% on December 14, 2011 and a further 1.71% on December 15, 2011.

### 2. December 16, 2011 Associated Press Article

191. A December 16, 2011 Associated Press article titled "Virtual schools booming as states mull warnings" reported on virtual schools in Colorado, where one of K12's largest schools, Colorado Virtual Academy (with over 5000 students during the Class Period), is located:

> A 2010 report by the state Department of Education showed below-average test scores, *dropout rates near 50 percent in some cases and a student-to-teacher ratio as high as 317 to 1 at one school*. Still, enrollment grew more than 12 percent between 2008 and 2009, and *Colorado's online schools get paid for an entire school year even if a student drops out after Oct. 1*, the date the state tallies student enrollment.
>
> ***
>
> An October report by the University of Colorado-based National Education Policy Center said school-choice advocates are pushing states to rush headlong into virtual K-12 education despite limited data.
>
> *"These online school providers are raking in hundreds of millions of dollars, and the product they're putting out is just horrible,"* said Gene Glass, author of the CU report and a vocal critic of public funding for online schools.

Emphasis added.

192. On December 16, 2011 K12's stock price fell another 8.8%, with 1,641,300 shares traded.

193. Later, the March 8, 2012 Burnett County News Sentinel article titled "Is online education giant K12 floundering?" reported that "[school] districts across the country" severed ties with K12 in the wake of the final disclosure, including the Grantsburg School Board, which voted to fire K12 in January 2012.

# VII.   ADDITIONAL SCIENTER ALLEGATIONS

194.   During the Class Period, Packard reaped the rewards of Defendants' fraud while K12's stock price was artificially inflated.  As shown in the tables below, Packard sold over *850,000* shares over the Class Period, for proceeds of over *$23.3 million*, compared with only 177,136 shares and $3.4 million in proceeds before the Class Period[14]:

**Pre-Class Period:**

| Filer name | Direct Indirect | Number of Shares | Transaction Type | Price | Transaction Value | Transaction Date |
|---|---|---|---|---|---|---|
| Packard (Ronald J) | D | 5,000 | Sale | $28.31 | $141,550.00 | 22-Sep-08 |
| Packard (Ronald J) | D | 5,000 | Sale | $26.54 | $132,700.00 | 30-Sep-08 |
| Packard (Ronald J) | D | 10,000 | Sale | $25.04 | $250,400.00 | 17-Oct-08 |
| Packard (Ronald J) | D | 11,265 | Sale | $18.36 | $206,825.40 | 26-Dec-08 |
| Packard (Ronald J) | D | 1,000 | Sale | $18.99 | $18,990.00 | 26-Dec-08 |
| Packard (Ronald J) | D | 7,735 | Sale | $18.27 | $141,318.45 | 29-Dec-08 |
| Packard (Ronald J) | D | 20,000 | Sale | $17.76 | $355,200.00 | 20-Jan-09 |
| Packard (Ronald J) | D | 20,000 | Sale | $17.73 | $354,600.00 | 20-Feb-09 |
| Packard (Ronald J) | D | 10,200 | Sale | $16.12 | $164,424.00 | 12-May-09 |
| Packard (Ronald J) | D | 9,800 | Sale | $16.07 | $157,486.00 | 15-May-09 |
| Packard (Ronald J) | D | 20,000 | Sale | $17.89 | $357,800.00 | 4-Jun-09 |
| Packard (Ronald J) | D | 20,000 | Sale | $18.89 | $377,800.00 | 12-Jun-09 |
| Packard (Ronald J) | D | 36,469 | Sale | $18.98 | $692,181.62 | 15-Jun-09 |
| Packard (Ronald J) | D | 667 | Sale | $19.99 | $13,333.33 | 16-Jun-09 |
| **Total** | | **177,136** | | | **$3,364,608.80** | |

---

[14] The prior trading period extends back to K12's initial public offering in December 2007.

