UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

DAVID HOPPAUGH, Individually and On
Behalf of All Others Similarly Situated,

Plaintiff,

v.

K12 INC., RONALD J. PACKARD, and
HARRY T. HAWKS,

Defendants.

1:12-CV-103-CMH-IDD

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
K12 INC., RONALD J. PACKARD, AND HARRY T. HAWKS'
MOTION TO DISMISS THE AMENDED COMPLAINT**

LATHAM & WATKINS LLP

Michele E. Rose (VSB# 45001)
Kevin H. Metz (*pro hac vice*)
Sarah A. Greenfield (*pro hac vice*)
555 Eleventh Street NW
Suite 1000
Washington, DC  20004-1304
Telephone: (202) 637-2200
Fax: (202) 637-2201
Email: michele.rose@lw.com
Email: kevin.metz@lw.com
Email: sarah.greenfield@lw.com

*Attorneys for Defendants K12 Inc.,
Ronald J. Packard and Harry T. Hawks*

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ....................................................................................................3

LEGAL STANDARD ...........................................................................................................9

ARGUMENT ......................................................................................................................10

I.      THE COMPLAINT FAILS TO PLEAD AN ACTIONABLE STATEMENT .................10

      A.      Statements About K12's Revenues, Enrollments, And Retention Are Not Actionable ...............................................................................................................10

      B.      Statements About Students' Academic Performance Are Not Actionable...........13

      C.      Statements About Parents' Satisfaction Are Not Actionable ...............................15

      D.      Statements About Teachers' Qualifications Are Not Actionable ..........................16

      E.      Statements Of Corporate Optimism Are Inactionable Puffery .............................17

II.     THE COMPLAINT FAILS TO PLEAD PARTICULARIZED FACTS GIVING RISE TO A *STRONG INFERENCE* OF SCIENTER ........................................................18

      A.      The Confidential Witnesses Fail To Create A Strong Inference Of Scienter ........19

            1.      The Confidential Witnesses Were Not In Positions To Know Information That Contradicted Defendants' Public Statements ...............20

            2.      The Confidential Witnesses' Statements Do Not Contradict Defendants' Public Statements ................................................................22

            3.      The Confidential Witnesses Had No Contact With Defendants During The Class Period .......................................................................22

      B.      The Absence Of Any Suspicious Stock Sales Or Other Motive Undermines Any Inference Of Scienter.....................................................................................24

III.    THE COMPLAINT ALSO FAILS TO SATISFY THE STANDARDS FOR PLEADING MATERIALITY AND LOSS CAUSATION.............................................27

CONCLUSION....................................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................. 9

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) ......................................................................... 21, 24

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*,
  497 F.3d 546 (5th Cir. 2007) ............................................................................. 25

*Cooke v. Manufactured Homes, Inc.*,
  998 F.2d 1256 (4th Cir. 1993) ........................................................................... 28

*Cozzarelli v. Inspire Pharms. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ............................................................................. 30

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ........................................................................................... 30

*Elam v. Neidorff*,
  544 F.3d 921 (8th Cir. 2008) ............................................................................. 25

*Freed v. Universal Health Svcs., Inc.*,
  2005 WL 1030195 (E.D. Pa. May 3, 2005) ....................................................... 21

*Gaer v. Am. Pub. Educ., Inc.*,
  2011 U.S. Dist. LEXIS 155243 (N.D. W. Va. Dec. 8, 2011) ....................... 18, 25

*Glaser v. Enzo Biochem, Inc.*,
  126 Fed. Appx. 593 (4th Cir. 2005) ................................................................... 18

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011) ............................................................... 25

*Hopson v. MetroPCS Commuc'ns., Inc.*,
  2011 U.S. Dist. LEXIS 47177 (N.D. Tex. Mar. 25, 2011) ................................ 24

*In re Acterna Corp. Sec. Litig.*,
  378 F. Supp. 2d 561 (D. Md. 2005) .............................................................. 23, 24

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999) .............................................................................. 25

*In re Am. Express Co. Sec. Litig.*,
  2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008) .................................................. 20

*In re Cable & Wireless, PLC*,
   321 F. Supp. 2d, 767 (E.D. Va. 2004) ...................................................................... 18

*In re Capital One Corp. Sec. Litig.*,
   2003 U.S. Dist. LEXIS 23042 (E.D. Va. Apr. 10, 2003) .................................... 11, 20

*In re Career Educ. Corp. Sec. Litig.*,
   2007 U.S. Dist.  LEXIS 23635 (N.D. Ill. Mar. 29, 2007) ...................................Passim

*In re Career Educ. Corp. Sec. Litig.*,
   2008 U.S. Dist. LEXIS 123319 (N.D. Ill. June 26, 2008)........................................... 2

*In re Citigroup Inc. Sec. Litig.*,
   753 F. Supp. 2d 206 (S.D.N.Y. 2010) ...................................................................... 22

*In re Conventry Healthcare Secs. Litig.*,
   2011 U.S. Dist. LEXIS 33808 (D. Md. Mar. 30, 2011) ........................................... 23

*In re Cryomedical Scis., Inc. Sec. Litig.*,
   884 F. Supp. 1001 (D. Md. 1995)............................................................................ 16

*In re Gildan Activewear, Inc.*,
   636 F. Supp. 2d 261 (S.D.N.Y. 2009) ...................................................................... 25

*In re ITT Educ. Servs.*,
   2012 U.S. Dist. LEXIS 65754 (S.D.N.Y. May 4, 2012) ................................. 9, 11, 12

*In re NutriSystem, Inc. Secs. Litig.*,
   653 F. Supp. 2d 563 (E.D. Pa. 2009)........................................................................ 25

*In re PEC Solutions, Inc. Sec. Litig.*,
   2004 U.S. Dist. LEXIS 29873 (E.D. Va. May 25, 2004) ...................................Passim

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993) ....................................................................................... 16

*In re Trex Co., Inc. Sec. Litig.*,
   454 F. Supp. 2d 560 (W.D. Va. 2006)................................................................. 18, 22

*In re U.S. Aggregates, Inc. Sec. Litig.*,
   235 F. Supp. 2d 1063 (N.D. Cal. 2002).................................................................... 21

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2001) ...................................................................... 24

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
   432 F. Supp. 2d 571 (E.D. Va. 2006) ........................................................... 11, 14, 28

*Johnson v. Pozen Inc.*,
   2009 U.S. Dist. LEXIS 12765 (M.D.N.C. Feb. 19, 2009) ...................................... 15

*Katyle v. Penn Nat'l Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) ................................................................ 3, 9, 27, 29

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ................................................................ 30

*Longman v. Food Lion, Inc.*,
   197 F.3d 675 (4th Cir. 1999) ................................................ 17, 18, 27, 28

*Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009) ...........................................................Passim

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ............................................................ 12, 26

*Nolte v. Capital One Fin. Corp.*,
   390 F.3d 311 (4th Cir. 2004) ............................................................ 23, 27

*Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*,
   2012 U.S. Dist. LEXIS 76011 (D. Minn. June 1, 2012) ...................................Passim

*Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*,
   551 F.3d 305 (4th Cir. 2009) ............................................................ 18, 30

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
   679 F.3d 972 (8th Cir. 2012) ............................................................ 30

*Scott & Stringfellow, LLC v. AIG Commercial Equip. Fin., Inc.*,
   2011 U.S. Dist. LEXIS 38554 (E.D. Va. Apr. 8, 2011) ............................................ 3

*Smith v. Circuit City Stores, Inc.*,
   286 F. Supp. 2d 707 (E.D. Va. 2003) ................................................ 13, 28

*Taylor v. First Union Corp.*,
   857 F.2d 240 (4th Cir. 1988) ............................................................ 11

*Teachers' Ret. Sys. of La. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) ............................................................ 9, 20, 25, 29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................ 10

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*,
   655 F.3d 1039 (9th Cir. 2011) ............................................................ 30

## STATUTES

15 U.S.C. § 78a-10(b) ............................................................................ 7

15 U.S.C. § 78u-4(b)(1) ........................................................................ 10

15 U.S.C. § 78u-4(b)(1)(B) .................................................................... 9

15 U.S.C. § 78u-4(b)(2)(A) .................................................................... 10

15 U.S.C. § 78u-4(b)(3)(A) .................................................................. 3, 9

17 C.F.R. § 240.10b5 ............................................................................ 25

## RULES

Fed. R. Civ. P. 9(b) ................................................................................ 9

Fed. R. Evid. 201(b)(2) .......................................................................... 3

## OTHER AUTHORITIES

John Hechinger, Bloomberg BusinessWeek, June 2, 2011 ............................. 5, 6, 14, 27

