UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

DAVID HOPPAUGH,                    )
Individually and On Behalf         )
of All Others Similarly            )  Case No. 1:12-cv-103
Situated,                          )  Alexandria, Virginia
                                   )
          Plaintiff,               )  November 30, 2012
                                   )  11:17 a.m.
          v.                       )
                                   )
K12, INC., et al.,                 )
                                   )
          Defendants.              )

_____

TRANSCRIPT OF HEARING

BEFORE THE HONORABLE IVAN D. DAVIS

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:     Jonathan Gardner, Esq.
                       Angelina Nguyen, Esq.
                       Aaron Book, Esq.
                       James Holt, Esq.

For the Defendants:    Kevin Metz, Esq.
                       Michele Rose, Esq.
                       Timilin Sanders, Esq.

1           P R O C E E D I N G S

2                THE CLERK:  *Hoppaugh v. K12, Inc., et al.*  Case

3      No. 12-cv-103.

4                Parties please identify yourself for the record.

5                MR. BOOK:  Good morning, Your Honor.  Aaron Book on

6      behalf of the plaintiff.  We have some *pro hac* attorneys who

7      have been admitted in this case.  They'll introduce themselves.

8                THE COURT:  All right.  Good morning.

9                MR. GARDNER:  Good morning, Your Honor.  Jonathan

10     Gardener with Labaton Sucharow for the plaintiffs.  I'll be

11     arguing on behalf of the plaintiffs.

12               I have Angelina Nguyen with me, who is also with

13     Labaton.

14               THE COURT:  Good morning.

15               MR. HOLT:  James Holt with Webster Book, the local

16     counsel, Your Honor.

17               THE COURT:  Good morning.

18               MR. METZ:  Good morning, Your Honor.  Kevin Metz of

19     Latham & Watkins on behalf of the defendants.

20               With me are my partner, Michele Rose, and my colleague,

21     Timilin Sanders.  I'll be arguing on behalf of the defendants.

22               THE COURT:  Good morning.  This matter is before the

23     Court on the plaintiff's motion to compel the production of

24     certain documents from the defendants.  The Court has had an

25     opportunity to review the motion, the memorandum in support of

1    the motion, the opposition to said motion, and the required to

2    said opposition.

3            Is there anything the plaintiffs would like to add to

4    their motion at this time?

5            MR. GARDNER:  Good morning, Your Honor.  Jonathan

6    Gardner again for the plaintiffs.  I think the motion papers are

7    fairly extensive in this for a motion to compel.

8            THE COURT:  The Court would agree.

9            MR. GARDNER:  I think there are two issues that arise

10   in our motion, and I would like to address them one at a time

11   and answer any questions that Your Honor might have that emanate

12   from the papers, but it's a fairly straightforward motion.

13           There are two issues.  One is what the relevant time

14   period will be for purposes of defendants' production.  There

15   are two issues that arise from that.  One is documents that

16   predate the class period and documents that postdate the class

17   period.

18           Our position is fairly --

19           THE COURT:  Actually, that's not the real issue.  I

20   think both parties agree that some period of time before the

21   class period and some period of time after the class period may

22   be appropriate.  What we disagree about is what the length of

23   that time period should be.

24           MR. GARDNER:  That's a fair summary, Your Honor.

25           THE COURT:  So why is your length better than theirs?

1          MR. GARDNER:  Well, our length actually is -- we

2     initiated it as a compromise.  I think that we would be entitled

3     to go back just addressing first the pre-class period.  The

4     first false and misleading statement in this case is the -- is

5     the 10K that was issued on September 14th of 2009.  That 10K

6     reports enrollment and revenue information from the previous

7     fiscal year.  That fiscal year runs from July 1st of 2008,

8     through June 30th of 2009.

9          I think it would be -- I think, from a plaintiff's

10    perspective, we would be entitled to documents all the way back

11    to June 1st of 2008.  That is the first date that is relevant in

12    the case because it's the first date from which information is

13    gathered and generated that relates to the revenues and

14    enrollment numbers that are incorporated in the defendants'

15    first statement.

16         Instead of going back all the way to June 1st of 2008,

17    our document request started in January 1st of 2009.  So I would

18    submit, Your Honor, that our -- we were cognizant of trying to

19    be reasonable from the get-go, and starting in January of 2009

20    is reasonable because documents from that time frame are

21    relevant to our allegations.  They're relevant to establish --

22         THE COURT:  Well, we don't know that yet.

23         MR. GARDNER:  Well, they certainly are reasonable

24    calculated to lead to the discovery of admissible evidence, and

25    the reason they're relevant is because they prove two things.

1    Their papers, I think, generally address one, but they don't

2    really address the second issue at all.

3         Their papers are geared towards establishing that these

4    documents can't establish scienter of the individual defendants

5    because you can only establish scienter through documents that

6    were in existence during the class period.  We take issue with

7    that because these documents, as I indicated, establish the

8    truth and falsity of statements that were made during the class

9    period; i.e., the statements in the 10K.

10        The 10K -- just take a step back.  The 10K reports

11   revenues and it reports enrollments for the calendar year

12   starting in July of 2008 or the fiscal year starting in 2008.

13        THE COURT:  The Court gets your --

14        MR. GARDNER:  To show the --

15        THE COURT:  The Court gets your point in regards to

16   documents prior to the class period.  Now, let's move on to

17   after the class period.

18        What do you mean by up to the date of production?

19        MR. GARDNER:  Well, we've compromised -- we established

20   and in our back and forth we had suggested a specific ending

21   date.  The point is that certainly they have to produce

22   document -- what we meant was you produce documents that you're

23   aware of up until the date you produce the documents.  And in

24   the course of this discovery through the end of their -- through

25   the end of discovery, they have an obligation to supplement

 1    their production if they come into possession of additional

 2    documents or they discover additional documents that are

 3    responsive.  So that was the intent of that phrase.