**Class Period:**

| Filer name | Direct Indirect | Number of Shares | Transaction Type | Price | Transaction Value | Transaction Date |
|---|---|---|---|---|---|---|
| Packard (Ronald J) | I | 20,000 | Sale | $17.15 | $343,000.00 | 24-Sep-09 |
| Packard (Ronald J) | D | 10,000 | Sale | $17.00 | $170,000.00 | 5-Oct-09 |
| Packard (Ronald J) | D | 40,000 | Sale | $19.16 | $766,400.00 | 15-Oct-09 |
| Packard (Ronald J) | D | 5,500 | Sale | $16.88 | $92,840.00 | 28-Oct-09 |
| Packard (Ronald J) | D | 30,000 | Sale | $17.40 | $522,000.00 | 6-Nov-09 |
| Packard (Ronald J) | D | 13,159 | Sale | $17.84 | $234,756.56 | 11-Nov-09 |
| Packard (Ronald J) | D | 1,846 | Sale | $17.84 | $32,932.64 | 12-Nov-09 |
| Packard (Ronald J) | D | 4,995 | Sale | $17.82 | $89,010.90 | 13-Nov-09 |
| Packard (Ronald J) | D | 20,000 | Sale | $18.25 | $365,000.00 | 2-Dec-09 |
| Packard (Ronald J) | D | 24,860 | Sale | $20.12 | $500,183.20 | 16-Dec-09 |
| Packard (Ronald J) | D | 6,853 | Sale | $20.43 | $140,006.79 | 16-Dec-09 |
| Packard (Ronald J) | D | 20,140 | Sale | $19.96 | $401,994.40 | 17-Dec-09 |
| Packard (Ronald J) | D | 5,000 | Sale | $21.04 | $105,200.00 | 3-Mar-10 |
| Packard (Ronald J) | D | 2,000 | Sale | $22.05 | $44,100.00 | 5-Mar-10 |
| Packard (Period Ronald J) | I | 25,000 | Sale | $22.62 | $565,500.00 | 15-Mar-10 |
| Packard (Ronald J) | I | 5,000 | Sale | $22.80 | $114,000.00 | 16-Mar-10 |
| Packard (Ronald J) | D | 9,000 | Sale | $22.81 | $205,290.00 | 17-Mar-10 |
| Packard (Ronald J) | D | 7,000 | Sale | $22.89 | $160,230.00 | 31-Mar-10 |
| Packard (Ronald J) | D | 11,000 | Sale | $23.87 | $262,570.00 | 14-Apr-10 |
| Packard (Ronald J) | D | 2,000 | Sale | $25.05 | $50,100.00 | 15-Apr-10 |
| Packard (Ronald J) | D | 5,400 | Sale | $24.44 | $131,976.00 | 28-Apr-10 |
| Packard (Ronald J) | D | 5,600 | Sale | $23.92 | $133,952.00 | 29-Apr-10 |
| Packard (Ronald J) | D | 11,000 | Sale | $24.14 | $265,540.00 | 12-May-10 |
| Packard (Ronald J) | D | 2,000 | Sale | $25.05 | $50,100.00 | 13-May-10 |
| Packard (Ronald J) | D | 11,000 | Sale | $23.56 | $259,160.00 | 26-May-10 |
| Packard (Ronald J) | D | 2,000 | Sale | $25.05 | $50,100.00 | 28-May-10 |
| Packard (Ronald J) | D | 9,000 | Sale | $22.55 | $202,950.00 | 9-Jun-10 |
| Packard (Ronald J) | D | 300 | Sale | $24.05 | $7,215.00 | 10-Jun-10 |
| Packard (Ronald J) | D | 1,700 | Sale | $24.05 | $40,885.00 | 11-Jun-10 |
| Packard (Ronald J) | D | 9,000 | Sale | $23.25 | $209,250.00 | 23-Jun-10 |
| Packard (Ronald J) | D | 5,000 | Sale | $21.46 | $107,300.00 | 7-Jul-10 |
| Packard (Ronald J) | D | 2,000 | Sale | $22.05 | $44,100.00 | 8-Jul-10 |
| Packard (Ronald J) | D | 10,000 | Sale | $23.47 | $234,700.00 | 21-Jul-10 |
| Packard (Ronald J) | D | 1,000 | Sale | $24.05 | $24,050.00 | 23-Jul-10 |
| Packard (Ronald J) | D | 10,860 | Sale | $26.19 | $284,423.40 | 4-Aug-10 |
| Packard (Ronald J) | D | 2,140 | Sale | $26.03 | $55,704.20 | 5-Aug-10 |