Andy Sher, *Berke, Online School Operator Trading Barbs,*
   Chattanooga Times Free Press, September 6, 2011 ................................ 5

Lee Fang, *How Online Learning Companies Bought America's Schools,*
   The Nation, Nov. 16, 2011 ............................................................... 6

Nick Anderson, *Most schools could face 'failing' label under No Child Left Behind, Duncan
   Says,* Wash. Post, Mar. 10, 2011 ..................................................... 14

Pa. Dept. of Educ., *Charter Annual Report – Agora Cyber CS,*
   at 49-53 (Feb. 14, 2011) ................................................................. 6

Stephanie Saul, *Profits and Questions at Online Charter Schools,*
   N.Y. Times, Dec. 13, 2011 ............................................................... 7

Abby Rapoport, *Virtual Schools, Virtually Unregulated?,*
   Texas Observer, Oct. 10, 2011 ......................................................... 5

Stephanie Banchero & Stephanie Simon, *My Teacher is an App,*
   Wall Street Journal, Nov. 12, 2011 ................................................. 5, 27

Lyndsey Layton & Emma Brown, *Virtual Schools Expand Territory,*
   Wash. Post, Nov. 27, 2011 ........................................................... 5, 14, 27

Pursuant to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the

Private Securities Litigation Reform Act ("PSLRA"), Defendants K12 Inc. ("K12"), Ronald

Packard, and Harry Hawks (collectively, "Defendants"), submit this memorandum in support of

their Motion to Dismiss the Amended Complaint ("AC").

## INTRODUCTION

On December 13, 2011, *The New York Times* published an article about K12, an

online education company based in Herndon, Virginia (the "*NYT* Article"). Relying on public

data, *The New York Times* scrutinized online education, focusing in particular on the academic

performance of students attending virtual schools managed by K12, a leading provider of

technology-based learning systems for kindergarten through 12th grade schools. AC ¶ 38.

Following the publication of this article on the front page of *The New York Times*, K12's stock

dropped 23.6 percent on December 13, and further in following days.

In this litigation, Plaintiff attempts to turn negative publicity into a case for securities

fraud. While the *NYT* Article may have been damaging, it did not reveal or "correct" a fraud on

investors. Indeed, the facts disclosed by *The New York Times* were *already well known to

investors*. For example, the *Washington Post* and *Wall Street Journal* ran articles on virtual

education during the Class Period which referenced the same publicly-available data. The only

thing "new" about the *NYT* Article was that it was *The New York Times* saying it. The dire effect

on a business of receiving negative publicity on the front page of *The New York Times*—one of

the most prominent newspapers in the U.S.—is not surprising, but also not securities fraud.

This is not the first time an investor has attempted to turn negative press into a claim of

securities fraud against a for-profit education company. Nearly identical securities fraud claims

have been *dismissed* against Capella Education Company, ITT Educational Services, Inc.,

Corinthian Colleges, Inc., and Career Education Services. As here, following the release of

negative news articles or reports, plaintiffs in those cases claimed securities fraud, challenging statements concerning enrollment practices, retention, and performance. *All of these cases were dismissed with prejudice.* Those courts highlighted the obvious flaws with these cases: That the "omitted" information that was supposedly "revealed" by these news articles and reports was publicly available during the class periods. That the statements of the low-level employees bolstering these claims knew nothing that rendered the companies' statements misleading. And, that almost none of these employees had any contact with or knowledge about the executives named as defendants. Those courts recognized that these "fundamental problems" were fatal to the claims. *See, e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*, 2012 U.S. Dist. LEXIS 76011, at *22-23 (D. Minn. June 1, 2012) (the "fundamental problem" with plaintiff's theory is that it "failed to articulate a plausible claim of securities fraud" because the so-called omissions failed "to mislead investors"); *In re Career Educ. Corp. Sec. Litig.*, 2007 U.S. Dist. LEXIS 23635, at *34 (N.D. Ill. Mar. 29, 2007), *vacated by settlement*, *In re Career Educ. Corp. Sec. Litig.*, 2008 U.S. Dist. LEXIS 123319 (N.D. Ill. June 26, 2008) (complaint failed to allege "any reliable statement that the defendants had knowledge of particular facts that rendered a specific statement materially false or misleading").

This case is no different. The AC here is also fatally defective and also must be dismissed. As shown below, Plaintiff's claims fail because they ignore the stringent pleading standards of the PSLRA, Rule 9(b) and the Fourth Circuit. Plaintiff does not—and cannot— plead that any of the challenged statements were false or misleading when made. None of the allegedly omitted information—either in the *NYT* Article or supposedly known by confidential sources—actually contradicted a K12 public statement or otherwise showed a statement to be misleading to a reasonable investor. Nor does Plaintiff plead, as it must, a strong inference that

any Defendant acted with scienter.  These shortfalls alone warrant dismissal of Plaintiff's claims,

but the AC is deficient for still other reasons.  Plaintiff fails to plead that any of the alleged

omissions or misstatements were material to investors or actually caused investors' losses.

Where, as here, Plaintiff fails to meet these stringent pleading requirements, "the court shall, on

the motion of any defendant, dismiss the complaint."  15 U.S.C. § 78u-4(b)(3)(A).

## STATEMENT OF FACTS[1]

K12 provides educational services to virtual charter schools that enroll students in

kindergarten through 12th grade.  AC ¶ 2.  Defendant Ronald Packard ("Packard") founded K12

in 2000, and serves as its Chief Executive Officer.  2011 10-K, (Ex. 1) at 44.  Defendant Harry

Hawks joined K12 in May 2010 as Chief Financial Officer and Executive Vice President.  *See*

AC ¶ 28.  K12 has 2,500 employees, including 1,150 teachers, and manages another 2,400

teachers who are employed by the virtual public schools it serves.  2011 10-K at 22.

Through its managed-school division, K12 enters into contracts with independent

charter school boards to provide curriculum and turnkey management services to those schools.

AC ¶ 3.  In fiscal year 2011 (ended June 30, 2011), K12 managed virtual schools in 27 states.  *Id.*

For these schools, "K12 takes responsibility for all aspects of the management," including

"monitoring academic achievement, teacher recruitment and training, compensation of school

personnel, financial management, enrollment processing and procurement of curriculum,

equipment and other required services."  2011 10-K at 16; *see also* AC ¶ 3.  The not-for-profit

---

[1] The facts are taken from the AC, and assumed true only for this motion.  Exhibits ("Ex.") to the Declaration of Sarah A. Greenfield submitted herewith are properly considered as incorporated into the AC, or matters of which this Court may take judicial notice, including SEC filings. *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (judicial notice may be taken of any fact that is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); Fed. R. Evid. 201(b)(2); *Scott & Stringfellow, LLC v. AIG Commercial Equip. Fin., Inc.*, 2011 U.S. Dist. LEXIS 38554, at *17-18 n.3 (E.D. Va. Apr. 8, 2011) ("A court may take judicial notice of SEC filings …[on] a motion to dismiss.").

board or governing authority of the virtual school retains ultimate accountability for and authority over the schools' operations.  2011 10-K at 23.  As with a traditional public school, a virtual public school must comply with state education regulations, the federal *No Child Left Behind Act* (NCLB), and similar federal education laws.  *Id.* at 25.

Virtual schools are typically funded by state or local governments on a per student basis.  *Id*. at 23.  Enrollments at schools managed by K12 are reported by those schools to state education agencies and to investors by K12 on a consolidated quarterly and annual basis.  *See id.* at 37.  Students primarily enroll at online schools in the fall, with some students withdrawing and new students enrolling during the school year.  As reported to its investors throughout the putative Class Period, K12 "track[s] new student enrollments and withdrawals throughout the year."[2]  In fiscal year 2010, total average enrollments rose by 21.6% to 66,811, as compared to total average fiscal year 2009 enrollments of 54,962.  2010 10-K at 56.  K12 explained that this growth was attained "by a process that combines replacing students who have withdrawn and adding new enrollments."  *Id*.  In fiscal year 2011, K12 again increased total average enrollments to 98,890.  2011 10-K at 58.  K12 informed the market of its ongoing efforts to "drive increased enrollments" through "targeted marketing efforts."  *See id.* at 4.

The purported Class Period commences on September 9, 2009, when K12 held its earnings call for the fourth quarter of fiscal 2009.  During that call, Mr. Packard, stated— consistent with K12's disclosures regarding the ebb and flow of enrollments and withdrawals— that retention has been "relatively consistent."  AC ¶ 123.  Nothing out of the ordinary occurred on the call and, not surprisingly, K12's stock price did not significantly rise or fall in response to this event.