 4         But in the back and forth, we proposed, I think, a

 5    cutoff date of July of 2012 just to give them some comfort there

 6    that there would be an end date.  Frankly, that was an arbitrary

 7    date in an effort to try to reach a compromise short of making

 8    this motion.

 9         But the relevance of those documents and the

10    specific -- you know, it's not every document that we're looking

11    for --

12         THE COURT:  Doesn't the Court have to -- and you hit

13    the nail on the head.  You picked an arbitrary date.  Why is

14    that arbitrary date a good date?  How do the courts say an

15    arbitrary date of January 1, 2012, would not be a good arbitrary

16    date since we're talking arbitrary dates?  Because based on your

17    theory, the Court could require them to produce documents up

18    until the date trial began because somebody could be discussing,

19    oh, man, we really screwed up, we lied on that 10K, up until the

20    date of trial.

21         MR. GARDNER:  That's true.

22         THE COURT:  That's not going to happen.

23         MR. GARDNER:  I don't think -- well, I understand --

24    you're asking two things.  One is -- one is what's relevant to

25    our case.

1          THE COURT:  None of us knows what's relevant right now.

2          MR. GARDNER:  And two what is a practical --

3          THE COURT:  The Court is talking.  No one knows what is

4    relevant right now.  That's why you're seeking the documents.

5    You're seeking the documents to determine whether there's

6    anything relevant in them.  No one has proof that the documents

7    are relevant at this point in time.  Let's be clear about that.

8    And the only entity that can make relevant determinations is

9    this Court, not the plaintiffs, not plaintiff's counsel, not

10   defendants and not defendants' counsel.  You may proceed.

11         MR. GARDNER:  Fair enough.  I would simply say, Your

12   Honor, when it comes to the post-class period cutoff date, there

13   is no -- there is no specific date to cut it off other than an

14   arbitrary date.  There is -- there's nothing in the complaint or

15   the allegations that make a particular date any more reasonable

16   or unreasonable than any other date.

17         THE COURT:  But you're arguing that their date is

18   unreasonable.

19         MR. GARDNER:  Well, they've -- that's true because it

20   is so close to the end of the class period.  I think it would be

21   helpful if I explained what it is we think exists past the end

22   of the class period that would provide relevant and admissible

23   evidence in the case, if I might.

24         THE COURT:  If you can explain, when you explain it,

25   from where you get that belief, because if you're just

speculating, the Court doesn't really need to hear it.  If you

have some basis for that belief, then the Court will hear it.

MR. GARDNER:  Okay.  There is, and it's in the papers.

We cite in our papers, and it comes right from the complaint,

three specific examples of documents that postdate the class

period that have information in them that's relevant to our case

from our perspective.

First is in paragraph 88 of the complaint.  We cite a

letter from February 13, 2012.  That's after the end of the

class period by a number of -- by three months.

THE COURT:  Okay.  But that's not July 2012.  So let's

move on to the next one.

MR. GARDNER:  Okay.  The -- well, let me skip to the

third one because that's the furthest one out.

THE COURT:  Okay.

MR. GARDNER:  September 11, 2012, and this is cited --

actually, it's not cited in the complaint because I think it's

something that we learned after the filing of the complaint.

But there was an investigation in Florida of one of K12's

virtual academies in Florida.  There was a report generated, I

think it involved the Seminole County Virtual School, and events

that took place in that that we believe are relevant and germane

to our case.

There were documents that came out, specifically

e-mails, from that school between K12 administrators and a

1  teacher that established that in that particular school, the

2  teacher had been asked to sign off on student rolls for students

3  that she didn't teach because they needed teachers who were

4  qualified in a particular class to have taught it.  They asked

5  her to sign off on it even though she didn't teach those

6  students.  She refused to do that because she didn't think it

7  was appropriate.  And --

8         THE COURT:  And how does that go to prove that the

9  statements made in a 10K in September 2009 were false and either

10 the defendants knew they were false or had reckless disregard

11 for their falsity?

12        MR. GARDNER:  Well, that particular statement

13 addresses, not the revenue or enrollment directly, but it

14 addresses statements they made during the class period

15 addressing teacher quality and that teachers --

16        THE COURT:  Well, they made a lot of statements during

17 the class period.  The Court didn't see anything in regards to

18 teacher quality.  You're talking about falsity in a statement

19 because there were bad enrollments, there was other -- guidance

20 policies, there were lax grading, all of those types of things.

21 I didn't see anything about teacher quality.

22        MR. GARDNER:  Well, there -- I believe there are false

23 statements regarding -- that K12 made certain statements about

24 how they -- how they go about selecting and employing teachers

25 at their schools.

1    THE COURT:  And they could have went about using those

2  policies to employ that teacher and still ended up with a bad

3  teacher.

4    MR. GARDNER:  That's --

5    THE COURT:  So teacher quality still isn't relevant.

6  It's what they -- what would be relevant is communications about

7  whether or not they followed their proper procedures in

8  employing that teacher, not the quality of that teacher.

9    MR. GARDNER:  Well, I think that that -- I think both

10  of those issues are relevant in this case.

11    THE COURT:  Well, the Court would disagree.

12    MR. GARDNER:  Understood.  You know, just to make the

13  point.  Whether the teacher is qualified or not goes to not only

14  scienter but to falsity.  If the issue is whether or not their

15  statement that our teachers are qualified is true or false, the

16  fact that there's a teacher who was being asked to sign off on

17  rolls for classes that she didn't teach because she was the only

18  one who had been qualified, I think that directly addresses the

19  issue of falsity of that particular statement.