| Filer name | Direct Indirect | Number of Shares | Transaction Type | Price | Transaction Value | Transaction Date |
|---|---|---|---|---|---|---|
| Packard (Ronald J) | D | 11,000 | Sale | $23.97 | $263,670.00 | 18-Aug-10 |
| Packard (Ronald J) | D | 9,000 | Sale | $23.51 | $211,590.00 | 1-Sep-10 |
| Packard (Ronald J) | D | 2,000 | Sale | $24.05 | $48,100.00 | 3-Sep-10 |
| Packard (Ronald J) | D | 16,000 | Sale | $26.20 | $419,200.00 | 15-Sep-10 |
| Packard (Ronald J) | D | 3,000 | Sale | $27.05 | $81,150.00 | 17-Sep-10 |
| Packard (Ronald J) | D | 14,400 | Sale | $28.94 | $416,736.00 | 29-Sep-10 |
| Packard (Ronald J) | D | 10,600 | Sale | $29.03 | $307,718.00 | 30-Sep-10 |
| Packard (Ronald J) | D | 22,000 | Sale | $27.71 | $609,620.00 | 13-Oct-10 |
| Packard (Ronald J) | D | 13,400 | Sale | $27.95 | $374,530.00 | 27-Oct-10 |
| Packard (Ronald J) | D | 8,600 | Sale | $28.06 | $241,316.00 | 28-Oct-10 |
| Packard (Ronald J) | D | 13,000 | Sale | $24.98 | $324,740.00 | 10-Nov-10 |
| Packard (Ronald J) | D | 12,400 | Sale | $25.36 | $314,464.00 | 24-Nov-10 |
| Packard (Ronald J) | D | 600 | Sale | $25.37 | $15,222.00 | 26-Nov-10 |
| Packard (Ronald J) | D | 8,000 | Sale | $27.91 | $223,280.00 | 22-Dec-10 |
| Packard (Ronald J) | D | 10,000 | Sale | $29.60 | $296,000.00 | 5-Jan-11 |
| Packard (Ronald J) | D | 4,000 | Sale | $30.00 | $120,000.00 | 6-Jan-11 |
| Packard (Ronald J) | D | 4,000 | Sale | $31.00 | $124,000.00 | 7-Jan-11 |
| Packard (Ronald J) | D | 14,000 | Sale | $30.07 | $420,980.00 | 19-Jan-11 |
| Packard (Ronald J) | D | 14,000 | Sale | $30.07 | $420,980.00 | 19-Jan-11 |
| Packard (Ronald J) | D | 6,939 | Sale | $27.80 | $192,904.20 | 2-Feb-11 |
| Packard (Ronald J) | D | 1,061 | Sale | $28.00 | $29,708.00 | 3-Feb-11 |
| Packard (Ronald J) | D | 26,000 | Sale | $32.99 | $857,740.00 | 16-Feb-11 |
| Packard (Ronald J) | D | 4,000 | Sale | $34.00 | $136,000.00 | 18-Feb-11 |
| Packard (Ronald J) | D | 24,200 | Sale | $32.89 | $795,938.00 | 2-Mar-11 |
| Packard (Ronald J) | D | 1,800 | Sale | $33.07 | $59,526.00 | 3-Mar-11 |
| Packard (Ronald J) | D | 22,000 | Sale | $32.62 | $717,640.00 | 16-Mar-11 |
| Packard (Ronald J) | D | 184 | Sale | $33.00 | $6,072.00 | 17-Mar-11 |
| Packard (Ronald J) | D | 18,150 | Sale | $33.80 | $613,470.00 | 30-Mar-11 |
| Packard (Ronald J) | D | 1,645 | Sale | $33.65 | $55,354.25 | 31-Mar-11 |
| Packard (Ronald J) | I | 23,400 | Sale | $33.94 | $794,196.00 | 13-Apr-11 |
| Packard (Ronald J) | I | 3,600 | Sale | $34.02 | $122,472.00 | 14-Apr-11 |
| Packard (Ronald J) | I | 19,335 | Sale | $35.23 | $681,172.05 | 15-Apr-11 |
| Packard (Ronald J) | I | 37,800 | Sale | $38.76 | $1,465,128.00 | 27-Apr-11 |
| Packard (Ronald J) | I | 17,619 | Sale | $38.52 | $678,683.88 | 28-Apr-11 |
| Packard (Ronald J) | I | 13,246 | Sale | $39.05 | $517,256.30 | 29-Apr-11 |
| Packard (Ronald J) | I | 26,000 | Sale | $35.15 | $913,900.00 | 11-May-11 |
| Packard (Ronald J) | I | 9,000 | Sale | $36.56 | $329,040.00 | 12-May-11 |