---

[2] *See* AC ¶ 18; 2009 10-K, (Ex. 2) at 45; 2010 10-K at 56; 2011 10-K, (Ex. 3) at 58.

Subsequently and throughout the putative Class Period, studies, reports and news articles were published that described the online education market in general and K12's business in particular.  This publicly available information included data and opinions about student withdrawals and enrollment, test scores, student-teacher ratios, and virtual students' academic performance compared to their brick-and-mortar counterparts.[3]  For example, in April 2011, the Center for Research on Education Outcomes (CREDO) released a report comparing eight virtual schools in Pennsylvania, including K12's Agora Cyber Charter School, to brick-and-mortar schools (the "CREDO report") (Ex. 4).  The report suggested that overall performance at the cyber charter schools studied was "substantially lower than the performance at brick and mortar charters," and "[c]yber charter students have significantly smaller gains in reading and math than those of their traditional public school peers." *Id.* at 20, 8.  K12's stock price did not substantially rise or fall in response to this report on academic performance.

Following (and citing to) these studies, national and local media outlets published articles opining on the meaning of these statistics for schools managed by K12. *See, e.g.*, *Bloomberg BusinessWeek* (June 2, 2011) (Ex. 5), the *Chattanooga Times Free Press* (September 6, 2011) (Ex. 6), the *Texas Observer* (October 10, 2011) (Ex. 7), the *Wall Street Journal* (November 12, 2011) (Ex. 8), and the *Washington Post* (November 27, 2011) (Ex. 9).  K12's stock price did not rise or fall substantially in response to these articles. *The Wall Street Journal*, for example, reported that "a few states have found that students enrolled full-time in virtual schools score significantly lower on standardized tests, and make less academic progress from year to year, than their peers." (Ex. 8). *Bloomberg BusinessWeek*, citing a December 9, 2010

---

[3] The AC cites nine Internet sites that disclose graduation rates for K12 schools in Arizona, California, Colorado, Nevada, Ohio, Pennsylvania, South Carolina, and Washington and twelve websites that disclose math and reading standardized test scores for students in each of those states plus Georgia and Texas. *See* AC ¶¶ 68-69.

report published by the National Education Policy Center (NEPC) in Colorado ("NEPC 2010 Report") (Ex. 10), repeated the study's finding regarding the percentage of schools managed by K12 that met the Adequate Yearly Progress (AYP) benchmarks under NCLB.  *Bloomberg BusinessWeek*, June 2, 2011 ("*BusinessWeek* Article") (Ex. 5).  The *BusinessWeek* Article further highlighted what it called "heavy turnover" at a virtual academy managed by K12 in Pennsylvania.  *Id.* ("Almost a third of the 7,700 students Agora signed up withdrew last year.").[4] As Plaintiff implicitly concedes, throughout the Class Period, schools managed by K12 publicly reported the types of student performance data underlying these studies and news articles, including retention and graduation rates, and math and reading scores.  *See* AC ¶¶ 68-69.

On November 16, 2011, during a lengthy presentation at an investor conference, Mr. Packard again acknowledged, as disclosed throughout the Class Period, that K12 tracked student withdrawals (or "churn," *i.e.*, withdrawals as a percentage of enrollments).  *Id.* ¶ 73.  The majority of the presentation focused on K12's financial performance, operations, and business development.  That day, K12's stock price declined 2.15 percent, which Plaintiff speculates was due to Mr. Packard's single comment regarding K12's tracking of withdrawals.  *Id.* ¶ 186.  That same day, *The Nation* ran an article on virtual schools and student achievement versus traditional brick-and-mortar schools, including schools run by K12.  *See* Lee Fang, *How Online Learning Companies Bought America's Schools*, The Nation, Nov. 16, 2011 (the "*Nation* Article") (Ex. 11).  Like the earlier articles, the *Nation* Article focused on K12's "churn" rate and student

---

[4] A 2011 report from the Pennsylvania Department of Education similarly disclosed Agora's withdrawal rates during the 2009-2010 school year, on a monthly basis.  *See* Pa. Dept. of Educ., *Charter Annual Report – Agora Cyber CS*, at 49-53 (Feb. 14, 2011), *available at* http://www.portal.state.pa.us/portal/server.pt/document/1256470/agora_cyber_cs-harter_annual_report-approved_2010_report_pdf (noting specific withdrawal statistics for each month of the school year, *e.g.*, "451 students withdrew during the month of September," "319 students withdrew during the month of October").

performance at K12-managed schools, relying on publicly-available results based on AYP benchmarks and state test scores, citing the April 2011 CREDO report and NEPC 2010 Report as support for its findings.  AC ¶ 187.  Following this article's publication, K12's stock price declined 5.88 percent and 7.75 percent on November 17 and 18, respectively.

However, it was not until this same information was published by *The New York Times* on December 13, 2011 that K12's stock price had a notable reaction.  *See* Stephanie Saul, Profits and Questions at Online Charter Schools, N.Y. Times, Dec. 13, 2011 (Ex. 12).  The *NYT* Article contained no new information.  The article, like others before it, relied on government-published test results, interviews with company officials, and a study by NEPC and Western Michigan University similar to the NEPC 2010 Report.  AC ¶ 189.  The only thing "new" about this article was that it was on the front page of *The New York Times*.  On the three trading days following the publication of the *NYT* Article, K12's stock price declined 23.6 percent, 4.14 percent and 1.71 percent.  *Id.* ¶¶ 19, 190.  This securities suit based on "omissions" supposedly "revealed" in the *NYT* Article followed.

Here, Plaintiff alleges that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, *et seq.*, by failing to disclose during the purported Class Period (a) student withdrawals or "churn" rates;[5] (b) K12's use of aggressive enrollment strategies; (c) state test scores for students enrolled in schools served by K12 compared to traditional schools; and (d) high student-teacher ratios and lax hiring, grading, and attendance policies at some schools served by K12.  These so-called omissions allegedly made certain of Defendants' public statements misleading, including statements regarding (1) K12's

---

[5] Plaintiff defines "churn" as "the number of students who drop out/withdraw over a school year expressed as percentage of the total number of students enrolled during the year."  AC ¶ 54. Churn therefore is just another way to express withdrawals as a function of total enrollment.

historical revenue and enrollments; (2) K12-managed schools' student performance compared to students at brick-and-mortar schools; (3) parents' satisfaction with K12's online curriculum; and (4) the qualifications of teachers at K12-managed schools.  Just like the complaints against Capella, ITT, Corinthian, and CES, this amended complaint does not come close to satisfying the stringent pleading requirements of the PSLRA, Rule 9(b) and Rule 8—and should be dismissed.

*First*, Plaintiff's fraud theory fails because most of the so-called omitted facts were in fact disclosed.  As shown above, the *NYT* Article did not reveal anything previously "omitted."  Instead, in an article that focused on the highly regulated for-profit education industry, *The New York Times* relied on *publicly available* state-reported data, academic studies, and other information regarding virtual education and K12-managed schools.  In any event, these "omissions" do not contradict or render misleading K12's public statements.  Plaintiff fails to plead, as it must, any direct connection between the "omitted" facts and what Defendants said.

*Second*, Plaintiff fails to establish a strong inference that Defendants acted with scienter.  Plaintiff relies entirely on statements from anonymous witnesses, but none of them claims to have had any contact with Mr. Packard or Mr. Hawks during the purported Class Period or were in a position to know whether Mr. Packard or Mr. Hawks knew facts contradicting K12's public statements.  Most of these employees simply complain about their old jobs.  Plaintiff also fails to show that either Individual Defendant received any concrete benefits from, or was motivated to commit, fraud—especially where the only stock sales alleged were made by a single Defendant, preset pursuant to a 10b5-1 trading plan.

*Third and fourth*, Plaintiff fails to allege that any of the supposedly omitted facts were material to investors or actually caused investors' losses.  The facts allegedly hidden from the market were either previously disclosed, or not part of the "corrective disclosures" Plaintiff

identifies (including the *NYT* Article).  As a matter of law, and common sense, these omissions could not alter the "total mix" of information available to investors and the "revelation" of them could not have caused investors' losses.

Where, as here, Plaintiff fails to meet these stringent pleading requirements, "the court shall, on the motion of [Defendants], dismiss the complaint."  15 U.S.C. § 78u-4(b)(3)(A).

## LEGAL STANDARD

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009) (citation omitted).  To survive a motion to dismiss under Rule 12(b)(6), Plaintiff's factual allegations must be "plausible on [their] face" and more than "speculative."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A court must accept as true only "well-pleaded factual allegations," and "owe[s] no allegiance to 'unwarranted inferences, unreasonable conclusions, or arguments.'"  *Katyle*, 637 F.3d at 466 (citation omitted).