20    THE COURT:  That the teacher is not qualified?  Does

21  this falsity say she's qualified to do -- we're saying she's

22  qualified to do a job that she says she's not qualified to do?

23  Because if it says she's qualified, she may be completely

24  qualified to do the job that -- to teach the classes that they

25  tell her to teach.  Signing off on a roll doesn't mean she's

1  not -- or a class that she doesn't teach doesn't mean she's not

2  qualified to teach the class that she does teach.

3          MR. GARDNER:  That's true, but it does imply --

4          THE COURT:  Which makes the statement not false.

5          MR. GARDNER:  But what it doesn't -- well, it does

6  imply that the teacher did teach the class, that this particular

7  individual was asked to sign for, was not qualified to teach

8  that class.  Otherwise --

9          THE COURT:  The Court doesn't find that implication at

10  all.  It could just mean that teacher was sick that day and they

11  needed to be signed that day so they found someone else.

12          MR. GARDNER:  Well --

13          THE COURT:  And that's speculation.  That's when we get

14  into fishing expeditions when you're talking about, well, we

15  believe that implies this.  You have to have a little more than

16  that to get information in discovery, at least from this Court.

17          MR. GARDNER:  This is the subject of an investigation

18  in Florida currently that is ongoing.  And I know that the clear

19  implication of a lot of the commentary and articles that have

20  come out regarding it have been surrounding whether these

21  teachers --

22          THE COURT:  This Court is not going to

23  make discovery --

24          MR. GARDNER:  -- are qualified or not.

25          THE COURT:  This Court is not in the habit of making

discovery decisions based on articles and news media and the such.

MR. GARDNER: Well, I did -- if you're -- I do have copies of the particular e-mails at question that came out from the investigation of the Seminole County Virtual School, one of K12's schools. If Your Honor would like to take a look at them, I have them with me. I can hand them up to give you a little bit more of the context of --

THE COURT: So now you want the Court to do an *in camera* review of every document that you want to request from them so I can make a relevance determination? That's not going to happen.

MR. GARDNER: No, not every -- this would be the only one. And it goes to directly to this particular example of post-class period events and documents or documents that postdate the class period that relate to events during the class period.

THE COURT: And if you found another document dated November 29, 2012, then am I supposed to extend the period to that date as well?

MR. GARDNER: I think once Your Honor sets the date, that's going to be the date that's going to apply in the case.

THE COURT: I mean, because doesn't the Court have to balance burdens? I mean, because maybe you can say, well, let's set this as an arbitrary date and maybe you'll get -- since

we're into maybes -- maybe you'll get all of the information you
need to prove your case and then we didn't have to burden them.

If you don't get any of the information that you needed
to prove your case and you believe or have a valid basis to
believe that information is out there but it's outside the class
period or outside the date that the Court set, then you can come
back and ask.  You're doing a lot of asking for things up front
that may not be necessary which the Court has to weigh in
determining, not just the relevance, but the likely benefit of
the information you're requesting against the burden it may
apply to the defendants.

I know you've already argued that they haven't really
argued very well the burden.  We'll get to them.  Right now all
we're dealing with is this July 2012 date.  So you've made your
position quite clear.  I'd like to hear their position in
regards to July 2012.

MR. GARDNER:  Okay.

THE COURT:  So why isn't that a good date?

MR. METZ:  Thank you, Your Honor.  Again, I think that
we do lay out the burden of trying to expand the relevant time
period by almost a hundred percent, almost two times the length
of the class period.  Our opening position, frankly, and the one
that we think is actually tethered to the requirements of a
securities fraud lawsuit is that the appropriate period is the
class period.  It is what was said during the class period --

1          THE COURT:  The Court's not going to agree with you on

2     you that.

3          MR. METZ:  I agree.  And --

4          THE COURT:  -- these things that were said before and

5     after that will say what knowledge they had during.

6          MR. METZ:  I agree, Your Honor.  I fully agree.  That

7     was our original position and we quickly said, look, let's

8     compromise.  Our compromised position is you need to have some

9     time before the first statement was made to see what were the

10    defendants thinking, what were they saying before they made the

11    statements that are actually at issue in this complaint.  So we

12    said a month before and a month after.  A month after would

13    actually give you ample time to get the reaction of the

14    defendants to the disclosures and the things that have led to

15    this lawsuit in December of 2011.

16         THE COURT:  So you're saying that these e-mails they

17    have from February 2012, September 2012, and the one that was, I

18    guess, in between that he didn't mention are completely not

19    relevant to their case, because at least one of them are.  Then

20    obviously your period of time before the class period should be

21    expanded and after the class period should be expanded because

22    they've shown that there is relevant documentation outside your

23    period.

24         MR. METZ:  And in our compromise and in our many meet

25    and confers with the plaintiffs, we again compromised and we

said, okay, you want more than a month before so we'll go back

to July 1st.  Why July 1st?  Very good reason.  That was the

first day that the data for the fiscal year ending June 30th of

2009 would have been available to the defendants.  Their fiscal

year, it's a little unusual of a company, their fiscal year

concludes on June 30th.  So on July 1st --

THE COURT:  Just because it's not available to the

defendants under their reckless disregard theory, what if it's

available to people close to the defendants --

MR. METZ:  Well, the issue --

THE COURT:  -- and it was so erroneous or egregious

that they could argue that these other senior management people

would have had to communicate this information to the defendants

and therefore the defendants were in reckless disregard by

trying to just, you know, go, oh, ostrich in the -- the ostrich

head in the sand argument.  That we're just -- you know, we know

it's out there, but we're just going to stick our head in the

sand and we're just not going to try to think about it so we can

avoid any liability in the future.