| Filer name | Direct Indirect | Number of Shares | Transaction Type | Price | Transaction Value | Transaction Date |
|---|---|---|---|---|---|---|
| Packard (Ronald J) | I | 22,000 | Sale | $34.16 | $751,520.00 | 26-May-11 |
| Packard (Ronald J) | I | 12,300 | Sale | $32.47 | $399,381.00 | 8-Jun-11 |
| Packard (Ronald J) | I | 5,700 | Sale | $32.77 | $186,789.00 | 9-Jun-11 |
| Packard (Ronald J) | I | 6,500 | Sale | $32.50 | $211,250.00 | 22-Jun-11 |
| Packard (Ronald J) | I | 7,500 | Sale | $31.83 | $238,725.00 | 23-Jun-11 |
| Packard (Ronald J) | I | 2,075 | Sale | $33.73 | $69,989.75 | 6-Jul-11 |
| **Total** | | **853,407** | | | **$23,323,671.52** | |

## VIII.   CLASS ACTION ALLEGATIONS

195.    Arkansas brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all purchasers of the common stock of K12 between September 9, 2009 and December 16, 2011 inclusive and who were damaged when the truth about K12's business was disclosed.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

196.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, K12 had more than 32,061,374 shares of common stock outstanding that traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by K12 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

197.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

198.     Arkansas will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

199.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) to state material facts about the business, operations and management of K12;

(c)     whether the Defendants made their misstatements or misrepresentations with the required scienter; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

200.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## IX. APPLICABILITY OF PRESUMPTION OF RELIANCE UNDER THE AFFILIATED UTE DOCTRINE, AND/OR, IN THE ALTERNATIVE, THE FRAUD ON THE MARKET DOCTRINE

201. Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Defendants are primarily predicated upon omissions of material fact which there was a duty to disclose.

202. Plaintiff is also entitled to a presumption of reliance because, as more fully alleged above, the Defendants failed to disclose material information regarding K12's churn rate, its use of enrollments to conceal churn rates, and the negative impact of churn rate on K12's schools, including their academic performance.

203. Plaintiff is entitled to a presumption of reliance under the fraud on the market doctrine of the Defendants' material misrepresentations and omissions, because at all relevant times, the market for K12's common stock was an efficient market for the following reasons, among others:

(a) K12's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, K12 filed periodic public reports with the SEC (and was eligible to file SEC Form S-1) and the NYSE;