The AC must also meet the high standards established by Rule 9(b) and the PSLRA. A plaintiff must "specify each statement [or material omission] alleged to have been misleading" and "the reason or reasons why the statement [or omission] is misleading."[6]  15 U.S.C. § 78u-4(b)(1)(B); *see also* Fed. R. Civ. P. 9(b); *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174

---

[6] The AC fails to comport with even this basic mandate of the PSLRA.  The challenged "statements" consist of lengthy block quotes from conference calls (some are italicized), followed by a list of purported omissions which allegedly render unidentified portions of these quotes misleading.  This oft-criticized "puzzle-pleading" style is plainly deficient.  *See In re ITT Educ. Servs.*, 2012 U.S. Dist. LEXIS 65754, at *14 (S.D.N.Y. May 4, 2012) ("Plaintiff's bolding and italicizing [in block quotes] does little to satisfy the PSLRA's specificity requirements.").

(4th Cir. 2007) (citing U.S.C. § 78u-4(b)(1)); *In re PEC Solutions, Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 29873, at *11 (E.D. Va. May 25, 2004) (to satisfy Rule 9(b) and the PSLRA, the complaint "must plead with particularity the time, place, speaker, and contents of the allegedly false statements").  To adequately plead scienter, Plaintiff must allege particularized facts supporting a "strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); *Matrix*, 576 F.3d at 181.  Contrary to the usual rule requiring courts to draw reasonable inferences in the plaintiff's favor, this strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  Plaintiff must plead facts demonstrating scienter as to *each* defendant and *each* alleged misstatement or omission.  *Matrix*, 576 F.3d at 182; *PEC Solutions*, 2004 U.S. Dist. LEXIS 29873, at *18-19.  As shown, the AC lacks the specificity mandated by the PSLRA and Rule 9(b), and is therefore fatally defective.

## ARGUMENT

## I.   THE COMPLAINT FAILS TO PLEAD AN ACTIONABLE STATEMENT

### A.   Statements About K12's Revenues, Enrollments, And Retention Are Not Actionable

In a single paragraph, Plaintiff alleges that K12's enrollment and revenue results reported in every quarterly and annual report and earnings release during the Class Period were false, because Defendants failed to disclose school "churn" rates and improper school practices which allegedly inflated its enrollments and revenue.  AC ¶ 122.  In addition, Plaintiff alleges that other oral statements by Mr. Packard (and one by Mr. Hawks) regarding K12's revenues, enrollment growth, and "relatively consistent" retention rate (AC ¶¶ 123, 131, 134, 141, 146, 152, 158, 169, 180, 183), also were misleading for the same reasons.  These allegations are not

actionable as a matter of law for at least two reasons.

First, Plaintiff never alleges what the correct enrollment and revenue numbers should have been or even speculates how much they were off.  Plaintiff's mere assertion of their falsity is insufficient.  *In re Capital One Corp. Sec. Litig.*, 2003 U.S. Dist. LEXIS 23042, at *8 (E.D. Va. Apr. 10, 2003) (to allege falsity, "the complaint must state which numbers were incorrect and the approximate amount by which they were incorrect"); *ITT*, 2012 U.S. Dist. LEXIS 65754, at *17 (dismissing claims based on enrollment and revenue numbers because complaint "does not allege any facts contradicting their veracity").

Second, the AC's allegations fail because Defendants had no duty to disclose the allegedly omitted information.  A company has a duty to disclose additional facts only "when silence would make other statements misleading or false."  *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 580-81 (E.D. Va. 2006) (quoting *Taylor v. First Union Corp.*, 857 F.2d 240, 243-44 (4th Cir. 1988)).  To give rise to such a duty, the omitted facts must be "sufficiently connected to Defendants' existing disclosures to make those public statements misleading."  *ITT*, 2012 U.S. Dist. LEXIS 65754, at *18 (citation and quotation omitted).  Here, the AC fails to establish even a "tenuous" connection between quarterly enrollment and revenues and the number of students who withdrew during the year or the company's enrollment practices.  *Id*. at *19-20.

Identical allegations have been considered and rejected in other recent suits against for-profit education companies.  In *Capella*, plaintiff argued that Capella, an online university, misleadingly touted its enrollment growth by concealing high withdrawal rates and abusive recruiting practices.  2012 U.S. Dist. LEXIS 76011, at *9-10.  Dismissing the complaint, the court held that the plaintiff failed to allege an actionable omission, because there was "'no direct

connection between Defendants' statements regarding the sources of its revenue and enrollment growth and the omitted information regarding [the school's] predatory recruitment practices or quota system.'" *Id*. at *25 (quoting *ITT*, 2012 U.S. Dist. LEXIS 65754, at *18).

Similarly, in *ITT*, the plaintiff alleged that ITT, a for-profit college system, made misleading statements regarding revenue and enrollment growth, by failing to disclose that it was operating a "predatory business model" designed to enroll as many students as possible. 2012 U.S. Dist. LEXIS 65754, at *8-10. Again, that court dismissed the complaint, reasoning that ITT had no duty to disclose its recruitment practices or quotas, because the statements regarding its revenue and enrollment growth said "nothing about how aggressively [ITT] marketed itself to prospective students." *Id*. at *18; *see also Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1071 (9th Cir. 2008) (holding that Corinthian Colleges had no duty to disclose a government investigation at one of its 88 colleges where plaintiff did not connect the investigation "to any false or misleading statement—*i.e.*, some affirmative statement or omission by Corinthian that suggested it was not under any regulatory scrutiny").

The AC's allegations here are no different. K12 is under no duty to disclose its retention rates or enrollment practices because the statements regarding K12's revenues and the source of those revenues (*i.e.*, enrollments) said nothing about how many students withdrew each year or how K12 marketed itself. As in *Capella*, *ITT*, and *Corinthian*, Plaintiff fails to connect the alleged omission of K12's "churn" rate or recruiting strategies to any false or misleading statement, *i.e.*, some affirmative statement by K12 regarding its withdrawal rates or how aggressively it recruited new students. Likewise, because Mr. Packard's statements that "retention has been relatively consistent" and K12 had "not seen any significant changes in retention," (AC ¶ 123), said nothing about whether the rate of retention (or withdrawals) was

high or low, Mr. Packard, therefore, was under no duty to disclose the rate itself. *See Capella*,

2012 U.S. Dist. LEXIS 76011, at *25. Without a "direct connection" between the alleged

omissions and Defendants' statements regarding enrollment and revenue results or K12's

"relatively consistent" retention rate, Defendants were under no duty to disclose more.

### B.    Statements About Students' Academic Performance Are Not Actionable

Plaintiff also challenges Defendants' statements about the academic performance of

long-term students at K12-managed schools.  The AC alleges that Defendants "misleadingly

touted the performance of K12 students who had been with K12 over several years," while

omitting information disclosed in the *NYT* Article, namely that schools served by K12:  (1) were

underperforming based on standardized tests and AYP benchmarks mandated by *No Child Left

Behind*; (2) had high student-teacher ratios; and  (3) recruited so-called "last resort" students,

which negatively impacted schools' academic performance.  AC ¶¶ 126, 141, 146, 154, 156, 161,

163, 165, 167, 172, 180, 183.  These allegations fail.

First, as shown above, all of the information in the *Nation* and *NYT* Articles,

including the standardized test data, was drawn from public sources that were available to the

market long before the articles were published.  Plaintiff cannot base a securities fraud claim on

allegedly "omitted" information that had in fact been disclosed to the market.  For example,

K12's 2009, 2010, and 2011 annual reports all informed investors that "[n]ot all of the virtual

public schools we serve meet the Adequate Yearly Progress requirements of NCLB."[7]  *See Smith

v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 721 (E.D. Va. 2003) (no actionable omission

where scope of defendant's finance operation was already available in company's 10-Ks, 10-Qs,

and 8-Ks).  Similarly, *Bloomberg BusinessWeek* and the *Washington Post* reported months

---

[7] *See* K12 2009 10-K, (Ex. 2) at 28; 2010 10-K, (Ex. 3) at 36; 2011 10-K, (Ex. 1) at 35.

earlier than *The New York Times* that some K12-managed schools (like thousands of other public

schools across the country) did not meet the benchmarks established by *No Child Left Behind*.[8]

*See Iron Workers*, 432 F. Supp. 2d at 580-81 (where information is available in newspaper

articles, "any withholding of information by the company is immaterial and cure[s] any

omissions by the company").  Plaintiff's theory is further belied by the widely-known fact that

the *vast majority* of public schools (traditional and virtual alike) struggle under *No Child Left*

*Behind*.  Indeed, in March 2011, the Department of Education estimated that 82% of traditional

schools were unlikely to meet NCLB targets in the 2010-2011 school year.[9]

   Second, the enrollment of at-risk students in K12-managed schools and their potential

effect on overall student performance was well known to the market.  Mr. Packard stated at least

five times during the Class Period in conference calls with analysts and investors that K12 was

often "fixing somebody else's problem" because many K12 students had dropped out of

traditional schools.  AC ¶¶ 154, 156, 161, 163, 167.  Mr. Packard also acknowledged that K12

was working with "an adverse selection bias" because the virtual school it managed attracted

kids for whom traditional brick and mortar schools had not worked.  *Id.* ¶ 161.  Thus, investors

were already well informed that K12-managed schools did not cater only to gifted students.