MR. METZ:  And that's the reason, Your Honor, that we

chose July 1st of 2009 as the -- as a reasonable start date

because that's the day you would have started to put together

the information that led to the annual report in September of

2009.  That's when people would have started to -- the case is

about our statements on enrollment, you know, the annual

1   enrollment numbers, were they false or misleading.  So you don't

2   have an annual enrollment number until the end of year, just

3   like you don't have an annual revenue number until the end of

4   the year.

5          So, yes, it is -- you know, you could go back further

6   and potentially find relevant documents relevant to the

7   statements that they made in September of 2009, but then you

8   have to balance that against the burden.  You could go back to

9   the beginning of time and require production there too, but --

10          THE COURT:  What is the burden?

11          MR. METZ:  The burden, Your Honor, frankly, is

12   collecting, processing, reviewing, and then producing the

13   documents.

14          THE COURT:  I don't know.  How many documents are

15   there?  I mean, you can collect, produce, and process ten

16   documents, there's absolutely no burden at all.  If you have to

17   collect, produce, and process 15 million documents, then the

18   Court might agree with you.

19          MR. METZ:  And to date, Your Honor, we've already

20   produced close to 100,000 pages of documents and will in the

21   coming two weeks be producing hundreds of thousands more

22   documents -- or pages of documents.  I don't know how many exact

23   documents.

24          We looked at just the --

25          THE COURT:  You did all of this in a week?

1          MR. METZ:  I'm sorry?

2          THE COURT:  Because I think they represented in their

3     papers that you had only produced 9000 pages.  Now you say --

4          MR. METZ:  Well, we actually made a large production

5     yesterday, Your Honor.  As Your Honor knows, you've got to come

6     up a pipeline to get documents to production.  You have to do

7     the forensic collection, which we actually started to do when

8     the complaint was filed, but then you have to process all of

9     that data.  You have to then review it.  We've hired 30 contract

10    attorneys to help us review.  We've got several of our own

11    Latham attorneys reviewing documents on a full-time basis.  So

12    we are doing quite a bit.  But you have a -- you know, it's a

13    process of getting the documents from collection all the way

14    through to production.

15         THE COURT:  Let's just cut to the quick.  They picked

16    an arbitrary date.  You picked an arbitrary date.  What if the

17    Court just picks an arbitrary date?

18         MR. METZ:  We don't think our date is arbitrary, Your

19    Honor, and it's because July 1st is the first day that the

20    information would have been available that would have gone into

21    the September 9th statements.  And we think that our ending --

22         THE COURT:  People could have made -- people could have

23    created documents way before they started putting them together

24    for a report.

25         MR. METZ:  They could have.  That's true.

1    THE COURT:  The creation of those documents, what was

2  in the created documents could have then been communicated to

3  other individuals who could have communicated to the defendants

4  so the defendants would have had knowledge way before the

5  report --

6    MR. METZ:  And we've considered that in the papers,

7  Your Honor, that it is possible.  It is at least theoretically

8  possible that a relevant document, that some relevant document

9  might be created or definitely would have been created before

10  July 1st.

11    THE COURT:  It's not theoretically possible.  I mean,

12  it's much more than that.

13    MR. METZ:  It's poss -- it's true.  Your Honor, we

14  agree.

15    THE COURT:  If there was a document that was created

16  that says enrollment in these schools is 250,000 students when

17  the other evidence was clear that it was only 20 students, the

18  creation of that document in all likelihood would have been

19  communicated to some senior management.  Because somebody would

20  have said this is so off base, who in the world created this,

21  and, no, I'm (inaudible) working in a place that lies like this.

22    So, I mean, it's more than theoretically possible.  So

23  what we're really talking about is burden, how long before and

24  after.  I mean, let's just boil it down to it.  Both parties are

25  arguing.  We all agree that some period before and some period

1  after would be appropriate.  All we're arguing about is what

2  that period of time would be.

3          MR. METZ:  And, Your Honor --

4          THE COURT:  -- disagree on that period of time.  And

5  you're not going to change your mind in regard to that time, and

6  either one of you really (inaudible) to convince the Court that

7  your date is the exact right date because the Court doesn't know

8  what documents are out there.  So the Court still has to set a

9  date.

10          MR. METZ:  Your Honor, you're right.  It is more art

11  than science in these discovery processes.  We picked July 1st

12  because -- as a second compromise because we thought that there

13  was a reasonable basis to do so.  We picked a month after the

14  class period ended because we thought that that gave them some

15  cushion so that if there were, you know, comments by the

16  defendants that said, oh, my gosh, that story is totally

17  accurate and totally right that appeared in *The New York Times*,

18  that would capture that.

19          THE COURT:  Why is it just a month?  I mean, if

20  someone -- if there were -- you know, people talk about things

21  for a long time.  I mean, it was on the radio the other day.

22  They're still talking about the death of that Redskins guy from

23  five years ago or whatever.

24          So why is one month not an arbitrary date?

25          MR. METZ:  Your Honor, I think that the key issue here

is what was known and what was said during the class period.
And so if you're not going to take an arbitrary date, then the
actual right time period is September 14th of 2009 --

THE COURT:  Why?

MR. METZ:  -- to the end of the class period.

THE COURT:  Because one defendant could have e-mailed
the other defendant four months after the class period and said,
phew -- before the complaint was filed -- and said, phew, we
really dodged a bullet, nobody found out about it.

When the complaint was filed, one of the defendants
could have e-mailed another defendant and said, oh, my goodness,
they got us, they found out our lie.  And that will be way more
than one month after the class period, would it not?