(c) K12 regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) K12 was followed by numerous investor research services that published publicly available reports, as well as by several securities analysts (including John Eade at Argus Research; Sara Gubins and David Ridley-Lane at Banc of America/Merrill Lynch; Gary Bisbee

and Zach Fadem at Barclays Capital; Alexander Paris, Jr. and Joe Janssen at Barrington Research; Jeff Silber and Paul Condra at BMO Capital Markets; Frank McEvoy, Mike Malouf, and Ross Licero at Craig-Hallum Capital Group; Kelly Flynn and Giri Krishnan at Credit Suisse; Klaus Von Stutterheim at Deutsche Bank; Karen Legotte at Gilder, Gagnon, Howe & Co.; Allen Smith at ISS Proxy Advisory Services; Suzanne E. Stein, Vance H. Edelson, Cristina Colon, and Thomas Allen at Morgan Stanley; Todd Young at Morningstar; Charles Kantor at Neuberger Berman; Rahul Sowani, Pallavi Kulkarni, and Peter Heise at RedChip Research; Amy Junker and Gordon Lasic at Robert W. Baird; Trace Udan at Signal Hill; James Maher at ThinkEquity LLC; Ariel Sokol and David Kwon at Wedbush Securities; Brandon Dobell at William Blair & Co.; and Trace A. Urdan and Jeff Lee at Wunderlich Securities) employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

204.    As a result of the foregoing, the market for K12's common stock promptly digested current information regarding K12 from all publicly available sources and reflected such information in K12's stock price. Under these circumstances, all purchasers of K12's common stock during the Class Period suffered similar injury through their purchase of K12's common stock at artificially inflated prices and a presumption of reliance applies.

## X.    NO SAFE HARBOR

205.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Further, most of the identified false and misleading statements and omissions herein are not forward looking statements, but are statements of current and historic fact regarding K12's practices.

206. To the extent that any of the false and misleading statements identified herein are mixed statements of current fact and forward looking projection, the portion of those statements relating to current fact are not protected by the safe harbor.

207. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of K12 who knew that those statements were false when made.

## XI.    LOSS CAUSATION/ECONOMIC LOSS

208. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and the Class.

209. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of K12's common stock by misrepresenting, or failing to disclose that (1) K12's schools had excessive churn rates; (2) its schools performed poorly on state academic tests and AYP compared with brick and mortar schools; and (3) improper practices at several of its schools nation-wide contributed to enrollment inflation.

210. The truth about K12 was revealed in a partial disclosure on November 16, 2011, and was fully disclosed on December 13, 2011 through December 16, 2011. On November 16, 2011, when the Defendants admitted that K12 schools had a 40% churn rate and the Nation

reported unfavorably on K12's academic performance, K12's stock price sank 2.15% on unusually heavy trading volume, with 481,900 shares traded compared with an average daily trading volume over the Class Period of 221,082 shares. On December 13, 2011 when a New York Times articles revealed K12's excessive churn rates, the poor academic performance of its schools compared with brick and mortar schools, improper practices at several of its schools nation-wide, and a state audit in Colorado that revealed enrollment inflation, K12's stock price plummeted 23.6% on unusually heavy trading volume, with 4,812,000 shares traded compared with an average daily trading volume over the Class Period of 221,082 shares. As the market continued to digest the disclosure, K12's stock price sank another 4.14% on December 14, 2011 and a further 1.71% on December 15, 2011. On December 16, 2011, following the Associated Press's report on the high churn and poor performance of online schools in Colorado (where Colorado Virtual Academy, one of K12's largest schools, is located), K12's stock price sank another 8.8%, with 1,641,300 shares traded.

## COUNT I

**Violation Of Section 10(b) Of
The Exchange Act And Rule 10b-5(b)
Promulgated Thereunder Against All Defendants[15]**

211. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

212. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding K12's business, operations, management and the intrinsic value of K12's common stock; and (ii) cause Plaintiff and other members of the Class to purchase common

---

[15] Defendant Hawks is only charged with certain misstatements and omissions made after he became CFO in May 2010.

stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

213.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for K12's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

214.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about K12's excessive churn rates, the poor academic performance of its schools compared with brick and mortar schools, improper practices at several of its schools nation-wide, and enrollment inflation, as specified herein.

215.    The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of K12's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about K12 and its business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which

operated as a fraud and deceit upon the purchasers of K12's common stock during the Class Period.

216.    Each of the Individual Defendants' primary liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading, or failed to disclose material information that made those statements false and misleading.