   Third, Plaintiff criticizes (but has not disputed the truth of) Mr. Packard's statements

regarding the performance of students who stayed enrolled longer at K12, *see, e.g.*, AC ¶¶ 128,

156, 161, alleging that such statements gave rise to a duty to disclose that other K12 students

withdrew within their first year.  Here too, Plaintiff fails to show a "direct connection" between

---

[8] *See* Ex. 5 (*Bloomberg BusinessWeek* article) ("K12 did lag behind in a key measure—the percentage of students meeting the federal benchmark for yearly progress toward proficiency on state tests") and Ex. 9 (*Washington Post* article) ("[L]ast year, about one-third of K12-managed schools met the achievement goals required under the federal No Child Left Behind law.").

[9] Nick Anderson, Most schools could face 'failing' label under No Child Left Behind, Duncan Says, Washington Post, March 10, 2011 (Ex. 13).

the retention of first-year students and the success of long-term students.  *Capella*, 2012 U.S.

Dist. LEXIS 76011, at \*25; *Johnson v. Pozen Inc.*, 2009 U.S. Dist. LEXIS 12765, at \*65

(M.D.N.C. Feb. 19, 2009) (accurate statements regarding cardiovascular studies had "nothing to

do with genotoxicity and, therefore, cannot create any duty to disclose additional information

about preclinical genotoxicity testing").[10]

 **C.** **Statements About Parent Satisfaction Are Not Actionable**

  Plaintiff next contends that Mr. Packard's statements that "parent satisfaction level is

extremely high" and K12 is "looking at 96% parent satisfaction with the curriculum and 89%

very satisfied" were misleading.  AC ¶¶ 126, 128.  Again, Plaintiff does <u>not</u> allege that parents'

satisfaction was <u>not</u> as stated, but argues that K12 should have "include[d] parents in its survey

whose children withdrew," and that the statement was misleading without disclosing that

students at schools served by K12 were "underperforming compared to state averages" and

"dropping out at excessive rates."  *Id*. ¶ 127.

  Of course, neither Plaintiff's unfounded assumption regarding who was surveyed, nor

its opinion on who should have been surveyed, makes the actual results of the survey false.  Yet

again, Plaintiff fails to allege with any level of particularity a "direct connection between

Defendants' statements regarding" parents' satisfaction with K12's product and "the omitted

information" regarding churn rates and student performance.  *Capella*, 2012 U.S. Dist. LEXIS

76011, at \*25 (dismissing plaintiffs' securities claim because there was no "direct connection"

between the company's financial success and the school's practices plaintiff alleged).  The AC

---

[10] Statements that K12 produces "results that are as good or better than state averages," AC ¶¶ 126-27, are too general to be rendered misleading by the omission of specific graduation rates or math and reading scores at a handful of K12's schools.  *See Career Educ. Corp.*, 2007 U.S. Dist. LEXIS 23635, at \*10, \*20 (allegations that some schools inaccurately reported student populations were insufficient to show misstatement of company-wide numbers).

does not allege that Mr. Packard suggested that the satisfaction rate was attributed to above-average test results or low "churn" rates.  Without this requisite link, K12 was under no duty to disclose the "omitted" information.  *In re Cryomedical Scis., Inc. Sec. Litig.*, 884 F. Supp. 1001, 1012 (D. Md. 1995) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know the fact.")  (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).

### D.      Statements About Teachers' Qualifications Are Not Actionable

Next, Plaintiff challenges statements by Mr. Packard regarding K12-recruited teachers' qualifications, including: (1) "[K12 virtual public school students] have state-certified teachers who were certified and reside in the state in which they're enrolled"; (2) "[K12] hire[s] teachers who, at a minimum, are state certified and meet the federal requirements for designation as a 'Highly Qualified Teacher,' and generally have at least three years of teaching experience"; and (3) K12 has a "rigorous evaluation and training programs" for teachers.[11]  AC ¶¶ 167, 176.  Again, these statements are inactionable as a matter of law.

Plaintiff points only to statements by two former teachers (CW8 and CW13) who criticize the depth of the questions asked during their job interviews.  *Id.* ¶¶ 63, 82-83.  However, statements by two alleged witnesses out of the 3,550 teachers employed by K12 or one of its managed schools, *id.* ¶ 41, does not make K12's general statements regarding its hiring goals and

---

[11] Plaintiff  also challenges Mr. Packard's statement that some teachers told him that they felt they "know their students far better in a virtual school than they ever did in a classroom," simply because some former teachers reported that high student-teacher ratios and administrative duties "made it impossible to adequately teach their students."  AC ¶¶ 161-62.  Plaintiff is merely substituting its judgment for that of the teachers who spoke to Mr. Packard, but fails to allege any facts that establish the falsity of Mr. Packard's statement.

teachers' qualifications false.[12]  *See Career Educ. Corp.*, 2007 U.S. Dist. LEXIS 23635, at *13 (allegations from confidential sources that "bad debt" was inaccurately reported at nine schools were insufficient to plead the falsity of CEC's "bad debt" expense, because they concerned "minimal discrepancies at only a few schools").   In fact, neither CW8 nor CW13 say they were not qualified for teaching positions they held.  Even if they had, such isolated incidences across a nationwide education system does not make the company's general statements false or misleading.  *Longman v. Food Lion, Inc.*, 197 F.3d 675, 686 (4th Cir. 1999).[13]

### E.  Statements Of Corporate Optimism Are Inactionable Puffery

Finally, Plaintiff challenges numerous positive statements about K12's product and business prospects, such as "K12 remains a tremendous value for taxpayers because we deliver a "high-quality" public education; "demand for virtual academy education persists"; and "[w]e deliver results that are as good or better than the average school in the state."  *See, e.g.*, AC ¶¶ 141, 152, 156; *see also* Appendix A (Statements of Inactionable Corporate Puffery).  Such statements are "too generalized to be demonstrably false," and are exactly the type of corporate "puffery" or optimism upon which no reasonable investor would rely.  *In re Trex Co., Inc. Sec.*

---

[12] Plaintiff fails to show that statements about K12 teachers' state certifications and residencies misled the market because a few teachers at K12-managed schools purportedly taught in different states or taught classes for which they lacked state certification. AC ¶ 168.  Again, such isolated incidents at one or two schools is insufficient to render K12's statement that it seeks to hire state-certified  teachers misleading or create a case for securities fraud.

[13] Plaintiff alleges that statements in K12's 2011 10-K regarding its special education programs were misleading because: (1) in February 2012, the Ohio Department of Education sent a letter to the Ohio Virtual Academy, stating that it failed to provide one student with adequate special education, and (2) a former teacher sent an email to K12's VP of Program Management, questioning whether one school could adequately serve its special education students. AC ¶¶ 178-79, 87-90.  However, one teacher's opinion (conveyed to neither Defendant) fails to demonstrate that K12's general statement regarding special education programs at all schools was false.  *See Longman*, 197 F.3d at 686.  Moreover, Defendants cannot be liable based upon a statement made in October 2011 when there is no proof the omitted fact existed until February 2012.  *PEC Solutions*, 2004 U.S. Dist. LEXIS 29873, at *16-17 (statements made in October were not actionable when there was no proof the alleged omissions existed until December).

*Litig.*, 454 F. Supp. 2d 560, 580 (W.D. Va. 2006) (statements that company had "a growing demand for its products," "a leading market share," and that it had "expanded its position as a market leader" were inactionable); *Longman*, 197 F.3d at 684 & n.2 (statement that "Food Lion is one of the best-managed high growth operators in the food retailing industry" amounted to nothing more than "immaterial puffery"); *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 767 (E.D. Va. 2004) ("[G]enerally rosy statements, such as 'healthy growth,' 'achieving our objectives ...' and 'competitive advantage' are puffery and not actionable.").[14]

## II.   THE COMPLAINT FAILS TO PLEAD PARTICULARIZED FACTS GIVING RISE TO A *STRONG INFERENCE* OF SCIENTER

To plead a strong inference of scienter in the Fourth Circuit, a plaintiff must plead particularized facts constituting intentional misconduct or recklessness.  Recklessness is conduct "'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Matrix*, 576 F.3d at 181 (quoting *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 313 (4th Cir. 2009)).  This inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations."  *Gaer v. Am. Pub. Educ., Inc.*, 2011 U.S. Dist. LEXIS 155243, at *58-59 (N.D. W. Va. Dec. 8, 2011) (quotation omitted).