MR. METZ:  That would be.  And I think it goes, Your
Honor, to the point -- to your point earlier, to the Court's
point earlier, which is that's speculation, and the plaintiffs
are doing a lot of speculating.

THE COURT:  And so are the defendants.  These are all
arb -- let's just admit it.  These are arbitrary dates.  Let's
pick a date that the Court believes is reasonable before and
reasonable after and then let's all go home.

MR. METZ:  I think that's fair.  I think that if you're
not going to pick an arbitrary date, then the date is the class
period.  And I think that's -- I'm just trying to explain why we
picked July 1st through a month after the class period.  And it

1    avoids the speculation of, well, they might have said something

2    ten years ago, they might have said something yesterday or

3    written something yesterday.  It avoids the speculation to,

4    look, what is the class period and what are the elements that

5    they have to prove.  They have to prove their false statement --

6            THE COURT:  If they said they have a document in

7    February of 2012 -- or September 2012 that they believe is

8    relevant to prove the reckless disregard theory, then how is

9    July a good date?  You just disagree with their theory.

10           MR. METZ:  Your Honor, I wasn't aware actually, and

11   maybe I missed this at some point in our conversations, that

12   they have suggested July.  But I will point out on their Florida

13   example that even that e-mail doesn't show anything about the

14   class period.  I don't know that there's an allegation that

15   defendants said something misleading or false about the Florida

16   certification policies or that that e-mail shows that there was

17   any communication about these things with the defendants or with

18   any corporate officer or executive who had any ability to

19   control the statements of the company.  So even their

20   speculation shows that it's irrelevant to --

21           THE COURT:  If the document showed all of that then we

22   might not be here because they have the evidence to prove what

23   they needed to prove and they wouldn't need any more of your

24   documents.  The whole point of discovery is not what is going to

25   be proved.  What will be admissible is what's reasonably

1  calculated to lead to the discovery of admissible evidence.

2  Your whole argument is their approach is not reasonable.  Their

3  argument is our approach is reasonable so it's reasonably

4  calculated to lead to discovery.

5  　　　　MR. METZ:  And we've not had ample opportunity to

6  actually run the numbers since their motion to -- or motion to

7  compel was filed on Friday of Thanksgiving week.  But in just

8  running some of the numbers, I'm just -- like, for instance,

9  one, head of school.  One of the other issues before Your Honor,

10  I think, is whether to expand discovery to all of these local

11  public schools across the country that the defendants -- I'm

12  sorry -- that the plaintiffs want to collect documents from.

13  And they want to collect them from --

14  　　　　THE COURT:  Well, they didn't say all.  They made it

15  clear that there's 62 of them and they're only asking for 28.

16  　　　　MR. METZ:  28, and they're asking for two employees

17  from each which gives you 56.  And we ran --

18  　　　　THE COURT:  We haven't gotten to the employees yet.

19  　　　　MR. METZ:  Right.  And I want to give Your Honor a

20  sense of the magnitude of their requests.  Just to run the

21  search terms that we've been applying, just to run those on one

22  of those 56 employees results in 23,000 documents.  Now, 23,000

23  times 56 -- I can't do the math in my head, but I know it's a

24  whole lot.  So there is --

25  　　　　THE COURT:  This Court has dealt with cases with a

1   whole lot more than that.

2       MR. METZ:  Well, that's just the addition of these 56.

3   That would be, I think, a million and -- if I had a calculator I

4   could tell you, but I think that would be a million and a half

5   documents just for these local school employees.  And the

6   premise of that is that those local school employees have

7   information that the defendants didn't have that they could have

8   had had they gone out and surveyed all the schools, but they're

9   saying that the defendants don't have that information, the

10  corporate executives don't have that information.  I need to go

11  to these local school employees, these 56 local school employees

12  to get that information.

13      What is the connection between these 56 local school

14  employees and the information they have that they have to

15  concede didn't get to the defendants and any claim in the case?

16  And to do that we would be adding, for one custodian that we've

17  been able to run, 23,000 additional documents.

18      THE COURT:  Because their argument is that you're

19  arguing direct knowledge.  They have two theories.  One is

20  direct knowledge and one is essentially reckless disregard.

21  Your argument works very well that says it didn't get to the

22  defendants for purposes of cutting down their direct knowledge

23  argument.  It works less well when you're talking about whether

24  or not they still have the reckless disregard theory.

25      MR. METZ:  Your Honor, with due respect to plaintiff's

counsel, we've been through that argument a number of times in our meet and confers, and that's not at all what we're saying. We're not saying that they have to prove direct knowledge. You don't have to prove that one of the defendants actually knew that the statement was false if you can show that they were severely reckless. But the way you show severely reckless, as this Court knows, is by showing that there was information that was presented to you, available to you in some way in your realm of knowledge that you could have known and you could have looked at it, but you chose --

THE COURT: Available.

MR. METZ: -- to look away.

THE COURT: That's the key word. Available to you.

MR. METZ: Exactly. And that --

THE COURT: So is it your position that these defendants would not have available to them communications by the principals of these schools?

MR. METZ: Your Honor, first of all, the principals of the schools are typically not even K12 employees so we wouldn't be collecting documents from them. What they're asking us to do is to collect documents from other employees who are managing the schools but are K12 employees. But the --

THE COURT: Who are the K12 employees?

MR. METZ: Typically, the head of school as well as a couple of other administrative. So the --

 1          THE COURT:  What's the difference between the head of

 2    the school and a principal?

 3          MR. METZ:  Right.  Exactly, Your Honor.  There is -- at

 4    each of these schools, many of them are organized slightly

 5    differently under state law because they're all kind of

 6    creatures of state law, but each of our K12 managed schools --

 7    and these are not, as the plaintiffs say often, K12 schools.