217.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing K12's operating condition from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants' misstatements of the Company's core business operations throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and

omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

218. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of K12's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of K12's publicly-traded common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired K12's common stock during the Class Period at artificially high prices and were damaged when the value of their common stock declined upon disclosure of the truth about Defendants' false and misleading statements and omissions.

219. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding K12's business and operations, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their K12's common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

220. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

221. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II

**Violation Of Section 10(b) Of
The Exchange Act And Rule 10b-5(a) and (c)
Promulgated Thereunder Against All Defendants[16]**

222. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

223. This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiff need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

224. During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiff and the Class; (ii) artificially inflate the market price of K12's common stock; and (iii) cause Plaintiff to purchase K12's common stock at artificially inflated prices.

225. In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the Class in connection with their purchases of K12's common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

226. Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of

---

[16] Defendant Hawks is charged with this Count for conduct that occurred after he became CFO in May 2010.

information regarding K12's excessive churn rates, the poor academic performance of its schools compared with brick and mortar schools, improper practices at several of its schools nation-wide, and enrollment inflation.

227.    Plaintiff and the Class reasonably relied upon the integrity of the market in which K12's securities traded.

228.    During the Class Period, Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct.  Had Plaintiff and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased K12's common stock, or if they had, would not have done so at the artificially inflated prices paid for such common stock.

229.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiff and the Class suffered damages in connection with their purchases of K12's common stock during the Class Period.

230.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiff and the Class for damages suffered in connection with their purchases of K12's common stock during the Class Period.

## COUNT III

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants[17]

231.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

---

[17] Defendant Hawks is charged with control person violations for K12 statements made after he became CFO in May 2010.

232. The Individual Defendants acted as controlling persons of K12 within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's core operations and/or intimate knowledge of the false statements filed by the Company with the SEC and otherwise disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements regarding K12's excessive churn rates, the poor academic performance of its schools compared with brick and mortar schools, improper practices at several of its schools nation-wide, and enrollment inflation prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

233. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

234. As set forth above, K12 violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as control persons of K12, the primary violator. As a direct and proximate result of the Individual

Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action and certifying Arkansas as class representative under Rule 23 of the Federal Rules of Civil Procedure and Labaton Sucharow LLP as Lead Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  June 22, 2012

                              **WEBSTER BOOK LLP**

                               */s/ Brian C. Athey*
                              Steven T. Webster (VSB# 31975)
                              Aaron S. Book (VSB# 43868)
                              Brian C. Athey (VSB# 66515)
                              300 N. Washington St., Suite 404
                              Alexandria, Virginia 22314
                              Telephone: (888) 987-9991
                              Facsimile: (888) 987-9991
                              Emails: swebster@websterbook.com
                                           abook@websterbook.com
                                           bathey@websterbook.com

                              *Local Counsel for the Class*

Jonathan Gardner (admitted pro hac vice)
Michael W. Stocker (admitted pro hac vice)
Paul J. Scarlato (admitted pro hac vice)
Angelina Nguyen (admitted pro hac vice)
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Emails: jgardner@labaton.com
        pscarlato@labaton.com
        anguyen@labaton.com

*Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of June, 2012, I will electronically file the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to the following:

Michele Rose (VSB# 45001)
Kevin H. Metz (*pro hac vice*)
Sarah A. Greenfield (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 11th Street NW, Suite 1000
Washington, DC 20004-1304
Telephone: (202) 637-2200
Fax: (202) 637-2201
Email: michele.rose@lw.com
Email: kevin.metz@lw.com
Email: sarah.greenfield@lw.com

*Attorneys for Defendants K12 Inc.,*
*Ronald J. Packard, and Harry T. Hawks*

/s/ Brian C. Athey
Steven T. Webster (VSB# 31975)
Aaron S. Book (VSB# 43868)
Brian C. Athey (VSB# 66515)
**WEBSTER BOOK LLP**
300 N. Washington St., Suite 404
Alexandria, Virginia 22314
Telephone: (888) 987-9991
Facsimile: (888) 987-9991
Emails: swebster@websterbook.com
        abook@websterbook.com
        bathey@websterbook.com

*Local Counsel for the Class*