---

[14]  The AC is nearly devoid of particularized facts as to Mr. Hawks.  He is alleged to have made a single challenged statement, in which he attributed K12's increased revenues to increased enrollments (AC ¶ 146).  However, as shown above, Plaintiff fails to allege how or why Mr. Hawks' statement was false or misleading when made.  *PEC Solutions*, 2004 U.S. Dist. LEXIS 29873, at *41 (allegations that defendants occupied senior positions in the company were insufficient to impart knowledge of falsity or scienter).  Nor is Mr. Hawks liable for statements made by others.  *See Glaser v. Enzo Biochem, Inc.*, 126 Fed. Appx. 593, 598 (4th Cir. 2005) (a challenged statement must be "directly attributable to the defendant and not to some other person") (quotation, alteration, and citation omitted)).

Where a plaintiff fails to meet this rigorous pleading requirement, courts do not hesitate to dismiss the claim. For example, in *Career Education Corp.*, plaintiff alleged that defendants failed to disclose improper accounting practices and reported inflated new student enrollments and student population numbers. 2007 U.S. Dist. LEXIS 23635, at *17-18. There, the plaintiff attempted to plead scienter based on the individual defendants' high-ranking positions, statements from 27 confidential witnesses, and defendants' stock sales. The Court rejected those allegations, finding the anonymous sources unreliable and the stock sales neither suspicious or unusual. *Id*. at *18 n.10, 32 n.17. The Court observed: "[P]laintiffs do not cite any competent witness or document to show how any of the alleged improprieties affected the truth of CEC's public statements." *Id*. at *10.

Those words could have been written for this case. Here, as shown below, Plaintiff's scienter allegations are premised on statements by mostly low-level employees who served at K12-managed schools, but profess no knowledge of Defendants' alleged awareness of the falsity of their public statements. Plaintiff is also unable to allege a cognizable motive to commit fraud. Mr. Hawks did not sell any stock during the Class Period, and Mr. Packard's stock sales were made pursuant to a 10b5-1 trading plan and not otherwise suspicious in timing or amount. Collectively, these facts fail to give rise any inference of scienter—and certainly not the required strong inference. *Matrix*, 576 F.3d at 183.

## A.   The Confidential Witnesses Fail To Create A Strong Inference Of Scienter

Plaintiff relies solely on 23 anonymous former employees to support its allegations of Defendants' state of state of mind.[15] Plaintiff appears to confuse quantity with quality. Not one

---

[15] As set forth on Appendix B hereto, the 23 CWs include 14 former teachers, administrators, advisors (CWs 3, 7-8, 11-14, 16-22) (AC ¶¶ 50-51, 57, 62-63, 77-79, 80, 82-83, 95-96, 98-99, 101-02, 105, 107, 109-17), 3 former enrollment consultants/sales staff (CWs 1-2, 4) (*id*. ¶¶ 48-49, 52), 2 former mid-level managers (CW5, a Market Research Manager and CW6, Senior

of these former employees (1) was in a position to know first-hand information relevant to the challenged statements; (2) had information that contradicted those statements; and (3) communicated with either Individual Defendant about those public statements.  These allegations fall far short of the high pleading standard set by the PSLRA and the Fourth Circuit.  *See In re Capital One Corp. Sec. Litig.*, 2003 U.S. Dist. LEXIS 23042, at *13 (dismissing plaintiff's 10b-5 claim for failing to plead scienter with the requisite particularity).

### 1. The Confidential Witnesses Were Not In Positions To Know Information That Contradicted Defendants' Public Statements

Plaintiff must describe confidential witnesses "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Hunter*, 477 F.3d at 174 (quotation and citation omitted).  Failure to do so undermines any credibility those witnesses could be afforded.  *See, e.g.*, *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *7 (S.D.N.Y. Sept. 26, 2008) (no basis to infer that "portfolio managers," a "pricing analyst," and "financial advisors" had access to information "indicating that Amex was not properly valuing the High Yield Debt, that its risk control policies were inadequate, that Amex was violating GAAP, or that contradicted the Company's statements").  Plaintiff offers only vague descriptions of the CWs' job responsibilities—*e.g.* "customer service and Sales/Enrollment" and "former operations manager at one of K12's virtual schools."  AC ¶¶ 49, 62.  The AC provides no reason to infer that any of the witnesses was in a position to have first-hand knowledge of information contradicting K12's statements about *company-wide* enrollments and revenue or student test performance.  *Hunter*, 477 F.3d at 181 (no basis to infer that "former assistant" to the president of an acquired division would have expertise in valuing a

---

Director for School Development) (*id.* ¶¶ 58-59, 60-61), 3 former senior-level employees (CW9, Senior VP of Operations, CW10, Controller, and CW 23, Internal Audit Director) (*id.* ¶¶ 64-65, 120), and 1 parent of a former K12 student (CW15) (*id.* ¶ 97).

business or credible information regarding defendants' intent to overpay for the division).

Tellingly, 20 of the CWs (CWs 1-8, 11-22) were low-level employees, managers, enrollment consultants or parents scattered throughout more than seven states, far removed from Messrs. Packard and Hawks in Virginia in both geographical and organizational proximity. AC ¶¶ 63, 79, 83, 97, 111, 112, 115.  This Court cannot reasonably infer that any of these CWs, all but one of whom had no role whatsoever in financial reporting, and none of whom had any responsibility for overall corporate operations, would have credible information about Mr. Packard's or Mr. Hawks' state of mind.  *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004) (discrediting statements from low-level employees at regional offices about national business practices and customer losses); *Freed v. Universal Health Svcs., Inc.*, 2005 WL 1030195, at *6 (E.D. Pa. May 3, 2005) (rejecting statements by local hospital employees who supplied data to corporate headquarters where plaintiff "fail[ed] to allege how they would have had access to information regarding UHS's operations nationwide");  *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074-76 (N.D. Cal. 2002) (no inference of scienter where 10 confidential sources worked for company subsidiaries and lacked first-hand knowledge of corporate decisions and alleged accounting improprieties).

Only one witness, CW10, is alleged to have had a financial reporting role, and only during a portion of the Class Period (as K12's Controller from September 2005 through January 2011, AC ¶ 65).  But all CW10 alleges is that all K12 schools "entered enrollment, attendance and other information into a 'central … proprietary' system that was managed at the corporate level."  *Id.*  No inference—let alone a strong inference of scienter—can be drawn from the unremarkable statements attributed to CW10.  *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d

206, 245 (S.D.N.Y. 2010) ("assertions that the information presented by confidential witnesses was known or common knowledge within the company" are insufficient to support scienter).[16]

## 2.   The Confidential Witnesses' Statements Do Not Contradict Defendants' Public Statements

Not only do the confidential witnesses lack any indicia of reliability, but the AC also does not show that any of the information allegedly possessed by these witnesses contradicted Defendants' public statements.  Indeed, many witnesses simply complain that policies, practices and administrative functions at their schools or departments could be improved.  For example:

- CW14 criticizes K12's policy of permitting parents and teachers to retroactively log students' attendance (AC ¶ 95);

- CW18 felt pressured by his school principal to pass students (AC ¶ 110);

- CW19 states that his class size resulted in an unmanageable workload (AC ¶ 111);

- CW23 observes that K12's quarterly closing of its books was challenging and complains that his entire department was laid off in early 2011 (AC ¶ 120).

On their face, none of these work-place complaints contradict any of Defendants' public statements.  *Career Educ. Corp.*, 2007 U.S. Dist. LEXIS 23635, at *21 (allegations from four CWs that student population numbers were inaccurately reported at individual schools were insufficient to contradict defendants' statements reporting companywide student population).