 8    These are K12 managed schools.  These are local public charter

 9    schools that contract with K12 to provide services, to provide

10    online curriculum and online education services.

11          THE COURT:  I completely understand.  The Court's

12    question is who are these employees they're talking about?

13          MR. METZ:  What they've asked for is a head of school

14    and another K12 employee at each of these 28 schools.  And what

15    they've asked us to do is provide all of the information that

16    these 56 employees would have that they are conceding would not

17    have been information communicated in any way to the defendants.

18          And Your Honor's exactly right, that they can prove

19    severe recklessness, but still, it has to be information that

20    was in some way available to you.

21          THE COURT:  Who's the other employee?  Any employee?

22          MR. METZ:  They've just said another administrator.

23          THE COURT:  Well, that's not any employee.  Another

24    employee could be a teacher, and the Court would completely

25    agree with you that any information in the possession of a

 1  teacher is of much less likelihood that that information would

 2  get to the defendants than something from someone higher up.

 3      MR. METZ:  And what we had proposed, Your Honor, is

 4  that these heads of school are people who report up to regional

 5  vice presidents.  There are five regional vice presidents.

 6  Those regional vice presidents are corporate officials,

 7  sometimes senior vice presidents, who actually do communicate

 8  and do provide information, including enrollment and testing

 9  performance and other things, actually do provide that

10  information to the defendants and to others at the company who

11  have --

12      THE COURT:  So you're willing to concede that at least

13  one employee of the schools, the head person can communicate

14  this information.

15      MR. METZ:  The head of school communicates to the

16  regional vice president.  That's who they report to.  And what

17  we had proposed as a compromise, because they want the school

18  level data, is let's get you information from the regional vice

19  presidents, the people who are the conduits, if you will,

20  between the school and the corporation rather than 28 separate

21  schools and 56 separate employees.  The --

22      THE COURT:  But what if they didn't communicate the

23  information to the regional vice president but every head of

24  school had the exact same information?  If you're saying -- if

25  you're saying -- let's just say 20 schools.  If the head of 20

```
 1   schools was screaming and jumping up and down saying these
 2   enrollment numbers are all impossible, you don't think they
 3   could use that to argue that the defendants were recklessly in
 4   disregard of that information if 20 heads of their schools
 5   they're managing are screaming and hollering because information
 6   is inaccurate?
 7         MR. METZ:  I think that they have to provide some link,
 8   some nexus between the people who can control the statements of
 9   the corporation and the people who have information.
10         If the two worlds are completely isolated, hermetically
11   sealed, if you will, and there's no way that that information
12   from one got to the other, it doesn't matter how loud they
13   yelled, if it's hermetically sealed --
14         THE COURT:  You just provided the connection.  You said
15   that the heads of schools provide the information to the senior
16   management.
17         MR. METZ:  To the regional vice president.
18         THE COURT:  To the regional vice president.
19         MR. METZ:  You're correct.
20         THE COURT:  So information in the possession of the
21   heads of schools could make it into the possession of the
22   defendants because it will make it to the regional vice
23   president.
24         MR. METZ:  And the regional vice presidents are who we
25   are collecting and processing and producing data from.
```

1        THE COURT:  But what if there's information that they

2    didn't provide?  It would still be available to the regional

3    vice president if they did provide it.  We don't know what

4    information they would, they did, or did not, but that could be

5    information that's available to them if the regional -- if the

6    heads of school did their job and reported the information they

7    were supposed to report.  They don't know whether the

8    regional -- I mean, the heads of school did their job or not.

9    That's why they're seeking the documents.

10        MR. METZ:  In a theoretical way, that's right, Your

11    Honor, but it's a little bit like saying that the service

12    manager at a local General Motors lot knows that the brakes are

13    faulty on one model or one car.  Is the CEO of General Motors

14    suppose to have known that just because it's known at one

15    local --

16        THE COURT:  I'm not saying that he knew it.  Once --

17        MR. METZ:  Well, could have known it.

18        THE COURT:  -- to your known.  We're talking about

19    reckless disregard.

20        MR. METZ:  Right.  And there's got to be some way that

21    the defendants could have known it.  It can't just be that

22    they're imputed to have all knowledge of the entire corporation.

23        THE COURT:  If that person was required to report to

24    someone who reports to the defendant, then there's the

25    connection.

           MR. METZ:  Then the reasonable way to collect that
information is to get it from that regional vice president --

           THE COURT:  But we don't know whether or not the
regional vice president will have all the information.  That's
why people always try to get communications from both sides.  So
you say e-mails from these people and e-mails from these people
because these folks may deleted the e-mail and these people may
not have.  So you want both sides of the e-mail because somebody
may have kept it and somebody may not have.

           MR. METZ:  And, Your Honor, the issue here is what are
the corporate statements and whether the corporate statements
are false or misleading.  And that means taking all of the
schools --

           THE COURT:  The Court completely understands the issue.

           MR. METZ:  And it means the full corporation.  If one
person or one school were to say -- or five schools were to say,
well, we're not sure about our enrollment numbers, we're not
sure about our student test scores, that doesn't make the
corporate statements false or misleading.

           THE COURT:  We don't know how many, if any, said it.
That's why they want the documents, because they said it's
reasonably calculated to lead to the discovery of admissible
evidence if we get information from people who are required to
report it to a regional vice president because that information
then would be available to the defendant.

1    MR. METZ:  And what we have produced to the plaintiffs

2  and what we have suggested to them is a reasonable way to get

3  that information is to look at the state audit reports of

4  enrollment, which are done by every state on the schools that

5  they pay for, or look at the corporate information, the weekly

6  enrollment reports that we produced to them that show school by

7  school --

8        THE COURT:  That's information that would have been

9  used to put the report together probably.  So that's used for

10 direct knowledge.  We're talking about reckless disregard.