## 3.   The Confidential Witnesses Had No Contact With Defendants During The Class Period

---

[16] Courts routinely reject allegations from witnesses based on hearsay and speculation. *Trex*, 454 F. Supp. 2d at 581 (citation omitted) (Confidential  witnesses "can be relied on for pleading under the PSLRA only if the testimony regards facts of which the witness had personal knowledge." ).  Here, for example, CW6, a "Senior Director for School Development," despite being employed for only the first month of the Class Period and not alleging any direct contact with Mr. Packard, speculates that his boss, Stewart, "who routinely received orders directly from Packard—was acting on Packard's instructions," when Stewart told CW6 that K12 "had to" target inner-city and at-risk populations due to their higher profit potential.  AC ¶¶ 60-61.  This is the type of allegation which is based on conjecture, and can be afforded no weight under the PSLRA. *Career Educ. Corp.*, 2007 U.S. Dist. LEXIS 23635, at *13 (confidential sources that merely "relay[] rumors and second hand information" were insufficient to show scienter).

Finally, not a single witness claims to have ever met, talked to or emailed any Defendant. As such, "it defies logic to conclude that these witnesses knew what the Defendants knew or recklessly disregarded." *In re Conventry Healthcare Secs. Litig.*, 2011 U.S. Dist. LEXIS 33808, at *18 (D. Md. Mar. 30, 2011) (no inference of scienter where witnesses had no contact with any defendant); *see also Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 316 (4th Cir. 2004) (rejecting statements of former Capital One employees where plaintiff failed to show that "management was ever informed" of their alleged concerns).

Out of 23 identified witnesses, three make passing reference to the knowledge of "management" or "corporate" employees, while the remainder do not even make this vague assertion. CW3 claims he attended weekly enrollment meetings with unidentified "corporate employees," in which a draft enrollment "script" that "originated from K12's corporate office" was discussed (AC ¶ 50), but this hopelessly vague allegation fails to specify whether either Mr. Packard or Mr. Hawks attended any of these meetings, was privy to the draft script, or how this script or anything else discussed at these meetings contradicted any of Defendants' public statements. *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 574 (D. Md. 2005) (CW allegations failed to state when discussions took place, whether the defendants were present, or "how else they may have been privy to them"); *see also Conventry*, 2011 U.S. Dist. LEXIS 33808, at *16-17 (The "broad assertion that 'CW2 *periodically* attended meetings, at which [one defendant and *occasionally* another] were present' does not … support an inference that this witness could reasonably attribute *scienter* to the Defendants.").

Similarly, while CW5 (a former "Market Research Manager") alleges that he was tasked with studying churn and that "management tracked churn" (AC ¶ 58), CW5 does not state who gave him instructions, whether he actually completed a study on churn, the results of a study

(if any), and whether the results contradicted Defendants' statements and were communicated to them. Without these details, this Court cannot attach any credibility to these allegations. *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2001) (absence of allegations that "any CW met [defendants], reported any concerns, received any instructions, or made any personal contact with [defendants]" undermined inference of recklessness).

Nor can Plaintiff meet its high burden to plead scienter based on CW9's unsurprising assertion that "K12 management tracked student enrollment through the SAMS database," which all "corporate employees" had "access to." AC ¶ 64. Absent are facts showing whether any Defendant accessed this system (or should have), and if so, when he did and what type of information he received regarding "churn" or contradicting his public statements. *See Hopson v. MetroPCS Commuc'ns., Inc.*, 2011 U.S. Dist. LEXIS 47177, at *44 (N.D. Tex. Mar. 25, 2011) (rejecting plaintiff's argument that internal software systems "must have revealed that the handset promotion was increasing churn" where plaintiff failed to allege what information the systems provided, who viewed or should have viewed such information, and when they did so).

In short, nothing in the AC suggests that any of these former employees were in a position to have—and in fact had—reliable, credible information about Defendants' public statements or intent. As in *Chubb*, although Plaintiff here has procured 23 confidential witnesses, "[t]he sheer volume of confidential sources cited cannot compensate for the[] inadequacies" of Plaintiff's scienter allegations under the PSLRA and *Tellabs*. 394 F.3d at 155.

> ### B.   The Absence Of Any Suspicious Stock Sales Or Other Motive Undermines Any Inference Of Scienter

Plaintiff's scienter allegations are further undermined by its failure to show a motive for any Defendant to engage in fraud. *Acterna*, 378 F. Supp. 2d at 576-77 (failure to show motive or "concrete benefits [to Defendants] that could be realized by the alleged false

statements," such as stock sales, "cut[] against" inference of scienter).  Here, Mr. Hawks is not alleged to have sold any stock during the Class Period or otherwise sought to profit from the alleged fraud.[17]  Plaintiff points only to Mr. Packard's stock trades, AC ¶ 194, but stock sales "imply scienter only if the timing and amount of a defendant's trading were 'unusual or suspicious.'"  *Hunter*, 477 F.3d at 184-85 (stock sales insufficient where plaintiff failed to show that any sale was timed to profit from a particular disclosure).  Plaintiff fails on both counts.

First, Plaintiff ignores that Mr. Packard's Class Period trades were made pursuant to a non-discretionary 10b5-1 trading plan, adopted on September 16, 2009, at the start of the Class Period.  *See* Packard Form 4s (Exs. 14-79).  A 10b5-1 plan is a divestment plan adopted under SEC Rule 10b5-1, which "prearranges stock transactions and provides an affirmative defense to an allegation of insider trading, provided the plan is adopted in writing prior to becoming aware of material non-public information."  *In re NutriSystem, Inc. Secs. Litig.*, 653 F. Supp. 2d 563, 576 (E.D. Pa. 2009); *see* 17 C.F.R. § 240.10b5.  This fact alone "undermines any allegation that the timing or amounts of [Mr. Packard's] trades [were] unusual or suspicious."  *In re Gildan Activewear, Inc.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) (no motive where 99% of stock sales were made by one defendant pursuant to a 10b5-1 plan).[18]

Second, Plaintiff also fails to show that the timing or amount of the Class Period sales was suspicious, *i.e.*, "'dramatically out of line with prior trading practices'" or made "'at times

---

[17] *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592-93 (S.D.N.Y. 2011) (defendants lack of stock sales undermines theory that "that negative information was withheld to obtain a higher sell price"); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999) (that some "of the individual defendants sold no stock at all during the class period, rais[es] doubt whether the sales [by other defendants] were motivated by an intent to profit from inflated stock prices").

[18] *See also Elam v. Neidorff*, 544 F.3d 921, 928-29 (8th Cir. 2008) (trades pursuant to 10b5-1 plans "can raise an inference that the sales were prescheduled and not suspicious") (quotation and citation omitted); *Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*, 497 F.3d 546, 554 n.4 (5th Cir. 2007) (same); *Gaer*, 2011 U.S. Dist. LEXIS 155243, at *67-68 (discounting stock sales made pursuant to a 10b5-1 plan and not shown to be suspiciously timed).

calculated to maximize the personal benefit from undisclosed inside information.'" *Corinthian*, 540 F.3d at 1066-67. Here, Plaintiff merely compares the number of shares sold by Mr. Packard before and during the Class Period, AC ¶ 194, but fails to provide the relevant trading history for those sales. To raise an inference of scienter, Plaintiff must plead "facts regarding overall stock holdings, the percentage of stock sold ... and how these sales compare to their previous trading history." *PEC Solutions*, 2004 U.S. Dist. LEXIS 29873, at *45. For example, many of Mr. Packard's trades, which were stretched out in small lots over a two-year period, occurred at prices as low as $16.88 per share, far below the highest priced alleged sale at $39.05 per share. On one occasion, Mr. Packard sold stock the day *before* making one of the challenged statements. *Compare* AC ¶ 130 (challenged statement); *with id.* ¶ 194 (sale of 10,000 shares at $17.00 on October 5, 2009). [19] None of these trades were made at "suspicious" times to take advantage of the so-called fraud. Moreover, Mr. Packard is alleged to have sold 853,407 shares during the Class Period (AC ¶ 194), yet he retained nearly 1.2 million shares[20] at the end of the Class Period, a total that declined less than 6 percent from the start of the Class Period. *See* Form DEF 14A (Oct. 19, 2009), (Ex. 80) at 9; Form DEF 14A (Dec. 9, 2011), (Ex. 81) at 13. These facts undermine any suggestion that the timing or amount of Mr. Packard's trading was "unusual or suspicious." *PEC Solutions*, 2004 U.S. Dist. LEXIS 29873, at *46 (sale of less than 2% to 13% of each defendant's total stock holdings negated any inference of motive to commit fraud).

---

[19] *Compare also* AC ¶¶ 128-30 (October 6, 2009 statement), 141-43 (May 10, 2010 statement), 146-48 (September 13, 2010 statement), 158-60 (February 9, 2011 statement), 180-82 (October 10, 2011 statement) *with id.* ¶ 194 (listing Class Period trades).

[20] This total does not include 171,207 shares that he owned at the end of the Class Period that remained restricted from sale.