11 Everything on a report, just because this information

12 (inaudible) on a report doesn't mean that it -- because it

13 didn't get on the report doesn't mean it doesn't exist.

14       MR. METZ:  And, Your Honor, that's true.  I guess they

15 could try and unwind and recalculate all of the enrollment, all

16 of the revenue, all of the test scores for each and every of the

17 50-some-odd K12 managed schools.

18       THE COURT:  Let's just cut to the quick.

19       MR. METZ:  And that's --

20       THE COURT:  This, just like the time period, is the

21 exact same to this Court.  The Court thinks you're limiting the

22 information you want to provide too much so the Court thinks

23 they're asking for too much.

24       MR. METZ:  And we have -- we have also in that way

25 offered a compromise.  We've just gotten into this

1    conversation --

2        THE COURT:  The Court believes that the compromise is

3    too compromising and it believes their response to your

4    compromise is not compromising enough.

5        MR. METZ:  Fair enough.

6        THE COURT:  That where we're at.  So now let's get to

7    what the Court believes is a real compromise.

8        MR. GARDNER:  Can I just add one -- I just want to

9    rejoin a couple of issues for a couple of minutes.

10        THE COURT:  Is it going to change -- are you trying to

11    change the statement the Court just made?

12        MR. GARDNER:  No, but I'm --

13        THE COURT:  Because if you're trying to -- if your

14    comments are going to be to try to convince the Court that your

15    position is correct, you might as well not.  The Court has

16    already said your position is overly broad, their position is

17    too restricted.

18        MR. GARDNER:  It is one comment -- actually, two

19    comments.  One addresses why we've asked for more than just the

20    head of schools, and I just want to point out one particular

21    point that the defendants had made in one of their letters of --

22    where we were trying to work out this issue.  And it was their

23    suggestion, actually, that led us to ask for more than just the

24    head of school for each of the 28 schools we're looking for.  I

25    just would like to point you to a particular part of one of

1    their letters in the case that's in the record, if I might,

2    which is attached as Exhibit 1 to their opposition, which is

3    Mr. Metz' letter to me of November 11th and we're trying to work

4    out a compromise to avoid us subpoenaing these schools.

5            THE COURT:  What does it say?

6            MR. GARDNER:  It says K12 would meet -- and I'm

7    quoting -- K12 would meet this obligation by collecting

8    documents from the, quote, heads of schools, end quote, from

9    those selected schools, which we never agreed to, who are K12

10   employees and are on our direct communications with the schools,

11   as well as from other K12 employees as directed by the heads of

12   school.

13           So they were proposing collecting documents from more

14   than just the heads of school because they recognized that the

15   heads of schools themselves would not have all of the

16   information relevant to our claims, and they had recognized the

17   fact that there was additional administrative K12 employees at

18   the school level that would be appropriate, at least they

19   conceded that in this particular piece of correspondence.

20           THE COURT:  I can guarantee you if he stands up, he's

21   going to say that's not what we meant.  I can guarantee you

22   that.

23           MR. GARDNER:  I'm not going to take -- I'm not going to

24   take a bet with Your Honor.

25           The other point, and it's just a quick point, is

1  everything that he just argued is addressed as scienter.  It

2  misses the entire point of falsity.  We have to prove scienter

3  whether we do that through reckless disregard or direct

4  knowledge.  That was the entire conversation that counsel just

5  made or argument that counsel just made.

6      We also are entitled or obligated to prove the falsity

7  of the statements.  Whether or not the defendants knew they were

8  false is scienter.  The fact that they were false is something

9  else that we have to prove.  We can prove scienter through

10 reckless disregard, direct knowledge, as well as --

11     THE COURT:  And isn't --

12     MR. GARDNER:  -- as well as motive and opportunity in

13 other ways.

14     THE COURT:  Is it not the obligation of the heads of

15 the schools to ensure that the information that they relay in

16 regards to attendance, enrollment, and all of that is accurate?

17     MR. GARDNER:  I don't know.  I haven't taken a

18 deposition of the heads of school, but --

19     THE COURT:  No.  This is a basic --

20     MR. GARDNER:  -- I presume --

21     THE COURT:  -- question.  You went to school.  You went

22 to elementary school and junior high and high school.  What was

23 your understanding of what the principal's job was?

24     MR. GARDNER:  I presume that Your Honor stated it

25 correctly.  I don't have any -- I don't have any reason to

dispute that, but it is broader than just the enrollment numbers
themselves.  Our complaint alleges that they manipulated those
information by their lax school policy.  So if every --

THE COURT:  And isn't it the job of the head of the
school to understand what the school policy was and to determine
whether or not that policy is being followed?

MR. GARDNER:  I would agree with that, but if --

THE COURT:  Then all of the information will be in
possession of the heads of school, right?  So why do you need
another employee?

MR. GARDNER:  Well, because I think that there is -- it
is likely or possible that, you know, that they had a --

THE COURT:  That possible and likely.  There we go with
the fishing expedition.

MR. GARDNER:  No.  I think what -- you know, I think
it's reasonable to presume that with respect to a grading
policy, in particular, that they might have a particular grading
policy, but they also have instructions that the heads of school
might not necessarily have been on e-mail chains but other
administrators would have saying, you know --

THE COURT:  Who would be instructing a teacher to
change policy, to change grades or whatever, if it's not the
principal?

MR. GARDNER:  I think --

THE COURT:  Another teacher?

1          MR. GARDNER:  I don't know what the heads of school

2    versus the other administrators' responsibilities are yet.  We

3    haven't taken a deposition of those folks.

4          THE COURT:  Well, the heads of school's responsibility

5    is for the entire school.