Taking Plaintiff's allegations collectively, the AC falls far short of pleading a strong inference of scienter.  *Matrix*, 576 F.3d at 182.

## III.   THE COMPLAINT ALSO FAILS TO SATISFY THE STANDARDS FOR PLEADING MATERIALITY AND LOSS CAUSATION

The AC also fails to allege that any alleged omission was material to investors, or that K12's stock price drop was caused by disclosure of the allegedly omitted facts.  Both of these deficiencies are fatal to the AC.  *Nolte*, 390 F.3d at 315-17 (affirming the district court's dismissal of plaintiff's claims upon finding that company executive had not made any material false claims to investors); *Katyle*, 637 F.3d at 472 (dismissing claims where complaint failed to plead loss causation and stating that "the complaint must allege a sufficiently direct relationship between the plaintiff's economic loss and the defendant's fraudulent conduct").

First, the allegations in the AC (and publicly available information) demonstrate that the challenged "omissions" were not material as a matter of law.[21]  As shown above, the "omissions" concerning student performance, student retention and aggressive marketing and recruitment strategies were well known to the market prior to the publication of the *Nation* or *NYT* Articles.  *See* 2011 10-K, (Ex. 1) at 35, 58; 2010 10-K, (Ex. 3) at 36, 56; 2009 10-K, (Ex. 2) at 28, 45; *BusinessWeek* Article (June 2, 2011) (Ex. 5); *Wall Street Journal*  (November 12, 2011) (Ex. 8), *Washington Post* (November 27, 2011) (Ex. 9), CREDO report (April 2011) (Ex. 4).  It is axiomatic that information already in the "total mix" cannot alter it.  *See Longman*, 197 F.3d at 685 (employment practices had been previously disclosed, and thus "[t]he market had a full opportunity to evaluate these claims and to reflect their risk in the market price for Food

---

[21] Materiality "is a mixed question of law and fact; and the standard for a motion to dismiss is whether 'no reasonable juror could determine that the alleged statements would have assumed actual significance in the deliberations of the reasonable investor.'"  *PEC Solutions*, 2004 U.S. Dist. LEXIS 29873, at *13 (citation omitted).

27

Lion stock"); *Circuit City*, 286 F. Supp. 2d 707 at 721 ("Disclosure of information already

publicly available does not materially alter the 'total mix' of available information." (citing

*Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262-63 (4th Cir. 1993))).

      For example, Plaintiff alleges that K12 failed to disclose how its students and schools

performed compared to state averages and brick-and-mortar schools. *See, e.g.*, AC ¶¶ 126-27,

141-42, 146-47, 154-57, 161-68, 172-73. Indeed, numerous reports, studies and articles

published during the class period examined and cited this publicly available data. *See, e.g.*,

NEPC 2010 Report (Ex. 10); *Washington Post* (Ex. 9). Indeed, Plaintiff's own charts on

graduation rates and test scores is drawn from publicly available data. AC ¶¶ 68-69. Thus, the

"market had a full opportunity to evaluate" this data. *Longman*, 197 F.3d at 685; *see also Iron*

*Workers*, 432 F. Supp. 2d at 580-81 (withholding of information publicly-available in analyst

reports or newspaper articles is immaterial). Likewise, Plaintiff's allegation that K12 failed to

disclose high "churn" is based on the *NYT* Article, which itself cited only publicly available data.

AC ¶ 189 (*e.g.*, "Records Agora filed with Pennsylvania reveal that 2,688 students withdrew

during the 2009-10 school year."). So widespread was knowledge of online schools' challenges

with withdrawals that *The New York Times* casually acknowledged that "[o]nline schools

typically are characterized by high rates of withdrawal." *Id.* (quoting *NYT* Article); *see also*

*BusinessWeek* Article (Ex. 5) (noting high withdrawal rates among some K12 students).

      Investors also knew that as a for-profit education company, K12 depended on

enrolling more students and would market itself, like any other company. K12 itself informed

the market of their continued efforts to "drive increased enrollments" through "targeted

marketing efforts." *See* 2011 10-K at 4. Addressing a nearly identical claim, the *Capella* court

made the common sense observation that "[i]nvestors already knew that Capella was a for-profit

educational institution … there is nothing surprising, much less fraudulent or otherwise illegal, in the fact that a successful business aggressively markets its goods or services." *Capella*, 2012 U.S. Dist. LEXIS 76011, at *26.[22]

Second, Plaintiff's failure to identify material omissions also dooms its loss causation pleading. In the Fourth Circuit, a plaintiff must allege a corrective disclosure that "revealed to the market the undisclosed truth about the defendants' misrepresentation or omission," and caused a drop in K12's stock price. *Katyle*, 637 F.3d at 580; *see also id.* at 465-66 (plaintiff must plead loss causation with "'sufficient specificity to enable the court to evaluate whether the necessary causal link exists'" (citing *Hunter*, 477 F.3d at 186)). The alleged corrective disclosures "must present facts to the market that are new, that is, publicly revealed for the first time, because, 'if investors already know the truth, false statements won't affect the price.'" *Id.* at 473 (citation omitted). Here, while the AC identifies three disclosures that preceded a stock price drop, it fails to explain how any of the information disclosed "corrected any prior, potentially actionable misstatements by Defendants." *Capella*, 2012 U.S. Dist. LEXIS 76011, at *39, *42 (government announcements not "corrective disclosure" where they "did not reveal what Plaintiff alleges had been fraudulently omitted, that is, that Capella's success was in fact due to it engaging in aggressive and abusive recruiting and enrollment practices").

Again, each of Plaintiff's alleged corrective disclosures merely repeated information already in the public domain. For example, the *Nation* and *NYT* Articles reported publicly known information regarding the academic performance of several online schools, including K12

---

[22] Similarly, it is implausible that the disclosure of high teacher-student ratios, a few unqualified teachers, or one school's non-compliance with special education regulations, even if timely disclosed, "would have made a difference with respect to investors' decisions." *Id.* at *23.

(AC ¶¶ 187, 189), and therefore could not have revealed to the market an "undisclosed truth."[23]

Likewise, Mr. Packard's statement on November 16, 2011 that K12 "track[s] churn immensely,"

AC ¶ 185, did not correct any prior statements by Mr. Packard or K12 regarding whether (or how

closely) K12 tracked "churn."  Despite its extensive quoting of the *Nation* and *NYT* Articles, and

selective quoting of Mr. Packard at the November 16 conference, Plaintiff cannot identify a

single fact "publicly revealed for the first time," and none that were both material to investors

and responsible for a drop in K12's share price.  The absence of any corrective disclosure leads

to only one inference—that disclosure of the undisclosed "truth" did not cause investors' loss.[24]

## CONCLUSION

Defendants respectfully request that the Court dismiss the AC with prejudice.[25]

---

[23] Information reported in these articles was negative as to multiple virtual schools; disclosure of industry-specific events are insufficient to show loss causation.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005); *Capella*, 2012 U.S. Dist. LEXIS 76011, at *42-43 (rejecting purported corrective disclosures that "concerned the for-profit educational industry as a whole").

[24] Plaintiff attempts to repackage its omission claims as "scheme liability" under Rule 10b-5(a) and (c), but because Plaintiff has "not allege[d] any facts that are separate from those already alleged in [its] Rule 10b-5(b) omission claims," this claim too fails.  *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057-58 (9th Cir. 2011); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177-78 (2d Cir. 2005) (affirming dismissal of scheme liability claims "where the sole basis … is alleged misrepresentations or omissions"); *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) ("a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)").

[25] Because Plaintiff has not established a primary Section 10(b) violation, the Section 20(a) claim for control person liability must also fail.  *Cozzarelli v. Inspire Pharms. Inc.*, 549 U.S. 618, 628 (4th Cir. 2008).  Finally, no amendment could cure the AC's defects, such as the utter failure plead falsity or scienter.  *Pub. Emps.' Ret. Ass'n of Colo.*, 551 F.3d at 316 (affirming denial of leave to amend where "no version of the facts creates a strong inference that … defendants had the scienter required" for a § 10(b) claim).

Date:   July 20, 2012

Respectfully submitted,

LATHAM & WATKINS LLP

By: /s/ Michele E. Rose

Michele E. Rose (VSB# 45001)
Kevin H. Metz (*pro hac vice*)
Sarah A. Greenfield (*pro hac vice*)
555 Eleventh Street NW
Suite 1000
Washington, DC  20004-1304
Telephone: (202) 637-2200
Fax: (202) 637-2201
Email: michele.rose@lw.com
Email: kevin.metz@lw.com
Email: sarah.greenfield@lw.com

*Attorneys for Defendants K12 Inc., Ronald J.*
*Packard and Harry T. Hawks*