6          MR. GARDNER:  Well, they've already said that there's

7    heads of schools and then there's principals and then there's

8    these administrators.  I think that --

9          THE COURT:  We are clear that the head of the school's

10   job description would include to ensure that this school runs

11   pursuant to management policy.  I don't need to read the head of

12   school's job description to know that's probably in it.

13         MR. GARDNER:  I have no basis to dispute that or to

14   question it at this point.

15         THE COURT:  What was the class period anyway?

16         MR. GARDNER:  The class period is September 9th of 2009

17   through December 16th of 2011.  That was the original class

18   period.

19         MR. METZ:  September 9th.  I'm sorry.

20         MR. GARDNER:  September 9th of 2009 through --

21         MR. METZ:  Through December 16th.

22         MR. GARDNER:  Of 2011?

23         MR. METZ:  I believe that's right.

24         And, Your Honor, if I could correct just one factual

25   point on the head of school.  The head of school actually are

1   not in charge of enrollment.  Enrollment is handled through the

2   corporate office.  So if their concern is getting accurate

3   enrollment data, enrollment is actually, as they'll find out in

4   the 30(b)(6) depositions week, is actually a corporate function.

5   It's not a head of school function.

6        THE COURT:  And you're not fighting giving him

7   corporate information, right?

8        MR. METZ:  No.  We've already produced enrollment

9   reports from the corporate office as well as 30(b)(6).

10        THE COURT:  That's one piece.  That's enrollment.

11        MR. METZ:  Correct.

12        THE COURT:  They have a lot of other things they're

13   alleging besides falsity in regards to enrollment which the head

14   of schools probably would be in charge of.

15        All right.  So this is what the Court's going to do.

16   It's going to grant the motion in part and deny it in part.

17   It's going to give information until -- from April --

18        When was the period you wanted?  From '09?

19        MR. GARDNER:  We started in January 1st, Your Honor.

20        THE COURT:  April 1, '09.  And what period did you end?

21        MR. METZ:  Your Honor, a month after the end of the

22   class period.  January 16th.

23        THE COURT:  April '09 to April 12th.  You're going to

24   get documents to and from the defendants' senior management of

25   K12, the principal of 25 schools, which reference -- and those

1    communications must reference high withdrawals, low retention

2    rates, lax grading and attendance policies, and poor academic

3    performance.  That's what you put in your complaint.

4         MS. ROSE:  Your Honor, when you say principal, do you

5    mean head of school?

6         THE COURT:  Head of school.

7         MS. ROSE:  Okay.  Thank you.

8         MR. METZ:  How many and which ones, Your Honor?  Heads

9    of school?

10        THE COURT:  25.  The Court's not going to get involved

11   in which ones.  I would hope that the parties can resolve that

12   amongst themselves.  That's 40 percent of K12 managed schools.

13        MR. GARDNER:  Your Honor, do the plaintiffs identify

14   the schools that we would like them to produce that for or

15   (inaudible) something else?  As far as identifying the 25

16   schools, I would ask that we be entitled to pick the schools.

17        There are certain ones that are -- certainly we have

18   information for those that are mentioned in the complaint.

19   There's some others, given their size, that we think would be

20   more appropriate.  Certainly ones that existed during the class

21   period --

22        THE COURT:  There should be a lot more documents from a

23   big school than a little school.

24        MR. GARDNER:  That's the thought process.  So we would

25   like to be entitled to pick the 25 schools at issue.

1          MS. ROSE:  I think our parameter would be that it be a

2     K12 managed school during the class period.  I note today there

3     was much discussion about a K managed 12 school that didn't even

4     exist during the class period.  Plaintiffs are off in

5     speculation land, and so that would be the one input we would

6     like to provide.  The Florida, for example --

7          THE COURT:  That appears to be reasonable.  If a school

8     didn't exist during the class period --

9          MS. ROSE:  As a managed school.

10         MR. METZ:  As a managed school.

11         MS. ROSE:  K12 didn't manage that school.

12         THE COURT:  I mean, as a K12 managed school.  How could

13    the defendants --

14         MS. ROSE:  Right.

15         THE COURT:  -- get any knowledge about that?

16         MS. ROSE:  Agreed.  But we spent a fair amount of time

17    today, the plaintiff did and Your Honor did, talking about a

18    school down in Florida that was not managed by K12 during the

19    class period.  So I just want that to be really clear and a good

20    example of kind of the world of speculation that seems to be

21    working here.

22         THE COURT:  Your cocounsel probably should have

23    mentioned that during his argument and then we could have cut

24    off that entire discussion.

25         MR. METZ:  I mean, I can address that, but I don't --

1  if you'd like me to.

2         THE COURT:  The Court said it believed that is

3  reasonable.  You would like to address that now?  You're going

4  to say you think it's unreasonable?

5         MR. METZ:  No, no.  25 is reasonable and --

6         THE COURT:  No.  Of K12 school -- of K12 managed

7  schools during the class period.

8         MR. METZ:  Yes.

9         THE COURT:  You have the right to pick those.

10        MR. METZ:  I think that's reasonable.  Thank you.

11        THE COURT:  Anything further in this matter?

12        There being nothing further, this Court stands

13  adjourned.

14     * * *

15     (Proceedings concluded at 12:03 p.m.)

16

17

18

19

20

21

22

23

24

25

1

2
## CERTIFICATION

3

4          I hereby, this 4th day of December 2012, that the

5     foregoing is a correct transcript from the recording provided by

6     the court.  Any errors or omissions are due to the inability of

7     the undersigned to hear or understand said recording.

8

9                              /s/
                    _____
10                      Tracy Westfall, RPR, CMRS, CCR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25